**NO. 04-01140C**
**(J. SWEENEY)**

---

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

---

WEST BAY BUILDERS, INC.

Plaintiff,

v.

The United States,

Defendant.

---

# PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

---

Timothy L. McInerney
McInerney & Dillon PC
1999 Harrison Street
Oakland, CA 94612
(510) 465-7100
(510) 465-8556

Attorneys for Plaintiff

Dated: September 7, 2007

# TABLE OF CONTENTS


I. Statement of the Issue Involved....................1

II. Statement of Facts....................1

III Statement of the Case....................8

A. Plain meaning of section 09800 does not require the contractor to apply moisture sealant to the entire floor area....................9

B. Section 09800, when interpreted in such a way to give meaning to all of its parts, addendums, and amendments, does not require the contractor to apply moisture sealant to the entire floor area....................10

C. The patent ambiguity rule provides no defense to the VA....................13

D. Conduct of the parties indicate that West Bay was not required to apply moisture sealant....................15

IV. ARGUMENT....................16

A. Summary Judgment Standard....................16

B. Plain meaning of section 09800 does not require the contractor to apply moisture sealant to the entire floor area....................17

C. Section 09800 should be interpreted in such a way to give meaning to all of its parts, addendums....................19

D. The Patent ambiguity rule provides no defense to the government....................22

E. Where ambiguity exists in a contract, the construction placed on it by the parties in their dealings and by their conduct will furnish a court with persuasive evidence of their meaning....................25

V. CONCLUSION....................28

## TABLE OF AUTHORITIES

### CASES


All Power, Inc. v. United States,
60 Fed.Cl.679 (2004) ....................19

Arizona v. United States,
216 Ct.Cl. 221 (1978) ....................20

Celotex Corp. v. Catrett,
477 U.S. 317 (1986) ....................17

Cloutier v. United States,
19 CL. Ct. 326 (1990) ....................17

C. Sanchez and Son, Inc. v. United States,
6 F.3d 1539 (Fed. Cir. 1993) ....................17, 18

Forman v. United States,
329 F.3d 837 (Fed. Cir. 2003) ....................17

Floyd v. Ring Constr. Corp.,
165 F2d 125 (8th Cir, 1948) ....................15, 25

Frys Communications, Inc. v. United States,
22 Cl. Ct. 497 (1991) ....................22, 25

Grumman Data Systems Corp v. Dalton,
88 F.3d 990, 997 (Fed. Cir. 1996) ....................22, 25

L. Rosenman Corp. v. United States,
182 Ct. Cl. 586, 390 F.2d. 711(1968). ....................22

Matsuchita Elec. Indus. Co. v. Zenith Radio Corp.,
475 U.S. 574 (1986)....................16

Metcalf Const. Co., Inc. v. United States,
53 Fed.Cl. 617 (2002) ....................13, 22, 25

Monarch Painting Corp. v. United States,
16 Cl.Ct. 280(1989). ....................17

Moran v. Prather,
90 U.S. 492 (1874) .......... 17

Overstreet Elec. Co., Inc. v. United States,
59 Fed. Cl. 99 (2003). .......... 22

Randa/Madison Joint Venture III v. Dahlberg,
239 F.3d 1264 (Fed. Cir. 2001) .......... 19

Record Steel and Cont., Inc. v. United States,
62 Fed. Cl. 508 (2004) .......... 14, 22, 25

Shultz & Lindsay Constr. Co. v. State
494 P.2d 612 (1972). .......... 28

Smelser v. United States
62 Fed. Cl. 768 (2004) .......... 16

Travelers Casualty and Surety of America v. the United States,
74 Fed. Cl. 75 (2006) .......... 9, 10, 17

Triax Pacific, Inc. v. West,
130 F.3d 1469 (Fed. Cir. 1997) .......... 22

**STATUTE**

41 U.S.C. §611 .......... 28

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| WEST BAY BUILDERS, INC.,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITIED STATES,<br><br>Defendant, | No. 04-1140C<br>(Judge M. Sweeney) |

**MEMORANDUM IN SUPPORT OF**

**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Pursuant to Rule 56 of the Rules of the Court of Federal Claims ("RCFC"), Plaintiff West Bay Builders, Inc., ("West Bay") moves for summary judgment, because there is no genuine issue of material fact and it is entitled to judgment as a matter of law. West Bay also submits the accompanying Proposed Finding of Uncontroverted Facts ("PFUF") pursuant to RCFC 56(h)(1), and Kurtis Vierra's Declaration in Support of Plaintiff's Summary Judgment pursuant to RCFC 56(e).

## I. STATEMENT OF THE ISSUE INVOLVED

This case presents only one issue: Whether West Bay is entitled to compensation for the application of concrete moisture sealant as directed by the government?

## II. STATEMENT OF FACTS

This dispute arises out of a public work of improvement known as the Renovation of Interior Finish of Building 90 of the Veterans Affairs Palo Alto Health Care System, Livermore Division (the "Project") between the VA Northern California Health Care System ("the VA") and West Bay, a general contractor. PFUF ¶1.

On November 11, 2001, the VA entered into a contract with West Bay, for the construction of the Project for $1,267,000. PFUF ¶1; Declaration of Kurtis Vierra in Support of Motion for Summary Judgment ("Vierra Decl.") ¶3. The work consisted of general construction, selected demolition, alterations, mechanical and electrical work, utility systems, necessary removal of existing asbestos, and other items to a multistory building with residential units, offices, kitchen and medical facilities. PFUF ¶¶ 1 and 2; Vierra Decl. ¶3. Kurtis A. Vierra was West Bay's project manager. PFUF ¶ 7; Vierra Decl. ¶ 7. Melvin P. Koening was the Contracting Officer on behalf of the VA. PFUF ¶ 7; Vierra Decl. p 7.

Section 09800 of the Contract Specifications, entitled "Special Coatings: Floor Concrete Moisture Sealant," governs the application of floor concrete moisture sealant. Exhibit B to Vierra Decl. Section 09800 gives specific instructions to contractor on whether to apply floor sealant, the type of testing required to determine if sealant is required, and the type of sealant to be used, if necessary. Exhibit B to Vierra Decl. Paragraph 1.02A states:

> "1.02 System Description
>
> The system shall consist of treatments designed to control alkalinity, and to reduce vapor emission to specified, measurable, compliance levels.
>
> A. The system shall reduce emission levels to within 3. lbs, and should be installed in all cases <u>where the starting calculation is 15.0 lbs or more</u> (Emphasis Added)."

PFUF ¶3; Exhibit B to Vierra Decl. Paragraph 1.06 of Section 09800 referenced the requirement of testing and the measurement of emission level prior to sealant application:

\\\

\\\

> "1.06 Quantification Testing
>
> A. Testing shall be conducted with calcium chloride test kits using the following test schedule: Minimum of 3 kits for up to one thousand square feet; and an additional test kit for each ensuing thousand square feet or portion thereof. Kits shall be placed in either a rectangular or cross-diagonal pattern. Procedures must be in strict accordance with ASTM S 1869-98."

PFUF ¶ 17; Exhibit B to Vierra Decl. Paragraph 2.02 A also referenced the requirement of testing and the measurement of emission level prior to sealant application:

> "2.02 Preparation
>
> A. The extent of moisture vapor emission levels shall be determined by the use of prepackaged calcium chloride dome test kits, administered by independent laboratory or competent contractor or inspector. Tests will not be conducted by system manufacturer, it's affiliates or agents. Results of tests must be expressed in pounds of moisture vapor emitted per 24 hours in a 1,000 square foot area. In addition, measurements must be taken in the anticipated service environment. Since this testing requires 60 to 72 hours, such time must be planned into the schedule."

PFUF ¶ 18; Exhibit B to Vierra Decl. Paragraph 1.02A unambiguously states that unless the "starting calculation," which is measured by the testing requirement stated under Paragraph 1.06 and Paragraph 2.02A, is 15 lbs or more, West Bay is not required to apply concrete moisture sealant.

Pursuant to the testing requirements under Paragraphs 1.06 and 2.02A, West Bay performed calcium chloride tests on the floor area of the Project to determine whether the emission level was "15 lbs or more" and whether any concrete moisture sealant needed to be applied. PFUF ¶ 4; Vierra Decl. ¶¶5 and 6. On April 22, 2002, test results administered by West Bay showed that the emission level at 7.52 pounds and 4.58 pounds, which are well under the

threshold. PFUF ¶4; Vierra Decl. ¶¶ 5 and 6; Exhibit C to Vierra Decl. Floor Seal Technologies also administered four additional tests on behalf of West Bay the same month, and the tests indicated emission levels of 8.0, 9.8, 8.0, and 9.3 pounds, respectively. PFUF ¶6; Vierra Decl. ¶7; Exhibit D to Vierra Decl. Based on these test results, Mr. Vierra wrote a letter dated April 30, 2002, to the VA that the sealant system outlined in section 09800 is not required, and that West Bay would not apply the floor concrete moisture sealant to the entire floor area. PFUF ¶7; Vierra Decl.¶10; Exhibit E to Vierra Decl.

In addition to the moisture tests administered by West Bay, multiple moisture tests were also performed by the VA prior to bid: The test results were not provided to West Bay prior to bid. PFUF ¶5; Vierra Decl. ¶9; Exhibit D to Vierra Decl. The pre-bid moisture tests were also administered by Floor Seal Technologies, a consultant to the VA at the time. PFUF ¶ 5; Vierra Decl. ¶9. The five tests administered in July of 1999, by Floor Seal Technologies, indicated emission levels of 12.1, 2.7, 14.4, 9.8, and 7.8 pounds, respectively. PFUF ¶5; Vierra Decl. ¶9; Exhibit D to Vierra Decl. None of the moisture tests exceeded the 15 pound threshold stated in the contract.

Despite the fact that none of the moisture tests administered on the Project exceeded the 15 pound threshold, the VA, through Mr. Koenig, issued formal written directives to West Bay on May 2, 2002, and again on May 9, 2002, to install the moisture sealant. PFUF ¶¶8 and 19; Vierra Decl. ¶¶11 and 18; Exhibit F and K to Vierra Decl. The VA directed West Bay to seal the entire floor area of the Project at no additional cost to the VA. PFUF ¶8, Vierra Decl. ¶11; Exhibit F to Vierra Decl.

On May 2, 2002, the VA's formal directive to West Bay outlined three arguments in support of its position that installation of the sealant was part of the

original scope of the contract. First, the VA referenced a technical opinion from one of the VA's employee, Mr. Armando Binsol. In his electronic mail, Mr. Binsol's stated that:

> "[t]he moisture test for the work required cannot be based on 'current' test result conducted by the contractor on 4/22/02. The bid package was completed in September, 1999 and specification 09800 was prepared and bidded by contractors based on test result conducted by an independent test laboratory in 1999."

PFUF 9; Vierra Decl. ¶¶11 and 12; Exhibit F to Vierra Decl. Mr. Binsol then directed West Bay to apply the test result conducted by Floor Seal Technologies in July of 1999 at 14.4 pounds "at no additional cost to the VA." PFUF 9; Vierra Decl. ¶¶11 and 12; Exhibit F to Vierra Decl.

Second, Mr. Koenig's letter pointed out that Amendment #4 to the VA's solicitation for the Project modified the contract specifications, Paragraph 3.01 (E) of Section 09800 to read:

> Based upon the results of the test data as described in section 1.03 (B), determine the level of remediation required. Such information must be obtained from the manufacturers of the products specified for the finished floor system (use 15 lbs).

PFUF ¶¶11 and 12; Exhibit B and F to Vierra Decl. The VA contended that this amendment should be interpreted as to require "the successful bidder on this project…to use 15 lbs of vapor pressure as the existing level for all floor surfaces." PFUF ¶11; Vierra Decl. ¶13; Exhibit F to Vierra Decl. Finally, the VA contended that on West Bay's approved schedule of values included time

allocated for scalant application. PFUF ¶13; Vierra Decl. ¶14; Exhibit F to Vierra Decl.

On May 2, 2002, West Bay submitted a claim in accordance with the contract for additional estimated costs for installation of the sealant in the amount of $157,681.00 and a time extension for thirty days. West Bay argued the specific language of the contract documents do not call for floor concrete moisture sealant where the moisture tests do not exceed 15 pounds. The claim for the extra work was based on the cost estimate provided by Surface Solution Innovations 2000, a company that was considered by West Bay to perform the application of sealant on the Project. PFUF ¶14; Vierra Decl. ¶¶15, 16; Exhibit G and H to Vierra Decl.

On May 2, 2002, Paul Thompson, the President of West Bay, also responded to the VA's formal directives. Mr. Thompson's letter stated that no where in the contract specifications required West Bay to use moisture test from 1999. Mr. Thompson also stated that West Bay did allow for a very minimal amount of time in its schedule for the application of the sealant treatment, based on the fact that any new concrete patches would require moisture sealant. Included in West Bay's original schedule of values was a budget for minimal floor moisture sealant in the amount of only $2,000. PFUF ¶15; Vierra Decl. ¶17; Exhibit I to Vierra Decl.

On June 10, 2002, West Bay submitted a certified claim with the corrected actual price for the scope of work, reducing the amount to $128,633.00 based on the bid from Floor Seal Technology. PFUF ¶¶20 and 21; Vierra Decl. ¶¶19 and 20; Exhibits L and M to Vierra Decl.

On January 8, 2003, the VA issued an "Amendment of Solicitation/Modification of Contract" that approved West Bay's claim for $128,279.20 for the floor sealant claim, finding that West Bay's claim was meritorious. PFUF ¶¶22 and 23; Vierra Decl. ¶21; Exhibit N to Vierra Decl. The VA's letter states,

> "A lengthy review of the merit of your claim has resulted in an interpretation of the contract provisions which is favorable to West Bay Builders. Therefore, the costs incurred will be treated as a Government directed change Order with overhead and profit limited to the VA Acquisition Regulation §52.236-88. "

PFUF ¶22; Vierra Decl. ¶22; Exhibit N to Vierra Decl. On January 15, 2003, West Bay sent a letter informing the VA that it had failed to address the requested time extension associated with the sealant work. PFUF ¶24; Vierra Decl. ¶22; Exhibit O to Vierra Decl.

On April 4, 2003, Mr. Koenig responded to West Bay by a letter issuing another modification which actually lowered the amount to $64,140.00. PFUF ¶25; Vierra Decl. ¶23; Exhibit P to Vierra Decl. In the April 4 letter, the VA articulated a wholly different reason for the decreased modification; the VA now stated that the contract specifications contain an alleged "patent ambiguity" with regard to the necessity for sealing the floor, and it was allegedly the contractor's responsibility to raise the issue with the VA prior to submitting a bid. PFUF ¶25; Vierra Decl. ¶23; Exhibit P to Vierra Decl. The VA's previous reasons for denying compensation to West Bay were dropped.

West Bay declined and requested a final decision from Mr. Koenig on West Bay's claim. PFUF ¶26. On July 7, 2003, Mr. Koenig mailed his "Final Decision of the Contracting Officer," reversing his decision for a third time, now denying the claim in its entirety. PFUF ¶27. This letter states, "I have reviewed your claim to recover costs associated with moisture sealing 24,800 square feet

concrete floors with an assumed moisture accumulation of 15 lbs down to 3 lbs with a 10 year warranty. I have determined that the contract specifications required that the floors be sealed to 3 lbs assuming a 15 lbs moisture accumulation overall." PFUF ¶27; Vierra Decl. ¶25; Exhibit R to Vierra Decl. Implicit in this position is that no testing needed to be performed.

The sealant work was performed in phases and completed by West Bay in April 2003. PFUF ¶28; Vierra Decl. ¶25.

To date, West Bay has incurred costs for the extra work performed pursuant to the VA's directive to apply floor sealant; West Bay has also incurred additional labor and material costs, as a result of the VA's failure to pay West Bay for the extra work performed. PFUF ¶29; Vierra Decl. 26. West Bay submitted certified claim in the total amount of $128,833.00 to the VA on June 10, 2002, as detailed in West Bay's Change Order Proposal Estimate 3.2. PFUF ¶29; Vierra Decl. 26; Exhibit "L". The VA has failed to pay West Bay for the extra work. PFUF ¶29; Vierra Decl. ¶26.

As of the date of the filing of this Motion for Summary Judgment, prejudgment interest has accrued, and will continue to accrue, on the principal sum of $128,833.00, from June 10, 2002 (the date of West Bay's certified claim) onward. PFUF ¶30.

On July 9, 2003, West Bay filed this action to recover the principal amount that is due and owing to West Bay, plus accrued interest, as a Government directed change order.

## III. STATEMENT OF THE CASE

West Bay is entitled to additional compensation, because the application of moisture sealant to the entire floor area of the Project is outside the scope of contract specifications. The specifications required West Bay to test the emission level of the floor area and to apply the sealant where "the starting

calculation is 15.0 lbs or more." Amendment #4 to Paragraph 3.01E addresses the type of product and the product's experience on other projects. Amendment #4 does not "assume" an actual "starting calculation" of 15 lbs. Had the VA truly intended the contractor to "assume 15 lbs" as the actual emission level, it could have simply required the contractor to "apply floor sealant" and delete all testing requirements stated in the contract.

**A. Plain meaning of section 09800 does not require the contractor to apply moisture sealant to the entire floor area.**

Government contracts disputes "are adjudicated under normal principles of contract interpretations." Travelers Casualty and Surety of America v. the United States, 74 Fed. Cl. 75, 88. First, a court will first consider the plain language of the contract's terms, and if a contract term is clear and unambiguous, the Court will adopt its plain and ordinary meaning. Id. at 87. In the present dispute, the clauses governing the application of floor concrete moisture sealant are plain and unambiguous.

Paragraph 1.02.A of section 09800 of the Contract Specifications states that the application of the sealant "shall consist of treatments designed to control alkalinity, and to reduce vapor emission to specified, measurable, compliance levels," and "shall reduce emission levels to within 3 lbs, and should be installed in all cases where the starting calculation is 15.0 lbs or more" (Emphasis added). PFUF ¶3; Exhibit B to Vierra Decl. The plain meaning of these terms indicated that West Bay was not required to apply the application of the sealant unless the "starting calculations" (which were derived from test results) was 15.0 lbs or more. Because none of the tests administered to measure the "starting calculations" of emission levels yielded the result of 15.0 lbs or more, West Bay was not required to install the application of the sealant.

**B. Section 09800, when interpreted in such a way to give meaning to all of its parts, addendums, and amendments, does not require the contractor to apply moisture sealant to the entire floor area.**

A contract must be interpreted in such a way as to harmonize and give meaning to all of its parts, addendums, and amendments. Travelers Casualty and Surety of America. 74 Fed. Cl. at 88. Section 09800, titled "Special Coatings- Floor Concrete Moisture Sealant," gives specific instructions to a contractor on the type of testing required, emission levels when sealant is necessary, and the types of sealant products to be used. Exhibit B to Vierra Decl. If Section 09800 is to be interpreted in such a way as to harmonize and give meaning to all of its provisions, then the contractor cannot ignore the pertinent provisions in Part 1 and Part 2 of Section 09800 that deal with the testing and measurement of moisture vapor emission levels before the application of the sealant. PFUF ¶¶17 and 18; Exhibit B to Vierra Decl.

Paragraphs 1.06 and 2.02A specifically requires the contractor to perform testing prior to the application of sealant to determine the measurement of moisture vapor emission levels. The contractor could not ignore these provisions and simply assume that the starting measurement of the moisture vapor emission level to be a certain pounds, or to use old or outdated testing data simply because this data was available. PFUF ¶¶ 9, 10, 11, 19.

Amendment #4, which modified Paragraph 3.01E of Section 09800, does not "delete" Paragraph 1.06, Paragraph 2.02A, nor the testing requirements set forth under these paragraphs. The VA's new contention that Amendment #4 implicitly eliminated the testing requirement and require the bidder to "use 15 lbs of vapor pressure as the existing level for all floor surfaces" is strained and not supported by the language of the amendment. PFUF ¶11. Amendment #4 did not explicitly nor implicitly eliminate the testing requirement under Paragraph 1.06 and Paragraph 2.02A. Instead, Amendment #4 only modified Section

3.01E, to read:

> Based upon the results of the test data as described in section 1.03B, determine the level of remediation required. Such information must be obtained from the manufacturers of the products specified for the finished floor system (Use 15 pounds).

PFUF ¶12.

Section 3.01E references 1.03B, which is under the heading "Quality Assurance" and addresses the experience requirement of the sealant product. Section 1.03B reads:

> "1.03 QUALITY ASSURANCE
>
> ***
>
> B. The manufacturer of the vapor emission compliance treatment shall supply written proof of at least 10 years successful experience in vapor emission reduction. Provide at least 5 verifiable projects with address, contract and phone number where system was successfully used to reduce before emission from 15 lbs or more to 3lbs or less."

Exhibit B to Vierra Decl.

Amendment #4 to Section 3.01E asks the contractor to look at the results of test data obtained from following section 1.03B of Section 09800. Section 1.03B requires the contractor to provide examples of five projects where the proposed sealant was successfully used. This section does not relate to the test data of existing moisture emission level on the VA Project. The contractor is requested to provide data on five past projects where the proposed sealant product "was successfully used to reduce before emissions from 15 lbs or more

to 3 lbs or less." In this historical data from past projects, the contractor could use 15 lbs as the measure.

Amendment #4 to Section 3.01E asks the contractor to obtain such product information "from the manufacturers of the products specified for the finished floor system". Then, upon obtaining the product history from the manufacturers, the VA could evaluate the proposed product. The "use 15 lbs" language at the end of Amendment #4 was again a reference to the product preformance information for past projects.[1] This interpretation of Amendment #4 was consistent with section 1.03(b) as well as other provisions of the Section 09800.

Had the VA truly intended Amendment #4 to eliminate all the testing requirements under Paragraphs 1.06 and 2.02A, it should have said so. Again, a contract must be interpreted in such a way as to harmonize and give meaning to all of its provisions, including its addendum. On its face, Amendment #4 does not contradict other provisions of the contract specifications, including provisions that require testing prior to application of sealant. Therefore, the VA cannot rely on its strained interpretation of Amendment #4 that the testing requirement had been eliminated.

In addition, paragraph 1.06, titled "Quantification Testing," and paragraph 2.02, titled "Preparation," are placed ahead of Part 3 of section 09800 that deals with the actual application of the sealant. See Exhibit B to Vierra Decl. Reading section 09800 as a whole allows the contractor to reasonably and logically interpret that the "preparation" phase of testing of emission level of the floor comes before the actual sealant application phase of the contract.

[1] The plain meaning of Amendment #4 is discussed more fully under section III.C and section IV.D of this memorandum.

**C. The patent ambiguity rule provides no defense to the VA.**

Furthermore, the VA's patent ambiguity argument provides no defense in this instance. There is no ambiguity in Section 09800, especially if the section is to be interpreted to give meaning to all of its parts, addendums, or amendment. Contrary to the VA's contention that West Bay had a duty to inquire of the VA of this section's patent ambiguity, West Bay had no such duty, because there was no "obvious," "gross," "glaring," or "substantial" ambiguity to contract document itself to impose such duty on West Bay. See Metcalf Const. Co., Inc. v. United States, 53 Fed.Cl. 617, 629 (2002). As mentioned above, there was clear direction from Paragraph 1.02 to install the application of floor sealant "where the starting calculation is 15.0 lbs or more." Furthermore, Paragraphs 1.06 and 2.02 both gave clear instructions on the requirement for testing of moisture emission level, which contractor used to measure the starting calculations. As a result, West Bay interpreted Section 09800 as a reasonable person would and proceeded with its performance accordingly.

The only alleged ambiguity in section 09800 was brought up by the VA. In its formal notice to proceed dated May 9, 2002, the VA stated,

> "[f]or purposes of the sealing application it was the intent of the VA to indicate in the contract (via amendment #4) that the successful bidder on this project was to use 15 lbs of vapor pressure as the existing level for all floor surfaces."

PFUF ¶19; Exhibit K to Vierra Decl.

The VA's contention is that Amendment #4 should be interpreted as to require the contractor to "assume" that 15 lbs of vapor pressure as the actual measured moisture emission level, instead of the contractor actually administering the tests prior to the application of the sealant. The VA's strained interpretation of Amendment #4 is directly contradictory to other provisions of

section 09800, which specifically spell out the requirement for contractor to test and the type of testing kits to use prior to the application of the sealant. In fact, the VA's interpretation of Amendment #4 directly contradicts the plain meaning of Amendment #4 itself. Nowhere in Amendment #4 is it spelled out that the contractor was to "assume" or "use" 15 pounds as the "starting calculation" for moisture emission level for all floor surfaces. Read together with other provisions of the contract specifications, this amendment did not delete other portions of Section 09800.

Instead, Amendment #4 has been correctly interpreted by West Bay to ask the contractor to look at the results of test data obtained from following section 1.03 (B) of Section 09800. Section 1.03B dealt historical product data from five other projects. Amendment #4/Section 3.01E asks the contractor to obtain such product information "from the manufacturers of the products specified for the finished floor system". The "use 15 lbs" language at the end of Amendment #4 did not ask the contractor to "assume" anything, but was rather a reference to information on the products performance on past projects.

In other words, the only way that this particular provision is patently ambiguous is if the contractor uses the interpretation of this provision employed by the VA. When the contractor interpreted this amendment as a reasonable person and in such a way that is consistent with other provisions of Section 09800, this amendment is not ambiguous. Therefore, this Court should adopt West Bay's reasonable interpretation of Section 09800 and Amendment #4. Assuming arguendo that a minor ambiguity exists, under the contra proferentem rule, the alleged the ambiguity must be construed against the drafter, which was the VA. See Record Steel and Cont., Inc. v. United States, 62 Fed. Cl. 508, 517 (2004).

**D. Conduct of the parties indicate that West Bay was not required to apply moisture sealant.**

Finally, if ambiguity exists in a contract, the construction placed on it by the parties in their dealings and by their conduct will furnish a court with persuasive evidence of their meaning. Floyd v. Ring Constr. Corp., 165 F2d 125 (8th Cir, 1948). It is undisputed that West Bay timely submitted all information and payment requests to the VA concerning extra work of the sealant application. West Bay's conduct was consistent in that it always maintained that it should be compensated for the extra work, which was outside the scope of contract.

On the other hand, the VA resorted to ever changing and contradictory arguments. First, the VA requested that West Bay use old test data (14.4 pounds) from emission tests administered four years prior to West Bay's work on the Project. PFUF ¶¶ 9 and 10. Curiously, the VA never informed West Bay prior to bid that the VA had previously tested the emission level of the floor areas. PFUF ¶5. Only after West Bay raised the issue of testing results not exceeding the 15 pound threshold, did the VA request that West Bay use the old test data of 14.4 pounds as the "existing" emission level. In other words, the VA here was attempting to use old, previously undisclosed test data solely for the purpose of denying West Bay's claims.

Second, the VA requested that West Bay should assume the existing emission level on the floor areas to be 15 pounds or more without administering a test, because the VA claimed that Amendment #4 requires such assumption. PFUF ¶11.

Third, the VA contended that the application of sealant was in the VA's schedule of values, despite the fact West Bay only allocated $2,000 for sealant application in its schedule of values. PFUF ¶13.

Later the VA actually agreed that West Bay's position was meritorious and agreed to pay all of West Bay's requested cost for the application of the sealant. The VA stated,

> "A lengthy review of the merit of your claim has resulted in an interpretation of the contract provision which is favorable to West Bay Builders. Therefore, the costs incurred will be treated as a Government directed Change Order with overhead and profit limited to the VA Acquisition Regulation §52.236-88 stated amounts."

PFUF ¶22.

Then, the VA offered to pay half of West Bay's requested costs based on the alleged "patent ambiguity" doctrine. PFUF ¶25. Finally, the VA denied West Bay's claim in its entirety based on the rationale that West Bay should have "assumed moisture accumulation of 15 lbs". PFUF¶27. Undisputed evidence shows that the VA could not maintain any reasonable position pertaining to this dispute or interpretation of the specifications.

## IV. ARGUMENT

### A. Summary Judgment Standards

Summary judgment pursuant to Rule 56(c) of the Rules of the Court of Federal Claims is appropriate "when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law." Smelser v. United States, 62 Fed. Cl. 768, 771 (2004). In ruling on a motion for summary judgment, a court should determine whether a genuine issue of material fact exists that makes a trial appropriate. *Id*. Any inferences drawn from the facts "must be viewed in the light most favorable to the party opposing the motion." *Id.* (citing Matsuchita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)). The moving party bears the initial burden of demonstrating "the absence

of genuine issues of material fact." *Id.* (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)).

Once the moving party established its initial burden demonstrating the absence of genuine issues of material facts, the burden shifts to the non-movant to present sufficient evidence demonstrating a dispute concerning material facts necessitating a trial. Celotex Corp., 477 U.S. at 317, 323*.* The party opposing a motion for summary judgment has the burden of demonstrating sufficient evidence that a genuine issue of material facts exists. *Id*. at 324. A material fact is "one which will make a difference in the result of [the] case." Cloutier v. United States*,* 19 CL. Ct. 326, 328 (1990) However, "[m}ere denials, conclusory statements, or evidence that is merely colorable or not significantly probative will not defeat summary judgment." *Celotex Corp.* 477 U.S. at 317, 323. Moreover, "argument of counsel cannot substitute for factual statements under oath that establish a genuine issue of material fact." Monarch Painting Corp. v. United States, 16 Cl.Ct. 280, 290 (1989).

Contract interpretation is a question of law. Travelers Casualty and Surety of America, 74 Fed. Cl. at 86. Therefore, summary judgment in West Bay's favor can be granted on whether the application of sealant is outside the scope of contract, and whether West Bay is entitled to compensation.

**B. Plain meaning of Paragraph 1.02.A indicates that the application of floor sealant is required only if actual test results of emission level were 15 pounds or more.**

In deciding question involving contract interpretation, this Court should first consider the plain language of the contract's terms. See Forman v. United States, 329 F.3d 837, 842 (Fed. Cir.2003). If a contract term is clear and unambiguous, the Court will adopt its plain and ordinary meaning. See Moran v. Prather, 90, U.S. 492, 499. "A contract term is unambiguous if there is only one

reasonable interpretation." C. Sanchez and Son, Inc. v. United States, 6 F.3d 1539, 1544 (Fed. Cir. 1993). The plain meaning of a contract term is "the meaning derived from the contract by a reasonably intelligent person acquainted with the contemporary circumstances."

The plain meaning of Paragraph 1.02A of section 09800 of the Contract Specifications indicates that the application of floor sealant to the entire floor area of the Project is required if test results of emission level indicated 15 pounds of vapor emission level or more. Paragraph 1.02A states that "The system shall reduce emission levels to within 3. lbs, and should be installed in all cases where the starting calculation is 15.0 lbs or more." This sentence is unambiguous in that it instructed the contractor that the sealant application, if applied, should reduce emission levels to within 3 pounds; but the sealant needs to be installed only when test data show the emission level to be 15 pounds or more. In other words, if the starting calculation show emission level to be less than 15 pounds, then there is no need to apply the sealant.

In addition, the fact that Paragraph 1.02A states that the threshold of whether the contractor should apply floor sealant is "15 pounds <u>or more</u>" (emphasis added) means that the measurement of emission level needs to be tested, not assumed. The VA now argues that Amendment #4 modified the contract specifications to mean the contractor should <u>assume</u> the actual starting calculation is 15 pounds. As noted above, the "(use 15 lb)" reference is related to historical product performance data. Furthermore, the VA's interpretation directly violates the plain meaning approach to Paragraph 1.02A, since "15 pounds or more" suggests that the emission level has yet to be determined, and therefore is to be measured, not to be assumed. Finally, if the VA really wanted sealant regardless of actual test data, it could have just said "apply sealant;" but it choose not to use such plain language.

An appropriate technique of contract interpretation is for this Court to place itself in "the shoes of a reasonable and prudent contractor and decide[ing] how a such a contractor would act in interpreting the contract documents." All Power, Inc. v. United States, 60 Fed.Cl. 679 (2004) (quoting Randa/Madison Joint Venture III v. Dahlberg, 239 F.3d 1264, 1274 (Fed. Cir. 2001)). Paragraph 1.02A is not placed or buried in the middle or toward the end of the contract specifications. Instead, it is placed near the beginning of Section 09800. Therefore, a reasonable contractor can reasonably interpret Paragraph 1.02A to be intended to be read first and to be taken as a task that is a priority in determining the sealant system. It makes sense that a contractual clause that sets the threshold on whether sealant application should be performed be placed at the beginning of the contract document.

West Bay, as the reasonable and prudent contractor, interpreted Paragraph 1.02A within the paragraph's plain meaning and had acted accordingly. This Court should likewise determine that Paragraph 1.02A is not ambiguous, and that West Bay, as the reasonable and prudent contractor, has interpreted Paragraph 1.02A reasonably, and that its actions to obtain compensation for the sealant application from the VA is justified based on Paragraph 1.02A.

**C. Section 09800 should be interpreted in such a way to give meaning to all of its parts, addendums, and amendments.**

Contrary to the VA's position that the contractor should assume that the moisture emission level of the Project's floor area to be 15 pounds, Section 09800 has several provisions that discuss the necessity for the contractor to perform tests to measure emission level. "A contract must be interpreted so as to harmonize and give meaning to all of its provisions, and…an interpretation

which gives a reasonable meaning to all parts will be preferred to one which leaves a portion of it useless, inexplicable, inoperative, void, insignificant, meaningless, superfluous, or achieves a weird and whimsical result." *Arizona v. United States*, 216 Ct.Cl. 221, 235-36 (1978). To ignore Section 09800's several references to testing and measurement of moisture emission levels is to render these provisions meaningless and the entire Section unintelligible and useless.

The first explicit reference to the testing and the measurement of moisture emission levels is stated under Paragraph 1.06 of Section 09800:

> "1.06 Quantification Testing
>
> A. Testing shall be conducted with calcium choloride test kits using the following test schedule: Minimum of 3 kits for up to one thousand square feet; and an additional test kit for each ensuing thousand square feet or portion thereof. Kits shall be placed in either a rectangular or cross-diagonal pattern. Procedures must be in strict accordance with ASTM S 1869-98."

Section 2.02 A also referenced the requirement of testing and the measurement of emission level prior to sealant application:

> "2.02 Preparation
>
> A. The extent of moisture vapor emission levels shall be determined by the use of prepackaged calcium chloride dome test kits, administered by independent laboratory or competent contractor or inspector. Tests will not be conducted by system manufacturer, it's affiliates or agents. Results of tests must be expressed in pounds of moisture vapor emitted per 24 hours in a 1,000 square foot area. In addition, measurements must be taken in the anticipated service environment. Since this testing requires 60 to 72 hours, such time must be planned into the schedule."

Based on the specifications outlined above, West Bay proceeded to test the existing emission level of the floor area on the Project, because this is required by the specifications. In addition, since both paragraphs 1.06 and 2.02 are placed ahead of Part 3 of section 09800 that deals with the actual application of the sealant, it is reasonable and logical for the contractor to interpret that the "preparation" phase of testing of emission level of the floor comes before the actual sealant application phase of the contract.

Based on the requirement for contractor to perform testing of emission level prior to the application of the sealant (Paragraph 1.06 and Paragraph 2.02A), and the instructions to proceed with sealant application if the starting calculation shows emission level to be 15 pounds or more (Paragraph 1.02), West Bay is reasonable to believe that it first needed to test the existing conditions of the floors, and then if tests results showed emission levels to exceed 15.0 pounds, West Bay was to proceed with sealant applications on all floor areas of the Project. Such interpretation of Section 09800 is successful in giving meaning to all of its parts. On the other hand, if the contractor is to adopt the VA's interpretation that the emission level of 15 pounds on all floor areas was to be automatically assumed without any testing, Paragraph 1.06 and Paragraph 2.02A would be rendered meaningless. West Bay's reasonable interpretation is particularly pertinent as to Paragraph 2.02 A, since this paragraph was listed under the heading "PREPARATION," which can be reasonably interpreted as requiring the contractor to obtain emission level test results during the preparatory phase of sealant application, i.e., before the sealant system was applied at all to the floor areas of the Project.

**D. The patent ambiguity rule provides no defense to the government.**

The government, as author of the contract documents, "has to shoulder the major task of seeing that within the zone of reasonableness the words of the agreement communicate the proper notions –as well as the main risk of a failure to carry that responsibility." Frys Communications v. United States, 22 Cl. Ct. 497 at 504. Therefore, the contractor is "not normally required…to seek clarification of any and all ambiguities, doubts or possible differences in interpretation." Id. Only where an ambiguity is "obvious," "gross," "glaring," or "substantial" does it rise to the level of a "patent ambiguity," imposing the duty to inquire on the contractor. Metcalf Const. Co., Inc. v. United States, 53 Fed.Cl. 617, 629 (2002) (quoting Grumman Data Systems Corp v. Dalton, 88 F.3d 990, 997 (Fed. Cir. 1996)).

The Federal Circuit has declined to give the patent ambiguity doctrine a broad application, since it has the effect "of relieving the government from the consequences of its own poorly drafted contracts." Triax Pacific, Inc. v. West, 130 F.3d, 1469, 1475 (Fed. Cir. 1997). The court's determination should be from the perspective of "what a reasonable man would find to be patent and glaring." L. Rosenman Corp. v. United States, 182 Ct. Cl. 586, 390 F.2d. 711, 713 (1968). "An ambiguity that is not so glaring as to trigger the patent ambiguity exception is considered latent, and the *contra pro ferentem* rule applies." Record Steel and Cont., Inc. v. United States, 62 Fed. Cl. 508, 517 (2004). Not every dispute as to the meaning of a contract terms rises to the level of a latent or patent ambiguity. Overstreet Elec. Co., Inc. v. United States, 59 Fed. Cl.99, 116 (2003). The court is not required to accept a party's assertion that competing interpretations must constitute one or the other. Id.

As discussed in the previous sections of this memorandum, Paragraph 1.02, Paragraph 1.06, and Paragraph 2.02A were reasonably interpreted by

West Bay within the paragraphs' plain meaning. The only alleged ambiguity in section 09800 concerns Amendment #4, which was brought up by the VA in its formal notice to proceed dated May 9, 2002. The VA contended that Amendment #4 should be interpreted as to require the contractor to assume that 15 pounds of vapor pressure as the starting position for the floor surfaces, instead of the contractor actually administering the tests prior to the application of the sealant as specified in Paragraph 1.02, Paragraph 1.06 and Paragraph 2.02A. In other words, the VA's May 9, 2002 letter concerning Amendment #4 requested West Bay to completely ignore the plain meaning requirement of Paragraph 1.02, Paragraph 1.06, and Paragraph 2.02A for contractor to conduct testing prior to sealant application.

However, there is nothing in Amendment #4, which modified Section 3.01E of the contract specifications, that speaks of requiring contractor to disregard or delete other provisions of the contract specifications. The VA's interpretation of Amendment #4 would effectively negate Paragraph 1.02, Paragraph 1.06, and Paragraph 2.02A of the contract specifications. The only provisions affected by Amendment #4 are Section 3.01E, which Amendment #4 directly replaces, and Section 1.03B, which was referenced in Amendment #4.

As stated above, It is clear from the language of Section 1.03B that this section deals with the manufacturer of the sealant and the requirement that the manufacturer submits proof that it had the required experience of sealant product. Section 1.03B, unlike Sections 1.06 and Section 2.02A, does not concern itself with the testing of floor areas of the Project.

The allegedly ambiguous section 3.01E referenced "the test data as described in 1.03B," and asked the contractor to determine the level of

remediation required. Section 3.01E went on to say that "[s]uch information must be obtained from the manufacturers of the products specified for the finished floor system. (Use 15 pounds)." Like section 1.03B, Section 3.01E deals with "manufacturers of the products specified for the finished floor system;" in other words, Section 3.01E does not concern itself with the testing and measurement of emission levels on the Project. Section 3.01E merely reiterates the requirement for contractor to obtain the results and the data that are already required under section 1.03B before the application of the sealant. Therefore, Section 3.01E, as it stands, does not create ambiguity.

The VA attempts to read the clause "(use 15 pounds)" as a requirement for the contractor to assume the existing emission level to be 15 pounds prior to the application of the sealant. This is not a reasonable interpretation, since both Section 3.01E and section 1.03E do not deal with the measurement and test data of existing emission level, but historical performance data <u>of the manufacturers from previous sealant work on other projects</u>. The more reasonable and literal interpretation of this clause is that it is the reiteration of the requirement from Section 1.03B that the sealant manufacturer needed to have experience and capacity to reduce the emission level from 15 pounds to the desired emission level. Such interpretation of this clause makes more sense, since it parallels other parts of Section 3.01E, Section 1.03B, and other parts of Section 09800.

Because West Bay understood Section 3.01E as it currently stands and did not find it to be ambiguous, it should not be required to seek clarifications of any alleged ambiguities. Only where an ambiguity is "obvious," "gross," "glaring," or "substantial" does it rise to the level of a "patent ambiguity," imposing the duty

to inquire on the contractor. Metcalf Const. Co., Inc. v. United States, 53 Fed.Cl. 617, 629 (2002) (quoting Grumman Data Systems Corp v. Dalton, 88 F.3d 990, 997 (Fed. Cir. 1996)). As demonstrated in the above discussion, the plain meaning of Section 3.01E does not contradict other provisions of Section 09800 and does not give rise to patent ambiguity.

It was the VA who brought up this issue of alleged ambiguity of section 3.01E after West Bay had already begun performing on the Project, not West Bay. If the VA found its own wordings of contract specifications to be poorly worded or had problems with the specifications' plain meaning, as a government entity, it has to "shoulder the major task of seeing that within the zone of reasonableness the words of the agreement communicate the proper notions—as well as the main risk of a failure to carry that responsibility." Frys Communications v. United States, 22 Cl. Ct. 497 at 504. In addition, "an ambiguity that is not so glaring as to trigger the patent ambiguity exception is considered latent, and the *contra pro froferentem* rule applies." Record Steel and Cont., Inc. v. United States, 62 Fed. Cl. 508, 517 (2004). In this instance, any alleged ambiguity associated with Section 3.01E and other parts of Section 09800 is not glaring, gross, nor substantial, therefore it should be the VA, the drafter of the specifications, that shoulders the risk of its failure to properly communicate the proper contract specifications.

**E. Where ambiguity exists in a contract, the construction placed on it by the parties in their dealings and by their conduct will furnish a court with persuasive evidence of their meaning.**

Where ambiguity exists in a contract, the construction placed on it by the parties in their dealings and by their conduct will furnish a court with persuasive evidence of their meaning. Floyd v. Ring Construction Corp., 165 F.2d 125 (8th Cir 1948). It is undisputed that West Bay timely submitted all payment

applications to the VA concerning extra work of sealant application and never agreed to the VA's demands that West Bay performed the extra work without compensation. West Bay's conduct was consistent in that it always maintained that it should be compensated for the extra work, which was outside the scope of contract specification, as discussed in the above sections of this memorandum.

On the other hand, the VA resorted to ever-changing and contradictory arguments that West Bay should not be compensated for performing extra work. First, the VA's first formal directive, dated May 2, 2002, demanded West Bay assume 15 pounds of vapor pressure as the existing level for all floor surfaces, instead of relying on any test results. The same formal directive offered an alternative but contradictory argument that required West not to base the existing moisture level on "current" test result conducted by West Bay, but on test result conducted by Floor Seal Technologies in July of 1999 at 14.4 pounds.

Curiously, the VA never informed West Bay prior to bid that the VA had previously tested the emission level of the floor areas of the Project. Only after West Bay raised the issue of testing result not exceeding the 15 pound threshold required by the contract, did the VA request that West Bay use the old test data of 14.4 pounds as the "existing" emission level. It appears that the VA was attempting to use the old, previously undisclosed test data solely for the purpose of denying West Bay's claims. The irony here is that the VA's demand that West Bay use 14.4 pounds as the "existing" emission level directly contradicts with the VA's concurrent position that West Bay "assume 15 pounds" as the emission level. It should also be noted that the use of 14.4 pounds as emission level is still lower than the 15.0 pounds threshold stated in the contract.

On January 8, 2003, and after West Bay had submitted claim with actual cost for the scope of the extra work. In response, Mr. Koenig issued an "Amendment of Solicitation/Modification of contract" that approved West Bay's

claim for $128,279.20 for the floor sealant claim, finding that West Bay's claim was meritorious. Mr. Koenig's letter first stated that "[a] lengthy review of the merit of your claim has resulted in an interpretation of the contract provisions which is favorable to West Bay Builders." The "Amendment of Solicitation/Modification of contract" states:

> "14a. This Supplemental Agreement is to provide full consideration to West Bay Builders as a result of a Government direction on 3 May 2002 and 9 May 2002 to seal approximately 32,000 square feet of concrete sub-flooring to a maximum measured vapor pressure of 3 lbs assuming an existing condition of 15 lbs vapor pressure throughout.
>
> ***
>
> c. The negotiated total price for the sealant effort is $128,279.20."

Exhibit N to Vierra Decl.

Despite the VA's apparently "lengthy" review of West Bay's meritorious claim , the VA does not mention the alleged obvious ambitguity it now champions. Despite its written validation of West Bay's claim and its intention to pay West Bay for the sealant application, the VA subsequently rescinded the "Amendment of Solicitation/Modification of contract" after West Bay inquired about a request for time extension. In his April 4, 2003 letter, Mr. Koenig stated that the VA's legal counsel has determined that the contract specifications contained a "patent ambiguity" with regards to the necessity for the sealant application. This was the first time that the VA raised this patent ambiguity argument.

Finally, the VA issued its "Final Decision of the Contracting Officer" to West Bay, denying West Bay's claim in its entirety. The "Final Decision of the Contracting Officer" states, "I have determined that the contract specifications

required that the floor be sealed to 3 lbs assuming a 15 lb moisture accumulation overall." Again, no where in the contract document states that the contractor should assume 15 pounds of moisture accumulation.

As outlined above, the VA never gave West Bay a consistent position on why it denied West Bay's claim for extra work. All of the VA's positions with regards to the issue of sealant application are contradictory and inconsistent, although it is undisputed that the VA had intended to pay West Bay before resorting to the patent ambiguity argument.

While West Bay's conduct has been consistent in its interpretation of section 09800, the VA's conduct was not. This Court should take notice of parties' respective conducts and determine that the VA should not be allowed to hide behind its patent ambiguity argument and West Bay should be compensated for performing the extra work. In other words, the VA, who accepted West Bay's claim, should not be allowed to later reject the extra work on the basis of ambiguous contract provisions. See Shultz & Lindsay Constr. Co. v. State 494 P.2d 612 (1972).

**CONCLUSION**

For the reasons stated above, West Bay respectfully requests this Court to grant its motion for summary judgment in the amount of $128,833.00, plus interest on the principal amount accrued from June 10, 2002 onward, at the rate established by the Secretary of the Treasury. See 41 U.S.C. §611 ("Interest on amounts found due contractors on claims shall be paid to the contractor from the date of the contracting officer receives the claim at the rate established by the Secretary of the Treasury pursuant to Public Law 92-41 for the Renegotiation Board").

\\\

\\\

Respectfully submitted,

/s/ Timothy L. McInerney

Timothy L. McInerney
McInerney & Dillon PC
1999 Harrison Street
Oakland, CA 94612
(510) 465-7100
(510) 465-8556
Attorneys for Plaintiff

Dated: September 17, 2007

## CERTIFICATE OF SERVICE

I hereby certify that on September 18, 2007, I electronically filed the foregoing Plaintiff's Motion for Summary Judgment with the Clerk of the Court using the ECF system which will send notification of such filing to the following:

**Tara Kathleen Hogan**
**Paul Reid Wellons**
U. S. Department of Justice
Civil Division- Commercial Litigation Branch
1100 L Street, NW
Washington, DC 20530
(202) 307-1011
(202) 514-8624 (fax)
tara.hogan@usdoj.gov
paul.wellon@usdoj.gov

/s/ Timothy L. McInerney
Timothy L. McInerney