IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| WEST BAY BUILDERS, INC., Plaintiff, | ) | |
| v. | ) | No. 04-1140C (Judge Sweeney) |
| THE UNITED STATES, Defendant. | ) | |

DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND RESPONSE TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

PETER D. KEISLER
Assistant Attorney General

JEANNE E. DAVIDSON
Director

DEBORAH A. BYNUM
Assistant Director

OF COUNSEL:

ANNA C. MADDAN
Office of General Counsel
Department of Veterans Affairs
Procurement, Construction, &
Litigation Division

TARA K. HOGAN
Trial Attorney
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
1100 L Street, N.W., attn: 8th floor
Washington, D.C. 20530
Tele: (202) 616-2228
Fax: (202) 305-7643

October 19, 2007

Attorneys for Defendant

# TABLE OF CONTENTS

**PAGE(S)**

STATEMENT OF THE ISSUES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

I. Legal Standard . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

II. The Contract Contained Ambiguous And Conflicting Requirements Regarding Floor Sealant . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

A. The Contract Provided West Bay With No Less Than Four Contradictory Instructions Regarding Moisture Sealant Installation . . . . . . . . . . . . . . . . . 8

B. West Bay's Proffered Contract Interpretation Does Not Address The Conflicting Provisions Identified Above . . . . . . . . . . . . . . . . . . . . . . . . 12

C. Because The Contract Provided West Bay With Conflicting Sealant Instructions, West Bay Was Required To Inquire Prior To Bidding . . . . 13

III. Even If This Court Does Not Find That The Contract Contained A Patent Ambiguity, Summary Judgment Should Still Be Granted In The Government's Favor Because The VCT Flooring Would Not Have Been Warrantiable Under West Bay's Interpretation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

IV. West Bay's Remaining Arguments Are Unavailing . . . . . . . . . . . . . . . . . . . . . 19

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

## TABLE OF AUTHORITIES

**CASES** **PAGE(S)**

Anderson v. Liberty Lobby, Inc.,
477 U.S. 242 (1986) . . . . . . . . . . 6

Beacon Constr. Co. of Mass. v. United States,
161 Ct. Cl. 1, 7 (1963) . . . . . . . . . . 14, 16

Blue & Gold Fleet, L.P. v. United States,
492 F.3d 1308 (Fed. Cir. 2007) . . . . . . . . . . 14, 16

Bristol-Myers Squibb Co. v. United States,
48 Fed. Cl. 350 (2000) . . . . . . . . . . 7

P.R. Burke Corp. v. United States,
277 F.3d 1346 (Fed. Cir. 2002) . . . . . . . . . . 14, 18

Celotex Corp. v. Catrett,
477 U.S. 317 (1986) . . . . . . . . . . 6

Community Heating & Plumbing Co., Inc. v. Kelso,
987 F.2d 1575 (Fed. Cir. 1993) . . . . . . . . . . 7

Conner Brothers Const. Co., Inc. v. United States,
65 Fed. Cl. 657 (2005) . . . . . . . . . . 7

Edward R. Marden Corp. v. United States,
803 F.2d 701 (Fed. Cir. 1986) . . . . . . . . . . 19

H.B. Mac, Inc. v. United States,
153 F.3d 1338 (Fed. Cir. 1998) . . . . . . . . . . 7

Harris v. Department of Veterans Affairs,
142 F.3d 1463 (Fed. Cir. 1998) . . . . . . . . . . 7

Helix Elec., Inc. v. United States,
68 Fed. Cl. 571 (2005) . . . . . . . . . . 12

Matsushita Elec. Indus. v. Zenith Radio Corp.,
475 U.S. 574 (1986) . . . . . . . . . . 6

Mays v. United States Postal Serv.,
995 F.2d 1056 (Fed. Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

McAbee Const., Inc. v. United States,
97 F.3d 1431 (Fed. Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Metcalf Constr. Co., Inc. v. United States,
53 Fed. Cl. 617 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Metric Constructors, Inc. v. NASA,
169 F.3d 747 (Fed. Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

NVT Technologies, Inc. v. United States,
370 F.3d 1153 (Fed. Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 12

Newsom v. United States,
230 Ct. C 676 F.2d 647 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

P.J. Maffei Bldg. Wrecking v. United States,
732 F.2d 913 (Fed. Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Sternberger v. United States,
185 Ct. Cl. 528 (1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Stratos Mobile Networks USA, LLC v. United States,
213 F.3d 1375 (Fed. Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Travelers Cas. & Sur. of America v. United States,
75 Fed. Cl. 696 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 19

Triax Pacific, Inc. v. West,
130 F.3d 1469 (Fed. Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Wang Labs., Inc. v. Mitsubishi Elecs. Am., Inc.,
103 F.3d 1571 (Fed. Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Wilner v. United States,
24 F.3d 1397 (Fed. Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| WEST BAY BUILDERS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 04-1140C |
| | ) | (Judge Sweeney) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND
RESPONSE TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56 of the United States Court of Federal Claims ("RCFC"), the defendant, the United States, respectfully requests that the Court deny the plaintiff West Bay Builders, Inc.'s ("West Bay") motion for summary judgment and grant defendant's cross-motion for summary judgment. Summary judgment is appropriate because there exist no genuine issues of material fact and the Government is entitled to summary judgment as a matter of law. In support of this motion, we rely upon the complaint, our proposed findings of uncontroverted fact, and the following memorandum of law.

STATEMENT OF THE ISSUES

(1) Whether the contract specifications contained a patent ambiguity such that West Bay was obliged to seek clarification prior to bidding on the solicitation regarding where and when floor sealant installation would be required.

(2) Whether, assuming that this Court finds the contract contains no patent ambiguity, West Bay's interpretation of the floor sealant specifications is nonetheless unreasonable because it is inconsistent with the tile flooring manufacturer's warranty requirements.

STATEMENT OF FACTS

For our complete statement of facts, we rely upon our concurrently filed proposed findings of uncontroverted facts ("DPFUF") and our responses to the plaintiff's proposed findings of uncontroverted facts ("PPFUF"), originally filed on September 7, 2007, and refiled on September 18, 2007. For the Court's convenience, we address below the facts relevant to our cross-motion.

The Department of Veterans Affairs, Palo Alto Health Care System, Martinez Division, issued a solicitation for general construction, demolition, alterations, mechanical and electrical work, casework, utility systems, and other certain items at Building 90, Livermore Division. PPFUF ¶¶ 1;2. On November 20, 2001, the fixed price contract was awarded to West Bay in the amount of $ 1,267,000. DPFUF ¶ 2. The Notice to Proceed was issued on January 9, 2002. Contract completion was due 436 days after receipt of the Notice to Proceed.

The contract provided various specifications for floor sealant. Floor sealant is a product placed on concrete floor in order to keep moisture from the concrete from damaging the flooring placed above the concrete.[1] DPFUF ¶ 14. In this renovation project, the concrete would ultimately be covered by vinyl composition tile ("VCT"). One specification required the contractor to seal the concrete flooring based upon the recommendations of the adhesive and tile manufacturer. Another provided that the contract should seal the floor for a moisture content of 15 lbs. The specifications further stated that the sealant should reduce moisture emission to within three pounds and should be installed in all cases where the starting calculation was 15

[1] Moisture may come from the concrete naturally or from the environment or a high water table.

pounds or more, but further stated that the level of moisture emission remediation required must be obtained from the tiling manufacturer. Finally, the solicitation was amended to correct specifications and included the instruction “use 15 lbs.” West Bay did not seek any clarification of the sealant requirements or seek proposals for floor sealant subcontractors prior to bid. DPFUF ¶¶ 3-4; 12.

On April 22, 2002, West Bay performed moisture emission tests, also known as calcium chloride tests. These tests generally consist of several small domed dishes that are set out on the floor to create a sealed, one square foot section of floor. The dishes are set out for a 36-72 hour period. The user can then either weigh the dishes or send them to a laboratory for results. The results demonstrate how much water has emitted from the concrete within a 24 hour time period.

On April 30, 2002, West Bay submitted a Request for Information No. 237-007. In this RFI, West Bay notified the VA that its moisture emission test results were 4.58 lbs and 7.52 lbs per 1,000 sq. ft per 24 hours. PPFUF ¶ 7. Further, West Bay stated that its position was that no floor sealant was required because it interpreted the sealant specifications as requiring no sealant application unless the moisture test results were 15 lbs or more. PPFUF ¶ 7. Subsequent tests performed by Floor Sealant Technology, a subcontractor, provided moisture emission results of 8.0 lbs, 9.8 lbs, 8.0 lbs, and 9.3 lbs per 1,000 sq. ft. per 24 hours. PPFUF ¶ 6.

On May 2, 2002, the contracting officer (“CO”) directed West Bay to proceed with moisture vapor sealing of the concrete in the entire renovation area. DPFUF ¶ 15. The CO noted that “it was the intent of the VA to indicate in the contract (via amendment #4) that the successful bidder on the project was to use 15 lbs [sic] of vapor pressure as the existing level for all floor surfaces. The maximum level of vapor pressure measured after application in all areas

shall not exceed 3 lbs." Ex. K to Vierra Decl., p. 1.[2] Thus, the CO determined that the application of the floor sealant at all areas, to reduce the moisture emission levels to within 3 lbs was within the scope of the contract. The CO reiterated this conclusion in two letters dated May 3 and May 9, 2002.

On May 2, 2002, West Bay submitted a request for an equitable adjustment in the amount of $157,881 for the cost of applying moisture control sealant to the entire floor area. Ex. G to Vierra Decl., p.1. Although the CO initially offered to negotiate a resolution in the amount of $128,279.20 and an additional fourteen days, West Bay did not sign the proposed supplemental agreement. PPFUF ¶ 24.

Subsequently, following legal and supervisory review, the CO notified West Bay that the contract contained a patent ambiguity which gave rise to a duty upon West Bay to inquire about the sealant requirements prior to submitting its bid. PPFUF ¶ 25. West Bay requested a final decision as to whether it was entitled to an equitable adjustment in the amount of $128,833. PPFUF ¶ 26. The CO denied that claim on July 7, 2003. PPFUF ¶ 27. On October 9, 2003, West Bay appealed the final decision to the VA Board of Contract Appeals. The board dismissed the appeal for lack of jurisdiction because West Bay did not file the appeal within the deadline. Nine months later, on July 9, 2004, West Bay filed its complaint in this Court.

SUMMARY OF ARGUMENT

This case presents a discrete issue of contract interpretation, which is appropriate for summary judgment. Faced with conflicting floor sealant specifications, West Bay chose to

[2] The exhibits to the declaration attached to plaintiff's motion for summary judgment have not been page numbered. Page numbers refer to chronological order.

prepare its bid without seeking clarification and then, after the award, sought an equitable adjustment to perform work the Government actually wanted.

The various contract specifications required West Bay to: (1) apply sealant if the actual tested moisture content was 15 lbs, and in that case, to reduce moisture levels to 3.0 lbs, (2) to "use 15 lbs," (3) to apply sealant at all new areas of concrete, regardless of actual tested moisture content, and (4) to refer to the floor tiling manufacturer's requirements for acceptable moisture content to determine necessary sealant application. West Bay's assumption that it would only seal the concrete if moisture emission tests resulted in measurements above 15 lbs ignores the other patently contradictory and confusing instructions in the specifications and drawings. West Bay had no basis upon which to know how and when it would be required to apply sealant. Because the sum of the contract specifications were contradictory and could not be harmonized, West Bay had a duty to investigate this patent ambiguity prior to submitting its bid. Instead, West Bay took a calculated risk to underbid the other bidders by assuming it would apply a minimal amount of floor sealant on new patched concrete. Because West Bay did not seek to clarify what work the VA required it to perform prior to submitting its bid, West Bay is not entitled to the relief it seeks.

Even assuming this Court finds there is no patent ambiguity, West Bay's interpretation that it was not required to install a moisture barrier sealant if calcium chloride tests results were between 3 and 15 lbs is not reasonable in light of the floor tiling manufacturer's requirements. Floor tiling manufacturers generally will not provide a warranty for its work if the final moisture emission levels are over three pounds. In West Bay's approved submittals for the VCT, the tiling manufacturer advised that the tiling should not be installed if moisture emissions were over

5 lbs. West Bay's argument that it was required to reduce the moisture emission to under 3 lbs only if the starting moisture emission level was over 15 lbs, conflicts with the purpose of sealing the floor and is not a reasonable interpretation. For this additional reason, West Bay's motion for summary judgment should be denied.

## ARGUMENT

### I. Legal Standard

Issues of contract interpretation, such as presented here, present questions of law that are uniquely appropriate for summary judgment. Mays v. United States Postal Serv., 995 F.2d 1056, 1059 (Fed. Cir. 1993); P.J. Maffei Bldg. Wrecking v. United States, 732 F.2d 913, 916-17 (Fed. Cir. 1984). If the language of the contract is unambiguous, the Court must accept its plain meaning. Triax Pacific, Inc. v. West, 130 F.3d 1469, 1473 (Fed. Cir. 1997). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." RCFC 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see also Wang Labs., Inc. v. Mitsubishi Elecs. Am., Inc., 103 F.3d 1571 (Fed. Cir. 1997).

This Court may grant summary disposition where there is no genuine dispute over a material fact. Anderson, 477 U.S. at 248. A material fact is one that might affect the outcome of the suit under the governing substantive law. Id. Any doubt as to factual issues must be resolved in favor of the party opposing summary judgment to whom the benefit of all presumptions and inferences run. Matsushita Elec. Indus. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

Issues of contract interpretation, as in this case, are a matter of law and therefore may be resolved by the Court. H.B. Mac, Inc. v. United States, 153 F.3d 1338, 1345 (Fed. Cir. 1998); Conner Brothers Const. Co., Inc. v. United States, 65 Fed. Cl. 657, 667 (2005). Such interpretation may include the contract's particular specifications. P.J. Maffei, 732 F.2d at 916.

As we demonstrate below, there are no genuine issues of material fact present in this case and the claims of West Bay fail as a matter of law. The Court should interpret the contract and rule that West Bay cannot, as a matter of law, establish its claim for an equitable adjustment. Therefore, the granting of summary judgment for the United States is appropriate.

## II. The Contract Contained Ambiguous And Conflicting Requirements Regarding Floor Sealant

The Court's interpretation begins with the plain language of the contract in order to determine whether the contract is ambiguous. Bristol-Myers Squibb Co. v. United States, 48 Fed. Cl. 350, 355 (2000). The plain language is controlling if no ambiguity is found. Id. Such language should be given its ordinary meaning unless the parties mutually intended an alternative meaning. Harris v. Department of Veterans Affairs, 142 F.3d 1463, 1467 (Fed. Cir. 1998). Ambiguity results when the contract in question may give rise to two different and reasonable interpretations that are both consistent with the contract language. Community Heating & Plumbing Co., Inc. v. Kelso, 987 F.2d 1575, 1579 (Fed. Cir. 1993). Whether the ambiguity is glaring or obvious should be determined by the Court against a reasonable person standard on an ad hoc basis. Newsom v. United States, 230 Ct. Cl. 301, 304, 676 F.2d 647 (1982). Contracts are not rendered ambiguous, however, solely by the fact that the parties disagree on their interpretation. Bristol-Myers, 48 Fed. Cl. at 355 (citing Community Heating, 987 F.2d at 1579). Rather, both parties' interpretations must lie within a "zone of

reasonableness" to show ambiguity. NVT Technologies, Inc. v. United States, 370 F.3d 1153, 1159 (Fed. Cir. 2004) (quoting Metric Constructors, Inc. v. NASA, 169 F.3d 747, 751 (Fed. Cir. 1999)). Here, the contract is ambiguous because it provides multiple and conflicting instructions as to when floor sealant should be installed.

A. The Contract Provided West Bay With No Less Than Four Contradictory Instructions Regarding Moisture Sealant Installation

The contract required general construction, demolition, mechanical and electrical work, alterations, and other items involved in a thorough renovation of a VA building. PPFUF ¶ 2. The contract provided several clauses relating to sealing of the building's concrete floors. Read as a whole, the specifications provided West Bay with contradictory instructions as to when to apply sealant. Those instructions were so facially confusing as to render the contract patently ambiguous.

First, section 09800 of the specifications, titled "Special Coatings: Floor Concrete Moisture Sealant," provided in part:

> 1.02 System Description
> The system shall consist of treatments designed to control alkalinity, and to reduce vapor emission to specified, measurable, compliance levels.
> A. The system shall reduce emission levels to within 3.0 lbs, and should be installed in all cases where the starting calculation is 15.0 lbs or more.
>
> 1.03 Quality Assurance
> A. The treated area shall demonstrate a reduction of moisture vapor emission to the level specified by the manufacturer of the finish flooring materials.
> B. The manufacturer of the vapor emission compliance treatment shall supply written proof of at least 10 years successful experience in vapor emission reduction. Provide at least 5 verifiable projects with address, contact and phone number where system was successfully used to reduce before emission from 15 lbs or more to 3 lbs or less.
>
> ...

1.06 Quantification Testing

A. Testing shall be conducted with calcium chloride test kits using the following test schedule: Minimum of 3 kits for up to one thousand square feet; and an additional test kit for each ensuing thousand square feet or portion thereof. Kits shall be placed in either a rectangular or cross-diagonal pattern. Procedures must be in strict accordance with ASTM S 1869-98.

...

3.01 Examination and Preparation

...

E. Based upon the results of the test data as described in section 1.06, determine the level of remediation required. Such information must be obtained from the manufacturers of the products specified for the finished floor system.

Ex. B to Vierra Decl., p. 2 (emphasis added).

Paragraph 1.02A required West Bay to use a sealant that would reduce moisture emission levels to under three pounds and to install such sealant where the tested result was 15.0 pounds or more. This sole clause is the one that West Bay adopts as the basis for its interpretation. Plaintiff's Motion for Summary Judgment ("Pl. Mot.") at 18. Paragraph 1.03A of the same section, on the other hand, required installation of a sealant that would reduce moisture vapor emissions to the level required by the tiling manufacturer. The tiling manufacturer, as indicated in subsequent submittals, required floor sealant if the tested moisture emissions were more than 5 lbs. DPFUF ¶ 16.

Next, section 09660, titled "Resilient Tile Flooring," contained the following clause:

2.4 Sealer & Primer (For Concrete Subfloors)

As recommended by the adhesive and tile manufacturer. Seal for moisture content of 15 lbs. Contractor to provide testing to verify moisture level. See Specification 09880 and, Part 3.2, Subfloor Preparation.[3]

...

[3] The reference to Specification 09880 appears to be a typographical error and should have referred instead to Section 09800.

3.2 E. Concrete Subfloor Testing:
Determine Adhesion and dryness of the floor by bond and moisture tests as recommended by RFCI manual MRP.

(emphasis added).

Paragraph 2.4 of section 9660 required West Bay to seal the concrete using the recommendations of the adhesive and tile manufacturer, an interpretation supported by ¶ 3.01(E) of Specification 9880. This specification also instructed to "seal for a moisture content of 15 lbs." It is vague whether the final moisture content, after sealant application, should be 15 lbs, which would conflict with ¶ 1.02(A)'s requirement of a final moisture emission level of 3 lbs.

Next, Contract Drawing A060, headed "General Keyed Plan Notes," requires the contractor to "[p]rovide moisture barrier at all new work areas at 1st floor concrete slab prior to installation of new finish." DPFUF ¶ 1. These drawing instructions clearly require installation of moisture barrier sealant at all new work areas, regardless of any initial moisture test results, and do not identify the final moisture level required after sealant application.

Finally, Amendment 4 to the solicitation, issued on September 18, 2001, notified bidders of corrections being made to the sealant specifications. That Amendment provided the following:

A. Reason for amendment: To correct specifications
B: Change Section 09800-Special Coatings-Floor Concrete Moisture Sealant-Page 09800-339, Paragraph 3.01-(E), Examination and preparation, from as reads "Section 1.06, to read Section 1.03(B) . . ."(use 15 lbs)

DPFUF ¶ 2; Ex. B to Vierra Decl., p. 5. Paragraph 1.03(B), "Quality Assurance" deals with the requirement for written proof of the sealant subcontractor's moisture treatment experience, as West Bay correctly points out. Pl. Mot. at 23. The phrase "use 15 lbs" could, but does not clearly, instruct the contractor to assume an existing amount of 15 lbs of moisture. Again,

Amendment 4 does not provide clear instructions, but adds to the confusion.

The provisions quoted herein are patently ambiguous and therefore gave rise to a duty on West Bay's part to obtain clarification before making its bid. Section 09800 ¶ 3.01(E) requires the contractor to determine the level of sealant remediation required based upon the flooring manufacturer specifications, an interpretation supported by Section 09800 ¶ 1.03(A). However, section 09800 ¶ 1.02(A) requires that the sealant reduce moisture levels to "within" 3.0 lbs - presumably less than 3.0 lbs, although this too is unclear - and that it be installed in all cases where the "starting calculation" is 15.0 lbs or more. Paragraph 1.02(A) provides no guidance as to what the starting calculation may consist of and what should be done with floor sections having moisture levels between 3.0 and 15.0 lbs, as was the case here. Section 09660 ¶ 2.4 specifies that the contractor should seal "for" a moisture content of 15 lbs and also to seal as recommended by the flooring products manufacturers. It is again unclear whether the moisture level verification is for the 15 lbs initial specification or to ensure that the final results are as required by the flooring products manufacturers. Finally, drawing A060 requires a moisture barrier for all new concrete work areas before the new flooring materials are installed, regardless of the results of moisture levels tests.

To summarize, various specifications required West Bay to either determine initial moisture levels by moisture testing, to assume or use a level of 15 lbs; to seal the concrete according to tiling manufacturer's guidelines, to seal in all new work areas, or to seal only when initial moisture levels exceed 15 lbs; and to produce final moisture levels of either less than 3 lbs in places where the initial levels exceeded 15 lbs, or to produce whatever final moisture level was required by the flooring manufacturer's guidelines. These requirements cannot be harmonized

and thus render the contract ambiguous. See, e.g., Helix Elec., Inc. v. United States, 68 Fed. Cl. 571, 582 (2005) (finding a contract ambiguous where language in a clause conflicted with the overall scope of the contract).

B. West Bay's Proffered Contract Interpretation Does Not Address The Conflicting Provisions Identified Above

West Bay denies that the contract provided conflicting instructions. Rather, West Bay argues that paragraph 1.02A of section 9800 alone was not ambiguous and that West Bay's interpretation of this specification was consistent. Pl. Mot. at 13; 18. West Bay also argues that its interpretation is reasonable because it could not assume a starting emission level of 15 lbs because section 09800 required performance of moisture testing before application of the sealant. Pl. Mot. at 20. While that section alone may have been clear, this Court must look at the contract document as a whole to determine whether any ambiguity exists. NVT Techs., 370 F.3d at 1159. West Bay's interpretation focuses on one provision and ignores other, conflicting, provisions of the contract.

Notably, West Bay's analysis omits Section 9660, the specification requiring the contractor to both "seal for moisture content of 15 lbs." and to refer to tiling manufacturer requirements, and Contract Drawing A060, which requires the contractor to provide a moisture barrier at all new work areas, seemingly without regard to any moisture content test results. West Bay does not, and cannot, harmonize the requirements to seal only if the moisture test results are over 15 lbs, to seal for a moisture content "for" 15 lbs, to rely on the tiling manufacturer guidelines as when to seal, and to apply sealant regardless of any moisture testing results. It cannot. Nor does the placement of ¶ 1.02(A) at the beginning of the specification 9800 mean that later, or other, specifications have diminished import, as West Bay implies. Pl. Mot. at 19.

West Bay suggests that Amendment 4's "use 15 lbs" language "refer[s] to information on the products[']s performance on past projects." Pl. Mot. at 14. It is true that Amendment 4 refers to the "Quality Assurance" portion of Specification 9800. West Bay assigns a meaning to the "use 15 lbs" language as possibly referring to "the measure" in considering the reliability data of the proposed sealant subcontractor. Pl. Mot. at 12. Section 1.03B requested information on projects where the proposed sealant "was successfully used to reduce before emission from 15 lbs to 3 lbs." Thus, that section already used "15 lbs" as the stated measure for the sealant's reliability. West Bay acknowledges that fact by stating that Amendment #4's "use 15 lbs" language is merely a "reiteration" of the requirement in the section. Pl. Mot. at 24.
West Bay's attempt to interpret Amendment 4 proves the point that the totality of the clauses and Amendment 4 were confusing and required that the contractor seek clarification from VA. The issuance of Amendment 4, while not clear, put West Bay on specific notice as to a potential issue with the sealant specifications.

Additionally, West Bay's proffered interpretation is inconsistent with the reason to seal the concrete floor in the first place: so that the VCT, installed over the concrete, can be warrantied, as discussed below. Because the contract required West Bay to make different assumptions regarding the sealant application and because West Bay has not attempted to show how all of the provisions can be harmonized, there was a patent ambiguity for which West Bay was required to, but did not, inquire.

C. Because The Contract Provided West Bay With Conflicting Sealant Instructions, West Bay Was Required To Inquire Prior To Bidding

It is undisputed that West Bay did not inquire about the sealant requirements prior to submitting its bid. DPFUF ¶ 4. West Bay did not have any moisture test results prior to bid and

thus could not rely on any assumptions as to what sealant amounts might be required. DPFUF ¶ 9. Nor did the specifications clarify to West Bay when it would be expected to apply floor sealant. The contract contained "an obvious omission, inconsistency, or discrepancy in significance." Beacon Constr. Co. of Mass. v. United States, 161 Ct. Cl. 1, 7 (1963); see also Travelers Cas. & Sur. Co. of America v. United States, 75 Fed. Cl. 696, 711 (2007) (defining a patent ambiguity where "there is a facial inconsistency between provisions or terms within the contract). Inconsistent provisions, such as those identified above, place the reasonable contractor on notice and prompt it to rectify the inconsistency. Stratos Mobile Networks USA, LLC v. United States, 213 F.3d 1375 (Fed. Cir. 2000); Metcalf Constr. Co., Inc. v. United States, 53 Fed. Cl. 617, 630 (2002).

The presence of a patent ambiguity "triggers a duty on behalf of a public contractor to inquire about that ambiguity before it even bids on a contract." P.R. Burke Corp. v. United States, 277 F.3d 1346, 1355 (Fed. Cir. 2002); see also Blue & Gold Fleet, L.P. v. United States, 492 F.3d 1308, 1313 (Fed. Cir. 2007). If that inquiry has not occurred, the patent ambiguity in the contract must be resolved against the contractor. Triax Pac., 130 F.3d at 1475. This doctrine has arisen in order to "prevent[ ] contractors from taking advantage of ambiguities in government contracts by adopting narrow interpretations in preparing its bids and then, after the award, seeking equitable adjustments to perform additional work the government actually wanted." Id.

In preparing a bid to perform this work, a reasonable contractor would have been put on notice of the inconsistency because it would not have known, based on the contract documents, how much of the concrete floor would need to be sealed, what the starting moisture emission measurement was or would be, or to what level it would be required to reduce moisture emission.

West Bay did not know the 1999 moisture test results prior to bid.[4] DPFUF ¶ 9. West Bay cannot affirmatively state whether it even availed itself of the pre-bid site walk-through so that it could look at the condition of the floor and any existing moisture emission damage. Instead, West Bay allocated only a very low amount of its bid price for floor sealant, an amount which included even the costs of the calcium chloride tests. DPFUF ¶¶ 6;7. West Bay did not seek any proposals for floor sealant prior to bidding on the project. DPFUF ¶ 12. West Bay was unable to explain its basis for the $ 2,000 it allocated for sealant in its bid amount, which is significantly lower than the $ 128,833.00 it sought from the Government in its certified claim. DA13 (testimony of Fraser).[5] Mr. Clayton Fraser, the estimator who prepared West Bay's bid for this project admitted that "if the specs are vague, we will price it based on what we think will work. And then it's kind of our risk, but it usually works out because we've done it so much." DA18. Thus, rather than being a "reasonable and prudent contractor," Pl. Mot. at 19, West Bay took a calculated risk to bid on the renovation project without any understanding of the actual assumptions of the contract.

Instead, West Bay's first inquiry into the situation, in which it took a position on the interpretation of the floor sealant clauses that required only a minimal amount of sealing, came during performance of the contract. PPFUF ¶ 7. After being ordered to seal the entire floor area, it submitted an initial request for an equitable adjustment of over $150,000. Ex. G to Vierra Decl., p. 1. Notably, Paul Thompson, West Bay's president, admitted that, pursuant to its

---

[4] The floors were evidently tested in 1999 due to existing moisture emission damage.

[5] The amount of West Bay's bid amount allocated to floor sealant was known only to West Bay.

interpretation of the contract, West Bay would not have been entitled to any additional compensation had the tested moisture levels been more than 15 lbs. Ex. I to Vierra Decl., p. 1. That is, West Bay was fully aware of the risk that it could be required to apply the full amount of sealant and would not have been entitled to seek any additional compensation. On that basis, the sealant cannot be said to be outside the scope of the contract work as West Bay contends. Pl. Mot. at 8. Instead, when asked to apply the sealant, West Bay attempted to procure an equitable adjustment to cover the work that the Government assumed was included in West Bay's fixed price contract. This is precisely the sort of situation that the patent ambiguity doctrine is designed to prevent. Blue & Gold Fleet, 492 F.3d at 1314. West Bay bears the burden of the cost of the floor sealant installation. Beacon Constr., 314 F.3d at 504.

## III. Even If This Court Does Not Find That The Contract Contained A Patent Ambiguity, Summary Judgment Should Still Be Granted In The Government's Favor Because The VCT Flooring Would Not Have Been Warrantiable Under West Bay's Interpretation

Even assuming that this Court finds that the contract did not contain a patent ambiguity, this Court should still grant summary judgment in the Government's favor. For the contractor to prevail if a contract ambiguity is latent, the interpretation advanced by the contractor must be reasonable. West Bay's interpretation, that it was not required to install any floor sealant if the calcium chloride tests showed moisture emission levels of less than 15 lbs, would have rendered the VCT unwarrantiable and would have been contrary to the VCT manufacturer's installation requirements. West Bay's interpretation of the floor sealant provisions is not reasonable given the purpose for which the sealing was being performed. Therefore, the Court should not adopt West Bay's interpretation.

West Bay interpreted the contract using a combination of the requirements found in Section 09880 ¶1.02(A) and ¶ 3.01(E), planning to seal only the portions of the floor that it found, using its own moisture testing, to have moisture levels above 15.0 lbs. PPFUF ¶ 7; Pl. Mot. at 17. The Government, on the other hand, had interpreted the contract to require the contractor to seal the entire floor surface in order to achieve a moisture level of under 3.0 lbs. Both interpretations are consistent with some of the contractual provisions and not with others. However, West Bay's interpretation would not have produced the results required to complete the contract in an adequate fashion.

If moisture levels are too high, the VCT flooring product will not adhere properly to the subflooring. DA32 (testimony of Kurtis Vierra). Flooring manufacturers generally will not guarantee their flooring products unless the moisture levels of the subflooring are below 3 lbs. DPFUF ¶ 13. In the submittal West Bay provided for the installed Armstrong brand VCT, Armstrong identified that "moisture tests should not exceed 5 lbs/100 sq.ft./24 hours." DPFUF ¶ 16. Thus, Specification 9800's requirement to bring the moisture level below three lbs was consistent with general flooring manufacturer's requirements.

The 1999 previous testing of the moisture levels of the concrete subflooring had shown that portions of the subfloor, in the moist winter months, were experiencing moisture levels of up to 14.4 lbs. PPFUF ¶ 5. West Bay's initial moisture level test results measurements were 7.52 lbs and 4.58 lbs. PPFUF ¶ 4. Floor Sealant Technology's tests resulted in measurements of 8.0 lbs, 9.8 lbs., 8.0 lbs. and 9.3 lbs. PPFUF ¶ 6. All but one of the tests resulted in results that would have rendered the VCT unwarrantiable under Armstrong's requirements.

The CO identified this concern to West Bay, noting that it is "very doubtful that . . . tile without substantial sealant levels would remain in place and useable [sic] given the fact that winter vapor pressure levels have already been measured at 14.4 lbs." Ex. F to Vierra Decl., p. 1. West Bay never addressed the CO's clear concern that West Bay's interpretation could lead to warranty problems and the potential for the VCT to fail due to moisture transmission through the concrete slab.

Given that even West Bay's April 2002 testing showed moisture levels above those at which the VCT manufacturer would provide a warranty, West Bay's proposal to seal only areas with moisture levels over 15 lbs would mean that the flooring could not be unwarrantied, but also that the VCT could potentially fail to adhere to the concrete over the long term. West Bay's interpretation, Pl. Mot. at 9, is therefore unreasonable. P.R. Burke, 277 F.3d at 1356 (finding contractor's interpretation unreasonable where it would have required performance detrimental to another system).

The Government's interpretation, on the other hand, was a reasonable reading of the specifications. As discussed above, attaining a moisture barrier level of under 3.0 lbs in all areas is consistent with the requirements for the flooring manufacturer warranty. DPFUF ¶ 12. More fundamentally, sealant application to reduce moisture emissions to a level of 3.0 lbs properly prepares the floor for effective installation of the VCT. The contract specifications allowed West Bay to use the a certain sealant system in all areas unless moisture tests specifically showed a level over 15 lbs, in which case another, sturdier sealant would be used. This reading of the provisions ensured that the VCT installed by West Bay would adhere properly to the subflooring and be warrantied by its manufacturer.

## IV. West Bay's Remaining Arguments Are Unavailing

West Bay argues that this Court should consider its "consistent" legal position, as opposed to the Government's interpretations of the contract provisions. Pl. Mot. at 15; 25. It is axiomatic that interpretation of a contract's specifications is a matter to be resolved by the court. P.J. Maffei, 732 F.2d at 916. Extrinsic evidence, including that of trade practice and custom, may be used in resolving the ambiguity. See McAbee Const., Inc. v. United States, 97 F.3d 1431, 1434 (Fed. Cir. 1996); Travelers, 75 Fed. Cl. at 709. If the intent of the parties may be ascertained, that intent is decisive in determining the interpretation of an ambiguous contract. Edward R. Marden Corp. v. United States, 803 F.2d 701, 705 (Fed. Cir. 1986).

While this Court may consider the parties' prior conduct to resolve ambiguities, West Bay misunderstands how this doctrine is applied. "[I]n construing ambiguous and indefinite contracts, the courts will look to the construction the parties have given to the instrument by their conduct before a controversy arises." Edward R. Marden Corp., 803 F.2d at 705. That is, the Court may look to see if the parties had agreed upon a construction or acted together in a certain way prior to the controversy arising. For example, in Edward R. Marden Corp., the Court found that, at the time of contract award, both parties intended that composition flooring would be installed in certain rooms. Id. Thus, the court found that even though an ambiguity existed in the contract language, the Court would follow the parties' demonstrated intent on the particular issue. Id.

By contrast, West Bay has identified no demonstrated mutual intent or meeting of the minds prior to West Bay's April 30, 2002 letter indicating its intent not to install any floor sealant. Rather, the sum of West Bay's arguments in this regard is that West Bay interpreted the facially inconsistent provisions as narrowly as possible in order to obtain the contract as the low

bidder, and refused to perform the work without "additional compensation." Pl. Mot. at 25. This recitation adds nothing to the Court's determination of the meaning of the contract provisions. Cf. Triax Pacific, 130 F.3d at 1475 (noting that the presence or absence of a contract ambiguity is not determined by the contractor's subjective knowledge or interpretation).

Similarly, although West Bay baldly asserts that the "conduct of the parties indicate [sic] that West Bay was not required to apply moisture sealant," Pl. Mot. at 15, West Bay provides no evidence of the parties' conduct which demonstrates an intent on the matter throughout the contract performance. West Bay proposes that this Court consider the parties' legal positions during the dispute to determine the meaning of ambiguous provisions. See Pl. Mot. at 25-26. The CO's assertion that following a "lengthy review of the merits of your claim," the CO initially agreed with West Bay's interpretation hardly qualifies as a course of conduct demonstrating the parties intent before the controversy arose.

Moreover, following a contracting officer's final decision, "the parties start in court or before the board with a clean slate." Wilner v. United States, 24 F.3d 1397, 1402 (Fed. Cir. 1994). Nor can the VA's attempts to settle this dispute amicably be interpreted as an admission of the proper interpretation of the provisions, as West Bay intimates. Pl. Mot. at 7. Cf. Sternberger v. United States, 185 Ct. Cl. 528, 538 (1968) ("An offer in settlement is ordinarily not admissible, for it is deemed to be an indication only of a desire for peace and not an admission.").

Because the Government's interpretation of the contract is reasonable, while that of West Bay is unreasonable within the context of the other tasks required by the contract, the Court should interpret the ambiguity in the Government's favor.

CONCLUSION

For the foregoing reasons, we respectfully request that the Court deny West Bay's motion for summary judgment and grant the government's motion for summary judgment and dismiss the case.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

JEANNE E. DAVIDSON
Director

S/Deborah A. Bynum
DEBORAH A. BYNUM
Assistant Director

OF COUNSEL:

ANNA C. MADDAN
Office of General Counsel
Department of Veterans Affairs

S/Tara K. Hogan
TARA K. HOGAN
Trial Attorney
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
1100 L Street, N.W., attn: Classification Unit
Washington, D.C. 20530
Tele: (202) 616-2228
Fax: (202) 305-7643

October 19, 2007

Attorneys for Defendant

CERTIFICATE OF ELECTRONIC FILING

I hereby certify that on October 19, 2007, a copy of the foregoing "DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND RESPONSE TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Tara K. Hogan