IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| WEST BAY BUILDERS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 04-1140C |
| | ) | (Judge Sweeney) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

APPENDIX TO DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT

PETER D. KEISLER
Assistant Attorney General

JEANNE E. DAVIDSON
Director

DEBORAH A. BYNUM
Assistant Director

TARA K. HOGAN
Trial Attorney
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
1100 L Street, N.W.
Attn: Classification Unit, 8th fl.
Washington, D.C. 20530
Tele: (202) 616-2228
Fax: (202) 305-7643

October 19, 2007

Attorneys for Defendant

# INDEX TO APPENDIX


Defendants First Set of Request for Admission (5-3-07) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Deposition of Clayton Fraser (12-21-06) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Deposition of Kurtis Vierra (12-21-06) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Western Flooring Corp.,- Warranty Certificate (8-3-03) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

Letter from Department of Veterans Affairs, Re: Letter of Acceptance (11-20-01) . . . . . . . . . 43

Contract Excerpt, Section 09660 - Resilient Tile Flooring . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| WEST BAY BUILDERS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 04-1140C |
| v. | ) | (Judge Sweeney) |
| | ) | |
| UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**DEFENDANT'S FIRST SET OF REQUESTS FOR ADMISSION**

Defendant, the United States, hereby requests that plaintiff, West Bay Builders, Inc. ("West Bay"), respond to the following requests for admission in accordance with Rule 36 of the Rules of the United States Court of Federal Claims ("RCFC").

**Definitions**

For purposes of the requests for admission and production of documents below:

1. "West Bay," "plaintiff," "you," "yourself," and "your" means West Bay Builders Incorporated and its present or former officers, employees, agents, subcontractors, attorneys or representatives and every person connected with plaintiff in connection with this matter.

2. "Person" and "individual" means natural persons, partnerships, corporations, associations, or any other kind of entity recognized by law and their employees or independent contractors.

3. "Documents" means all writings, tapes recordings, graphic representations, drawings or printed materials of any kind whatsoever, specifically including electronic media of any kind, however produced or reproduced, that are now or have ever been in your possession or whose existence is or was ever known to you, including but not limited to: correspondence,

letters, notes, memoranda, electronic messages or mail, invoices, bills, written estimates, contracts, agreements of any kind, shipping or receiving documents, diagrams, drawings, designs, books, articles, or extracts from any of the foregoing, any drafts of the above, or any other tangible things containing information. If a document responsive to any production request was, but no longer is, in your possession and control, describe in detail the contents of the documents, its date of creation and disposition, and its present location and custodian.

4. "Complaint" means the pleading filed by plaintiff to commence this action.

5. "Contract" means the prime contract number V261C-1096, which is the subject of this action.

6. "Related to," and "Regarding" means containing, constituting, discussing, describing, identifying, referring to, supporting, explaining, contradicting or in any way pertaining to the subject specified.

7. "Project" or "building" refers to the Building 90, Livermore Division, Department of Veterans Affairs renovation project that is the subject of this action.

**REQUESTS FOR ADMISSION**

Request For Admission No.1

Admit that the contract included Contract Drawing A060, General Keyed Plan Notes 2, which states: "Provide moisture barrier at all new work areas at 1st floor concrete slab prior to installation of new finish. See Specification 07260 (Amended to 9800)."

Request For Admission No. 2

Admit that Amendment 4 to the solicitation addressed concrete moisture sealant requirements.

Request For Admission No. 3

Admit that West Bay did not submit a request for information or seek clarification from the contracting officer regarding Amendment 4 prior to submitting its bid for the contract.

Request For Admission No. 4

Admit that West Bay did not submit a request for information or seek clarification from the contracting officer about any issue related to concrete floor sealant prior to submitting its bid for the contract.

Request For Admission No. 5

Admit that the contract award amount was $1,267,000.00.

Request For Admission No. 6

Admit that West Bay's bid allocated $2,000.00 for floor sealant for the entire project.

Request For Admission No. 7

Admit that the $2,000.00 allocation for floor sealant included the cost of vapor testing.

Request For Admission 8

Admit that the $2,000.00 allocation for floor sealant included overhead and profit.

Request For Admission 9

Admit that West Bay did not rely on any moisture testing results in estimating its cost for floor sealant prior to submitting its bid for the contract.

Request For Admission 10

Admit that the contract required West Bay to reduce moisture emission levels to within 3.0 lbs.

Request For Admission 11

Admit that all moisture emission (calcium chloride) test results performed by or on behalf of West Bay for this project in April 2002, prior to application of floor sealant, were above 3.0 lbs.

Request For Admission 12

Admit that West Bay did not seek proposals for floor sealant prior to submitting its bid for this contract.

Request For Admission 13

Admit that the flooring manufacturer would not guarantee its product if it was installed over a substrate which has more than 3.0 lbs moisture emission.

PETER D. KEISLER
Assistant Attorney General

JEANNE E. DAVIDSON
Director

DEBORAH A. BYNUM
Assistant Director

TARA K. HOGAN
Trial Attorney
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
Attn: Classification Unit, 8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tel: (202) 616-2228
Fax. (202) 305-7643

May 3, 2007

Attorneys for Defendant

CERTIFICATE OF SERVICE

I certify under penalty of perjury that on this 3rd day of May 2007, I caused to be served by first class mail and by facsimile, the attached "DEFENDANT'S FIRST SET OF REQUESTS FOR ADMISSION" addressed as follows:

Timothy L. McInerney
McInerney & Dillon, P.C.
1999 Harrison St., Suite 1700
Oakland, CA 94612
Facsimile: (510) 465-8556

[signature]

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---oOo---

WEST BAY BUILDERS, INC.,

Plaintiff,

vs.

THE UNITED STATES,

Defendant.

COPY

No. 04-1140

DEPOSITION OF CLAYTON FRASER

Taken before LETICIA A. RALLS, RPR

CSR No. 10070

December 21, 2006

Aiken and Welch

One Kaiser Plaza, Suite 505
Oakland, California 94612
510/451-1580 Fax 510/451-3797

Certified Shorthand Reporters

INDEX


| | PAGE |
|---|---|
| Examination by Ms. Hogan | 4 |


EXHIBITS


| DEFENDANT'S | | PAGE |
|---|---|---|
| 11 | Previously marked exhibit | 21 |
| 12 | Document entitled "Section 09800" | 23 |
| 13 | Document entitled "Section 09660" | 26 |

DEPOSITION OF CLAYTON FRASER

BE IT REMEMBERED, that pursuant to Notice of Taking Deposition, and on the 21st day of December 2006, commencing at the hour of 2:52 p.m. in the offices of McInerney & Dillon, P.C., 1999 Harrison Street, Suite 1700, Oakland, California, before me, LETICIA A. RALLS, a Certified Shorthand Reporter, personally appeared CLAYTON FRASER, produced as a witness in said action, and being by me first duly sworn, was thereupon examined as a witness in said cause.

---o0o---

TIMOTHY L. McINERNEY, McInerney & Dillon, P.C., 1999 Harrison Street, Suite 1700, Oakland, California 94612-4700, appeared on behalf of the Plaintiff.

TARA K. HOGAN, U.S. Department of Justice, Civil Division, 1100 L Street, N.W., Washington, DC 20530, appeared on behalf of the Defendant.

CLAYTON FRASER,

sworn as a witness,

testified as follows:

EXAMINATION BY MS. HOGAN:

Q. Would you please state and spell your name?

A. It's Clayton Fraser, C-l-a-y-t-o-n, F-r-a-s-e-r.

Q. Mr. Fraser, my name is Tara Hogan, I'm an attorney with the United States Department of Justice, and I have been assigned to represent the United States in a lawsuit that West Bay has filed against the United States in the Court of Federal Claims.

The purpose of this deposition is to cover information relevant to West Bay's claims or relevant to the United States' claims.

Do you understand that?

A. I do.

Q. Have you ever been deposed before?

A. I have.

Q. How many times?

A. Five.

Q. And what was the nature of those depositions?

A. Multiple issues. Different claims that we've had with subcontractors or owners.

Q. So these have all been as an employee of West

same value, you know, the same product for a lesser value.

Q. Are you familiar with the project that we're -- that's the subject of this lawsuit?

A. Yes.

Q. Do you remember the bidding process for that long project?

A. I -- no, I don't. I mean, I know the process. I don't know the actual day. I mean, it was five years ago.

Q. Right. Did you receive proposals from floor sealing -- floor sealant companies on that project?

A. I -- I do not -- I don't know.

Q. Would you have sought proposals if you hadn't received any?

A. No.

Q. Why not?

A. We don't on floor sealant. We -- I know what -- I know what it costs to do it. If we don't get a price, I know what it costs to do it.

Q. And you know how much it costs based on your experience?

A. Correct.

Q. And the cost history?

A. Correct.

11

Q. And would floor sealant companies have these Saylor's Guides that you were talking about?

A. I couldn't tell you. I don't -- I really don't know. I don't know if they have them or not. They may.

But being that they're a specific subcontractor for that trade, I mean, that's all they do. They know exactly what it costs to do their type of work.

Q. What was the cost for the floor sealant that was in the original bid?

A. I don't recall. I haven't looked at the bid documents. You have a copy of it, I could tell you.

Q. Let's see what we've got.

Okay. I'm going to show you what's already been marked Defendant's Exhibit 11. Have you seen that document before?

A. I have not.

Q. If you look at the -- I think it's the third page Bates stamped at the bottom WBB, dash, 067?

A. Okay.

Q. It says "Change Proposal Document." Have you seen this type of document before?

A. Yes.

Q. Is this a common document in your office?

A. Yes.

Q. If you look at the last row, it says, "Floor sealant budget and bid," and then there's a $2,000 in parentheses.

A. Yes.

Q. What would that mean?

A. That would be the amount we carried in our bid.

Q. The amount you carried in your bid, meaning the amount you allocated for that purpose in the bid?

A. Correct.

Q. Would you have been the person to come up with that number?

A. Possibly.

Like I said, I don't -- I don't recall this bid -- this specific bid. I mean, I've probably bid 200 jobs since this bid, so I -- I don't know where that number exactly came from or who came up with it, but I may have been, yes.

Q. So you don't know what the assumption was in terms of whether you would need floor sealant when you --

A. No, I'd have to look at the specs to tell you. I mean, this -- just based on what the description says here, it says, you know -- they're saying, it looks like, they want it everywhere.

Q. Okay. Do you remember looking at the specs for

this project?

A. I do not.

Q. Do you remember if you made any contact with the owner about the specifications for this project?

A. I do not.

MS. HOGAN: Go off the record for a second.

(Discussion held off the record.)

MS. HOGAN: Let's go back on the record and mark this Defendant's Exhibit 12.

(Document marked Defendant's Exhibit 12 for identification.)

BY MS. HOGAN:

Q. Once you've had a chance to look at that, let me know.

(Witness reviews document.)

THE WITNESS: Okay.

BY MS. HOGAN:

Q. Do you recognize these specs?

A. I don't recognize them, but they look like standard floor moisture specifications.

Q. So you've seen specifications like this?

A. Correct.

Q. Okay. If we look at section 102 -- I'm sorry, 1.02, subsection A?

A. Okay.

14

before you put in the flooring. But most cases you're not waiting that long.

It really comes down to, you know, you do your testing. But we only really test -- unless we're told to -- test new concrete. If we're told to, we'll test everything, but those results are always lower than what's recommended.

Q. The $2,000 that was evidently a part of the original bid, would that have reflected a small square footage of new concrete or --

A. Yes, relatively small.

Q. Is it possible with an existing project that the emissions testing could get results that would be greater than normal?

A. Anything is possible. I've never seen it.

You know, concrete keeps drying over time, so, I mean, the concrete in this building is still drying, so...

MS. HOGAN: Okay. Mark this Exhibit 13.

(Document marked Defendant's Exhibit 13 for identification.)

BY MS. HOGAN:

Q. And once you've had a chance to look at this exhibit, let me know.

(Witness reviews document.)

flooring. We don't do it where there's carpet, so there's a little variance from what you said, but yes.
And then on an existing project, it's if there's flooring going over new concrete, we would account for it there, such as resilient flooring.
Q. Are there any other assumptions or variables that you would take into account in coming up with your floor sealant estimate?
A. No.
Q. Would you take into account high water table?
A. No. You apply the same product. If it's 15 or 25.
Q. 15 or 25 what?
A. Pounds. Yeah, sorry.
Q. Is there any variance in the types of floor sealants?
A. Yes.
Q. What?
A. They can specify a very simple one, or they can specify a product that is a four-step process, and there's only two guys that can do it. Those two guys price it very expensively.
Q. When you say "they," you're referring to --
A. Subcontractors. There will be a certain brand name, such as Floor Seal Technology or whatever the

16

case may be, and they're the only ones that can do it, and they can price it as expensive as they want to.

Q. But when you say -- are we talking about simple versus four-step process? Who would be determining what sealant to use?

A. The specifications.

Q. So the owner?

A. The owner or the architect.

Q. And these specifications that we've just looked at in Exhibits 12 and 13, how would you describe those? Are they simple, or are they more complicated?

A. Well, they're simple because they don't specify a certain product. They just kind of give you a general overview.

Q. So you would use a different type of sealant mostly based on the owner's preference?

A. The architect's preference, yes.

Q. Or the architect's preference.

A. What we would do is we would also -- or we could submit -- we could submit to the architect what we felt meets the intention of the specifications, and they can approve it or reject it if they feel it meets or doesn't meet the intent of the specs.

There's a lot of different options, but...

Q. And would you be giving that submittal to the

architect prior to the bid or after the award?

A. After.

Q. I guess what I'm wondering is how you would account for all these possible variations when you're submitting the bid. You don't know what the vapor tests are going to say yet; you don't know what the architect or the owner wants. How do you know what the right price to estimate is?

A. It's more of a -- it's a gut feeling. It's -- I've done this for 12 years now, and I know what -- what we've done in the past. I know what's worked. I know where the moisture levels are high, where they're low.

Just like in any profession, you know -- it's your business to know, and we're supposed to know what we think is going to work, and that's -- if the specs are -- are vague, we will price it based on what we think will work.

And then it's -- it's kind of our risk, but it usually works out because we've done it so much.

Q. So it's your experience --

A. It's our experience, yeah.

Q. So when you saw these specs, your experience would tell you that it would need a minimal amount of floor sealant?

A. Correct.

Q. The vapor testing, how would that be allocated in the -- in the estimate?

A. It's part of a unit price that we would -- that we would carry.

Q. And that's a unit price for the tiling or for vapor testing or...

A. For vapor testing, right.

Q. It would be its own line item?

A. Yeah. So on this spec, on this section, this line item 9800 on your bid form, anything involved with the testing, the actual sealant would be involved in this line item.

Q. Okay. So the $2,000 that we've talked about would include the cost of the vapor testing as well?

A. Correct.

Q. And once the -- once you needed the vapor testing, then you would go to one of your subs and seek proposals for...

A. We could.

Vapor testing, though, we actually do it a lot ourselves now just because you can do it. You go down to Home Depot; you buy a little kit; set it on the floor, and six hours later it gives you a reading.

So it really depends -- certain specifications

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---oOo---

WEST BAY BUILDERS, INC.,

Plaintiff,

vs.

THE UNITED STATES,

Defendant.

COPY

No. 04-1140

DEPOSITION OF KURTIS VIERRA

Taken before LETICIA A. RALLS, RPR

CSR No. 10070

December 21, 2006

Aiken and Welch
One Kaiser Plaza, Suite 505
Oakland, California 94612
510/451-1580 Fax 510/451-3797

Certified Shorthand Reporters

# I N D E X


| | PAGE |
|---|---|
| Examination by Ms. Hogan | 5 |


# E X H I B I T S


| DEFENDANT'S | | PAGE |
|---|---|---|
| 1 | Letter to West Bay Builders, from Taylor Tools, dated 4-22-02 | 55 |
| 2 | Letter to Mel Koenig, from Kurtis A. Vierra, dated 4-30-02 | 57 |
| 3 | Letter to West Bay Builders, from Veterans Health Administration, dated 5-2-02 | 59 |
| 4 | Document entitled "VAPRECISION" | 61 |
| 5 | Surface Solution Innovations 2000 estimate, dated 5-1-02 | 68 |
| 6 | Proposal to West Bay Builders, from Floor Seal Technology, dated 5-8-02 | 70 |
| 7 | Letter to Mel Koenig, from Paul Thompson, dated 5-2-02, with attachments | 72 |
| 8 | Letter to Mel Koenig, from Kurtis Vierra, dated 5-3-02 | 76 |
| 9 | Letter to Mel Koenig, from Kurtis Vierra, dated 5-7-02, with attachment | 79 |


21

| | | |
|---|---|---|
| 10 | Subcontract Agreement between West Bay Builders and Floor Seal Technology, dated 6-3-02 | 81 |
| 11 | Letter to Mel Koenig, from Kurtis Vierra, dated 6-10-02, with attachment | 83 |

22

DEPOSITION OF KURTIS VIERRA

BE IT REMEMBERED, that pursuant to Notice of Taking Deposition, and on the 21st day of December 2006, commencing at the hour of 8:41 a.m. in the offices of McInerney & Dillon, P.C., 1999 Harrison Street, Suite 1700, Oakland, California, before me, LETICIA A. RALLS, a Certified Shorthand Reporter, personally appeared KURTIS VIERRA, produced as a witness in said action, and being by me first duly sworn, was thereupon examined as a witness in said cause.

---o0o---

TIMOTHY L. McINERNEY, McInerney & Dillon, P.C., 1999 Harrison Street, Suite 1700, Oakland, California 94612-4700, appeared on behalf of the Plaintiff.

TARA K. HOGAN, U.S. Department of Justice, Civil Division, 1100 L Street, N.W., Washington, DC 20530, appeared on behalf of the Defendant.

KURTIS VIERRA,

sworn as a witness,

testified as follows:

EXAMINATION BY MS. HOGAN:

Q. Mr. Vierra, would you please state your name and spell your name for the record?
A. It's Kurtis Vierra, K-u-r-t-i-s, V-i-e-r-r-a.
Q. Mr. Vierra, my name is Tara Hogan, and I'm an attorney with the Justice Department, and I've been assigned to represent the United States in a lawsuit that has been filed by West Bay Builders against the United States, that's been filed in the United States Court of Federal Claims.
The purpose of this deposition is to obtain information that may lead to -- that may be relevant to either your -- West Bay's claims or to the government's claims.
Do you understand the purpose of the deposition?
A. I do.
Q. Have you ever been deposed before?
A. Yes.
Q. How many times?
A. I don't know.
Most of them have been with you (indicating).

that we had to satisfy as we became more into the public work sectors. It was -- we'd get the job, and we'd work for whoever was paying for it.

Q. Prior to the Livermore project that we're talking about today, had you ever worked on a project with the federal government?

A. I don't believe I have.

Q. Did you work on any after that project?

A. No.

Q. Let's talk about floor sealant.

A. Okay.

Q. What is floor sealant?

A. Floor sealant is a product that you put on a concrete floor in order to keep the moisture from the concrete from damaging the flooring.

Q. Do you only use it on concrete floor?

A. Primarily.

Q. When else would you use floor sealant?

A. I can't think off the top of my head of any other conditions where you'd use it. There's different -- different types of concrete floor. Some of them are slab-on-grade, which is just concrete on dirt, essentially, or maybe an elevated slab where the second floor is on a metal deck, and they pour concrete over the top of it. Primarily that would be about it.

Q. What form is the product? Is it a liquid?

A. It's a liquid that is -- it's a very thick liquid. It's not just poured out. It has to be applied with a roller or a squeegee or a trowel, something to spread it around, depending on the nature of the material itself.

Some of it is -- the stronger the material is, the more water it's designed to hold back, the thicker the material is.

So if it's only intended to stop a little bit of water, then you might be able to apply it with a squeegee. If it's a medium range, then maybe you have to do it with a roller, or if it's a thicker product, then it would have to be troweled on and physically spread with a knife.

Q. When we're talking about moisture, are we talking about that would come from the concrete naturally or moisture that occurs in the air?

A. Both. In some projects, concrete -- concrete has water inherent to it in the mix, and as concrete hardens, it gives off moisture, and the water evaporates out of it.

You can see this -- a moisture barrier applied in a couple of different conditions. One is if the concrete is fresh and it is still -- still giving off

moisture when you've tried to put the floor down, you would need to put a moisture barrier down in order to get the floor to stick.

Other conditions, there's high water table.

Q. What does that mean?

A. It means the water in the ground is closer to the surface. And concrete is a sponge; it's porous. So if there's a lot of water in the ground -- in the surface, then it will go into the concrete slab, and then it will -- the concrete will act like a sponge, and it will suck the moisture out and distribute it to the top of the slab, and then floors have a hard time staying applied.

Q. When you talk about the floor, are you talking about tile or linoleum or --

A. Basically it's vinyl -- vinyl products, vinyl ceramic tiles. We call it VCT or sheet vinyl.

You don't typically see it under carpet because carpet can breathe, and so the moisture can just evaporate through the carpet, and it doesn't become a problem.

There are types of carpet that don't allow for that, and then you would have to -- then you may need to apply this under that as well.

Q. So if you had a carpet, the moisture would be

it would be necessary unless there's some other indication on the facility, some other knowledge that I had that said water's a problem out here.

Like I said, some of these projects that we're running out in Alameda, we have to go out and do moisture tests, water table tests before we start construction. Other ones we don't even think about it because there's no indication that it's necessary.

Q. Can you explain how the vapor emission levels are tested or measured?

A. It's a -- the product that we use, it's called a calcium chloride test. In the trades they're called hockey pucks, essentially. They look like clear, plastic Petri dishes with essentially something in it that looks like Styrofoam, the individual granules of Styrofoam.

And you need to clean a section of the floor, and you can buy these as a kit -- and I believe that we did this on this project -- you can buy them as a kit. It comes in a box, and all the directions are in a box. You don't have to be specifically licensed to do these tests. It's pretty simple.

You clean a section of the floor; you take the hockey puck; you take the lid off of the hockey puck, set it on the floor. And then it comes with a lid that

you tape to the floor to create basically a sealed, one-foot -- one square foot section.

And what the box does, the seal, it traps all the moisture in that's released. So it says that you need to leave these things on the ground for, I think, 36 to 72 hours.

So each one of these things -- the weight of each of these hockey pucks is known from the factory; it's established. Then you record the time that you put it down and the time that you removed it. Then you put the lid on it, and you can either weigh it yourself and do the mathematical calculations that it tells you how to do or you can send it off to this company that sells you these things -- I think they're in Colorado -- and they weigh it, and they'll give you official test reports.

Q. Is the calcium chloride test the only way to test for emissions?

A. I doubt it, but common practice, it's the easiest, the simplest. It's the only one that I've ever seen anybody use.

Q. When the calcium chloride test is being performed, can other work be done on the floor?

A. Yes, as long as -- as long as the seal's not compromised and as long as nobody spills water around

there, because even if it's sealed, the water will seep into the concrete because it's a sponge, and then it will come back out, and it will -- excuse me, contaminate the test. But other work can go on.

Typically, we're in a building, and we're getting ready to install the finishes -- the wall, paint it, put the ceiling in, put the carpet in -- so there's other tradesmen in the area. And we just basically cordon off a section of the room and put these in.

Typically you have to do one for one -- you have to do a minimum of three, I believe -- two or three, and then typically one for every thousand square feet.

But there's usually -- there's usually requirements in the flooring spec that says, "You will test at this many tests and this many per thousand square feet minimum." Usually that's identified in the testing procedures in -- either in the contract or the flooring manufacturer's requirements.

Q. I think you mentioned before that there were different types of floor sealant systems?

A. Yes.

Q. Is that just a -- a competitive market, or are there different reasons to use different types?

A. It's a competitive market, so there's other -- there's several manufacturers on the market. But the harder you expect the floor sealant to work, the more expensive it is.

So typically -- let's say a flooring company won't warranty their product if it's -- if there's more than -- usually the range they say is three to six pounds of moisture per thousand square feet over 24 hours. That's -- that's the full version of it. But -- but in the industry, it's three to six pounds.

So if there's three to six pounds of moisture, they're usually okay. And once you get beyond three to six pounds, then you need to involve the flooring manufacturer to figure out an acceptable level.

If I have nine pounds of moisture, I don't need something that's going to have to work very hard. If I have 18 pounds of moisture, I need something that's going to work really hard, and that becomes more expensive.

So there's different levels -- these things are designed at different thresholds. If you have one that -- one may be designed to work to nine pounds; anything above nine pounds, then you have to switch to a different product. Basically you have to go from a Chevy to a Cadillac, that type of thing. You don't

need to change manufacturers; you just need to upgrade the level.

Q. So when we're talking about nine pounds of moisture, that would be when you first test the floor and you say there's nine pounds, then you would still need to look at the manufacturer's requirements?

A. You would need to look at what -- what's following the concrete and figure out what those products are and what their manufacturers require.

And typically you'll see in a flooring spec, it will say, "You need to do this testing." And the reason why it's required in the flooring spec in the carpet guide spec, in the vinyl -- the VCT spec, because they need to establish the moisture level of a slab before they apply their material in order for them to provide a warranty.

Q. So the floor manufacturer will not provide a warranty if the moisture can't be guaranteed?

A. Correct, because then his product isn't able to stick with the current glues that are on the market, and he's expected to come back because his floor failed.

So he needs to establish that the -- the existing surface was -- is at a level that will allow him to warranty his product.

Excuse me. Can I get some water, possibly?

MS. HOGAN: Sure. We can go off the record.

(Recess taken.)

MS. HOGAN: Okay. We'll go back on the record.

BY MS. HOGAN:

Q. Other than the flooring not being able to stick if the moisture is too high, is there any other reason to put the floor sealant down?

A. No.

Q. So it's really for the benefit of the floor --

A. Yes.

Q. -- manufacturer?

A. Well, the floor manufacturer and the end user. Once the warranty period expires, then it becomes a maintenance issue for the facility.

Q. How long do the warranty periods typically last?

A. Anywhere from one to three years.

Q. So you have a different floor sealant system based on the existing moisture level?

A. Yes.

Q. Would there be any other reason to use a different type of sealant, or is the moisture level really the primary --

A. Other than the low bidder, who's providing the

best price.

Q. When you do the calcium chloride tests, how long are those test results good for or accurate?

A. They're really just a snapshot in time. It establishes what the level is for this period.

I've seen them fluctuate just based off of weather, time of year. Typically on an existing building, there will be less water in the slab during the summer than there will be in the winter. So it depends. It really -- it really is just a snapshot.

(Office interruption.)

BY MS. HOGAN:

Q. And usually the general contractor would perform the test -- who -- let me back up.

Who would perform the calcium chloride test?

A. Typically it's the responsibility of the flooring manufacturer to perform the test. He's the one -- either the manufacturer or the floor subcontractor. He's the one that has to provide the warranty. It's a requirement of their manufacturers, so typically it's -- the person responsible for installing the floor would make -- would do that. Typically.

Q. And West Bay would have subcontracted floor sealing --

WESTERN FLOORING CORP

850 South Van Ness Avenue
San Francisco, CA 94110
Phone: (415) 647-6888
Fax: (415) 647-2738
License: 766413
E-mail: info@westernflooring.com
Internet: www.westernflooring.com

# WARRANTY CERTIFICATE

Project: **VA Palo Alto Health Care System Building 90, Livermore Ca.**

Owner: **Department of Veterans Affairs**

WORK:

We hereby warrant that the **Carpet and Resilient Flooring** we have installed at the above named project has been done in accordance with the Drawings and Specifications and that the work as installed will fulfill the requirements of the warranty included in the specifications and will be free of defects in materials and workmanship for a period of one (1) years from the date of Substantial Completion.

REPAIR/REPLACE:

We agree to repair or replace to the satisfaction of the Owner any or all of such above named work, that may prove defective in workmanship and or material within the specified period above. Ordinary wear and tear and unusual abuse or neglect excepted.

In the event of our failure to comply with the above mentioned conditions within twenty (20) calendar days after being notified in writing by the Owner, we do hereby authorize the Owner to proceed to have said defects repaired and made good at our expense.

Signed: Tyrone l Coll

Date: 8-7-03

Signed: ______________________

Date: ______________

**"Specializing in Carpet, Ceramic Tile, Linoleum, Resilient and Laminate Floors"**

REC'D 3/28/02

Specifications for

Building 90 Livermore VA
Department of Veterans Affairs

Resilient Flooring
Sections – 09660 & 09679

VA PALO ALTO HEALTH CARE SYSTEM
PALO ALTO, CA (640/138D1)

VA PROJECT FILE: 09660-1

VA PROJECT NO.: 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

VA CONTRACT NO.: V261C-1096

Approved as to general arrangement only subject to correction noted and contract requirements. No responsibility assured for quantities or dimensions.

Disapproved, Resubmit.

Other:

Signature: [signature] Date: 4/1/02

SEE ATTACHED COMMENTS

By:
Western Flooring Corporation
850 South Van Ness Ave.
San Francisco, Ca. 94110
(415) 647-6888

**SUBMITTAL REVIEW**
WEST BAY BUILDERS

Submittal No.: 13-09660/09679

Date: 3-28-02

Reviewed By: KC

Detail dimensions not checked. Subcontractor is responsible for correctness of dimensions and fitting of parts.

# Table of Contents

## Products

1. Armstrong Vinyl Composition Tile, Style Stonetex
2. Roppe Rubber Wall Base

## Samples

1. Armstrong Vinyl Composition Tile, Style Stonetex Sample Box
2. Roppe Rubber Wall Base

# Stonetex Excelon Vinyl Composition Tile

**Warranty:** Limited 5-Year Commercial Flooring Products Warranty
**Width:** 12" (305 mm) X 12" (305 mm)
**Use:** Commercial
**Shipping Weight:** 63 lbs. (28.58 kg)/carton
**Gloss:** (typical value) 60° specular, 20-40

**Installation**

*Location:* All grade levels
*Fitting:* Tile cutter, straight scribe, hot knife
S-89, S-515, S-750, or S-700

PRODUCT ATTRIBUTES:

- A tile reminiscent of natural stone, with organically inspired colors and peppered accents for an architectural look.
- An Armstrong original, with a non-directional, simple visual that complements any interior.
- Color and design are "through-pattern" to last the lifetime of the floor.
- 25 warm neutrals, soft pastels and bolder accent colors.
- Styled and constructed for office, retail, education and healthcare interiors.

**MATERIAL:** A composition of polyvinyl chloride resin binder, fillers, and pigments.

**PATTERNS AND COLORS:** Colors and pattern detail are dispersed uniformly throughout the thickness of the material. Color pigments are insoluble in water and resistant to cleaning agents and light.

**NOTE:** Stonetex patterns 52147, 52148, 52149, 52150, 52151, 52152, 52153, 52154 and 52157 are subject to scratch whitening. Use should be limited to nonfield areas.

**REFERENCE SPECIFICATIONS:** ASTM F 1066, Class 2 - through pattern

**FIRE TEST DATA:**

ASTM E 648 Critical Radiant Flux - 0.45 watts/sq. cm. or more - Class I
ASTM E 662 Smoke - 450 or less
Numerical flammability ratings alone may not define the performance of the product under actual fire conditions. These ratings are provided only for use in the selection of products to meet the specified limits.

**STATIC LOAD LIMIT:** ASTM F 970; 75 psi (5.27 kg/sq cm)
**DURABILITY:** Very Good
**MAINTAINABILITY:** Good
**RESILIENCE:** Good

**APPROXIMATE INSTALLED COST PER SQUARE FOOT:**

U.S.: $1.60 to $2.00 Canada: C$2.15 to C$2.70

# S-515 Clear Thin Spread Tile Adhesive

**Installation**

**System:** Tile Installation System
**Use:** Commercial, Residential
Use For:

- Vinyl composition tile

**Description**

**Type:** Water-based/latex-resin

**Color:** Creamy yellow; dries clear (beige)

Saturn Yellow
**Trowel:** Fine notch: 1/32D x 1/16W x 5/64A U-notch trowel

Until dry to touch; approximately 30 -90 minutes
24 hours
NOTE: Working times vary based on job conditions, substrate, temperature, and humidity
350-400 sq ft/gal (33-37 sq m)
**Removal:** Removal from surface using a clean, white cloth
WET: Detergent and water
DRY: Mineral spirits
**Advantages:**

- 24-Hour Working Time (Ideal for large commercial installations)
- Dries Clear (Allows chalk lines to show through)
- Can Be Used Over "Cutback" Adhesive Residue (Reduces subfloor preparation time)
- Excellent Initial Grab
- Moisture and Alkali Resistant (Allows installation on all grade levels of concrete)
- Excellent Trowelability (Easy to use, easy to trowel)
- Freeze/thaw stable to 10° F (-12° C). Avoid low temperatures or multiple freeze-thaw cycles.
- AGIS Guarantee (Included as part of the Armstrong Guaranteed Installation System when installing Armstrong VCT)

One year if not opened
**Available Units:** Gallon, 4 Gallons

VOC content: 49 g/L; calculated and reported, SCAQMD 1168

| | |
|---|---|
| **WARNING:** | **EYE AND SKIN IRRITANT.**<br>**Read carefully other cautions on label.** |

**SUBSTRATES:** Will bond to all substrates listed below but refer to flooring installation system for specific installation recommendations:

- Concrete on all grade levels
- Existing asphalt "cutback" residue which is smooth with no ridges or puddles evident

39

- Suspended wood and wood underlayments
- Existing well-bonded resilient flooring; not perimeter-bonded or cushion-backed
- Ceramic tile, terrazzo, marble and polymeric-poured floors
- Properly mixed and applied powder underlayment and embossing levelers
- Primed, poured-in-place gypsum subfloors
- Radiant-heated subfloors where the surface temperature does not exceed 85° F (29° C)

**DO NOT USE OVER:** Concrete with excessive moisture and/or alkali; existing cushion-backed resilient flooring; substrates treated with fire-retardant chemicals, fungicides, preservatives, release agents, adhesive removers, sealers, curing compounds or other incompatible treatments

**UPC INFORMATION:** Gallon: 0-42369-114.2-6
4 Gallons: 0-42369-07063-8

**WEIGHT PER GALLON:** 8.37 lbs

**SHIPPING UNIT:** Gallon: 4 gallons/ctn
4 Gal: 1 pail

**QUANTITY PER PALLET:** Gallon: 30 ctns
4 Gal: 48 pails

**INSTALLATION TIPS:** Refer to flooring installation system.

- Condition area to be installed, adhesive, and tile at 65° F (18° C) or above for 48 hours before, during, and for 48 hours after installation.
- Subfloor must be smooth, sound, dry, clean, and free of dirt, wax, polish, paint, and all other foreign matter which may interfere in a good bond, including curing agents and sealers.
- Always run a calcium chloride and alkali test over concrete on any grade level or any other substrate over on- or below-grade concrete. For accurate results, curing agents must be removed in areas where tests will be run. Moisture test results should not exceed 5 pounds/1000 sq ft/24 hours. Alkali readings should be 5 to 9.
- Stir any liquid on the surface into the adhesive and full spread using the recommended trowel notching.
- Allow adhesive to set open until dry to the touch, approximately 30 to 90 minutes. When dry to the touch, the adhesive will be tacky with no transfer to fingers.
- Install and fit all tile within 24 hours. Working time will vary based on job conditions, substrate, temperature and humidity.
- Roll residential tile in both directions with a 100-pound roller. Do not roll Excelon tile.
- Remove wet adhesive residue using a clean, white cloth dampened with soapy water. Use mineral spirits for dried adhesive residue carefully following warnings on container.
- Do not wet wash or strip tile for at least five days after installation.

**WARRANTY:** When Armstrong S-515 is used with a recommended Armstrong floor application, the Armstrong Guaranteed Installation System warranty applies.

**WARNING:** Carefully read and follow all cautions and warnings on the product label. Refer to the Material Safety Data Sheet for additional product information.

40

# MATERIAL SAFETY DATA SHEET

Armstrong

## S-515

**Prepared 11/98 – Replaces 4/97**

Armstrong World Industries, Inc.
P.O. Box 3209
Lancaster, PA 17604
(717) 396-2328 or (717) 396-2935

**I. PRODUCT IDENT ICATION**
Name: Armstrong S- . Clear Thin Spread Tile Adhesive
Description: Water-di sed latex em ulsion

**II. DEPARTMENT OF RANSPORTATION INFORMATION**
Shipping name: Not c ssified Hazard Class: N/A ID #: N/A
EMERGENCY ONLY ( TACT: CHEM-TEL -1-800-255-3924

**III. HMIS (0 = minim zard; 4 vere hazard)**
Health = 1 Flamm ity = 1 Reactivity = 0

**IV. PRODUCT CONT NT**
This product does no ntain chemicals subject to the reporting requirements of Secti 13 of SARA Title III and 40 CFR 372. All components are on A inventory. This product does NOT cont asbestos.

**V. HAZARDOUS ING IENTS**

| (Chemical Identi. Common Name) | C.A.S. No. | % | OSHA PEL | ACGIH TLV |
|---|---|---|---|---|
| VM&P aphtha | 64742-89-8 | 2-3 | 300 ppm<br>STEL 400 ppm | 300 ppm |

**VI. PHYSICAL DATA**
APPEARANCE: Beige cre aste. ODOR: Mild solvent odor. BOILING POINT (degrees F): 212 F LTING POINT: N/A. VAPOR PRESSURE (mm Hg @ degrees C): N/ VAPOR DENSITY (Air = 1): N/K. PERCENT VOLATILE BY WEIGHT ( . @ 275 ees F): 56.0-58.0%. EVAPORATION RATE (Butyl Ac = 1): N/K WT/GAL (water = 8.3): 8.37 lb. SOLUBILITY IN WATER: sible. SPECIFIC GRAVITY ($H_2O$ = 1): 1.00. VOC: g/l calculated at 21°C, SC 4D. pH: 9.

**VII. FIRE AND EXPLOSIO HAZARD DATA**
FLASH POINT (Method): 0°F (Setaflash Closed Tester). FLAMMABLE RANGE: LEL = N/A; UEL A. EXTINGUISHING MEDIA: Carbon dioxide; dry chemical or wate y. SPECIAL FIRE FIGHTING PROCEDURES: Protect fire fighters from products of combustion by wearing self-contained breathing apparatu. UNUSUAL FIRE AND EXPLOSION HAZARDS: Closed containers in a fire rupture due to pressure build-up; use water to cool containers to prev s.

**VIII. HEALTH HAZARD ATA**
PRIMARY ROUTE(S) OF TRY: Inhalation, ingestion and direct dermal exposure. TARGET OR S: Upper respiratory tract, skin and eyes. EFFECTS OF OVEREXPO : SKIN AND EYES: Excessive skin contact may cause drying and cr g of the skin, defatting of tissue, and result in derm . Contact with may caus ation. INHALATION: VM&P Naphtha may cause irrita respiratory ct, coughing, and CNS effects such as headache, dizzin drowsiness, nausea. CARCINOGENICITY: NTP: ; IARC Mono. : No; OSHA Regulated: No. MEDICAL CONDITIONS GENERAL GGRAVATED BY EXPOSURE: Any condition generally aggravated by s s, including pre-existing upper respiratory and lung d se such as, but limited to bronchitis, emphysema and asthma. Existing conditions. AID PROCEDURES: SKIN AND EYES: Flush any contact with water. Additionally with skin contact, wash with and water. R physician irritation or symptoms persist. INHALATION: Remove air if exp d to excess concentrations of vapor. k medical at symptoms persist. INGESTION: Do not induce vomiting. Call a P Control Center or physician for guidance.

**IX. REACTIVITY DATA**
STABILITY: Stable. MPATIBILI : Strong oxidizing agents. HAZARDOUS DECOM ION PRO TS: Carbon monoxide, carbon d e and other va pors and that are common to thermal degradation of organic unds. HAZARDOUS POLYMERIZATION: Will not cur.

Form 11/98J

**X. SPILL OR LEAK PROCEDURES**
STEPS TO BE TAKEN IF MATERIAL IS RELEASED OR SPILLED: Ventilate area of spill or release. Contain spill, preventing it from entering sewer lines or waterways. Use absorbent to assist with the pick-up of material. Scrape up product and place into container. Residual of product, while still wet, can be cleaned up with warm soapy water. WASTE DISPOSAL METHOD: Dispose of container and any unused contents in accordance with Federal, State and Local Waste Disposal Regulations. Do not flush unused contents or residue down drains. Do not reuse container.

**XI. SAFE HANDLING AND USE INFORMATION**
VENTILATION: Use natural cross-ventilation, local (mechanical) pick-up, and/or general area (mechanical) ventilation to prevent an accumulation of solvent vapors, keeping in mind that the ventilation pattern must remove the heavier-than-air solvent vapors from the lower levels of the work spaces. The ventilation should be sufficient to keep the solvent vapor concentration below the TLV. RESPIRATORY PROTECTION: With adequate ventilation, respiratory equipment should not be needed. If adequate ventilation is not afforded, wear respiratory equipment approved for organic vapors. SKIN AND EYE PROTECTION: During normal end-product use, cotton or loop-pile gloves and spectacle-type safety glasses are recommended to prevent contact with this mastic product.

**XII. SPECIAL PRECAUTIONS**
PRECAUTIONS TO BE TAKEN IN HANDLING AND STORAGE: Store in an area suitable for combustible mixtures. Recommended storage temperature is below 90°F. OTHER PRECAUTIONS: Vapors are heavier-than-air. Use precautions that are common with the safe handling of combustible liquids. WORK SITE ENVIRONMENT: Initially there may be a potential adverse impact on indoor air quality within the general work area during the installation process. Therefore you should advise the building manager or other appropriate person that: • It will be necessary to establish and maintain adequate ventilation of the work area, without causing the entry of contaminants to other parts of building; and • Persons who are sensitive to odors and/or chemicals should be advised to avoid the work area during this process.

The information presented herein is supplied as a guide to those who handle or use this product. Safe work practices must be employed when working with any materials. It is important that the end user makes a determination regarding the adequacy of the safety procedures employed during the use of this product.

N/A – not applicable or not available
N/K – none known or not known

## Wall Base
## Type TS Thermoset Vulcanized Rubber Wall Base

Product Info | Color Palette | Samples | Specifications | Support


Rubber Wall Base

**Premium Performance**
Roppe Type TS thermoset, vulcanized SBR Rubber Base is still the best base in the industry, standing alone in quality and performance.

**Features and Benefits**

- Made only from the highest quality, 100% virgin synthetic rubber
- Extremely flexible; easy to wrap around corners and cut to size
- Easy to install, easy to maintain
- It has a high degree of dimensional stability. Won't shrink, gap, or separate from the wall. Maintains a smooth, attractive appearance
- Does not have to be acclimated to room temperature
- Exclusive low-gloss satin finish resists scuffing, gouging, and most chemicals
- 52 decorator colors; color is inherent throughout the entire base
- Available in 4' pieces - 1/8" thickness, 2 1/2", 4" and 6" heights
- Available in 120 coils - 1/8" thickness, 2 1/2", 4" and 6" heights


Oral B Laboratories
Belmont, California

Visit our Gallery to see installations of the Rubber Wall Base.



**New! Alpha Base**
This unique, patented product combines the benefits of our famous SBR Base with an innovative "signage" capacity. Click here to read more.

ALPHA BASE

View our catalog on Sweets.com.

Company | Distributor | Products | Gallery | Contact | Home

© 2000 Roppe Corporation

VA Medical Center
10535 Hospital Way, Mather, CA 95655-1200
Center for Rehabilitation & Extended Care (CREC)
150 Muir Road, Martinez, CA 94553
VA Outpatient Clinics:
150 Muir Road, Martinez, CA 94553
2221 Martin Luther King, Jr. Way, Oakland, CA 94612
351 Hartnell Avenue, Redding, CA 96002

VA Outpatient Clinics (cont.):
25 Main Street, Suite 101, Chico, CA 95928
Building 201, Walnut Avenue, Mare Island, CA 94592
101 Bodin Circle, Travis AFB, CA 94535
Oakland Army Base, Building 762, Oakland, CA 94626
Telephone Care: 1-800-382-8387
Website: "www.va.gov/station/612-martinez/main.html"

**Department Of Veterans Affairs**
**VA Northern California Health Care System (VANCHCS)**
**150 Muir Road, Martinez, CA 94553**

November 20, 2001

West Bay Builders Inc.
615 Lindaro Street
San Rafael, CA 94901

Subject: Solicitation 261-0341-01, Letter of Acceptance

Dear Mr. Thompson:

1. Acceptance is hereby made of your Best & Final offer dated September 27, 2001, which was submitted in response to our RFP 261-0341-01. Department of Veterans Affairs (VA) Contract No. V261C-1096 will be assigned and all future correspondence should reference the contract number assigned.

2. You will be required to furnish the materials, labor and perform the work for this contract for the Consolidated Contracting Activity (CCA), 150 Muir Rd., Martinez, CA, 94553, in strict adherence with the specifications for the total sum of $1,267,000.00. The work is to be completed within 436 calendar days after receipt of notice to proceed.

3. You will also be required to furnish Performance & Payment Bonds in the penal sum of One Million, Two Hundred and Sixty Seven Thousand, ($1,267,000.00) each. Forms for bonds are enclosed and in accordance with your accepted offer, should be executed and returned within ten (10) days after they are presented for signature. You will be officially notified to proceed with the contract work after they have been properly executed and approved.

4. Pursuant to the provisions of the Veterans Affairs Acquisition Regulation 852.270-1, Mr. Wilson Bunoan is designated as the Contracting Officer's Technical Representative (COTR). A copy of his delegation and responsibilities will be furnished to you at the Pre-Performance Conference to be scheduled at a later date prior to contract performance. If you have any questions, I can be reached at 925-372-2038.

Sincerely,

Vincent I Osorio
Contracting Officer

cc:
138

**VETERANS HEALTH ADMINISTRATION**
VISN 21 Consolidated Contracting Activity-McClellan
5342 Dudley Blvd., Room 2S05
McClellan Park, CA 95652-1074

9 January 2002

**NOTICE TO PROCEED**
**(VIA Telefax)**

West Bay Builders, Inc.
Attn: Mr. Paul Thompson
615 Lindero St.
San Rafael, CA 94901

REF: **Contract V261C-1096/ Rennovation of Bldg 90, Livermore, CA**

Dear Mr. Thompson:

You are hereby notified to proceed with the above referenced project, within **ten** working days from receipt of this notification. All work under these task orders is to be accomplished at the agreed to firm fixed price of **$1,267,000.00**. Work is scheduled for completion not later than **436 days** from this Notice to Proceed. Time is of the essence in performing all work by the necessary completion date.

Letter dated 09 Jan 2002(attached), Subject: Delegation of Authority as COTR, designates Mr. Wilson Bunoan as the Contracting Officer's Technical Representative (COTR) for the purpose of furnishing technical guidance when appropriate and assuring the completed product meets contract requirements. Please note specific responsibilities and limitations of authority as stated in the attached delegation letter. Additionally, you are required to contact Mr. Bunoan prior to commencing work on this task order. He can be reached at 650-333-4234(cell).

You are required to sign and date this **NOTICE TO PROCEED** in the space provided below, and return the original to the Contracting Officer. Please provide me with a fax copy also to 916-561-7490. Thank you.

Sincerely,

Melvin P. Koenig
Contracting Officer CCA/90

Attch: COTR Ltr.
**Receipt Acknowledged:**

[signature] 2/6/02 *

**Signature** **Date**

*ORIGINAL REC'D BY WBB 2/09/02

SECTION 09660

RESILIENT TILE FLOORING

PART 1 – GENERAL

1.1 DESCRIPTION

This section specifies the installation of vinyl composition tile flooring and accessories.

1.2 RELATED WORK

A. Color and pattern and location in room finish schedule: Section 09050, INTERIOR/EXTERIOR FINISHES, MATERIALS, AND FINISH SCHEDULES.

B. Resilient Base: Section 09679; RESILIENT BASE, STAIR TREADS, ACCESSORIES.

C. Concrete Moistureproofing: Section 09880: SPECIAL COATINGS

1.3 SUBMITTALS

A. Submit in accordance with Section 01340, SAMPLES AND SHOP DRAWINGS.

B. Manufacturer's Literature and Data:

1. Description of each product.
2. Resilient material manufacturers recommendations for adhesives, underlayment, primers and polish.
3. Application and installation instructions.

C. Samples:

1. Tile: 300 mm by 300 mm (12 inches by 12 inches) for each type, pattern and color.
2. Edge Strips: 150 mm (6 inches) long, each type.
3. Feature Strips: 150 mm (6 inches) long.

D. Shop Drawings:

1. Layout of patterns shown on the drawings and in Section, INTERIOR/EXTERIOR FINISHES, MATERIALS, AND FINISH SCHEDULES.
2. Edge strip locations showing types and detail cross sections.

E. Test Reports:

1. Abrasion resistance: Depth of wear for each tile type and color and volume loss of tile, certified by independent laboratory.
2. Tested per ASTM F510.

## 1.4 DELIVERY

A. Deliver materials to the site in original sealed packages or containers, clearly marked with the manufacturer's name or brand, type and color, production run number and date of manufacture.

B. Materials from containers which have been distorted, damaged or opened prior to installation will be rejected.

## 1.5 STORAGE

A. Store materials in weathertight and dry storage facility.

B. Protect from damage from handling, water, and temperature.

## 1.6 APPLICABLE PUBLICATIONS

A. The publications listed below form a part of this specification to the extent referenced. The publications are referenced in the text by the basic designation only.

B. American Society for Testing and Materials (ASTM):

D4078-92..... Water Emulsion Floor Finish

D3564-95..... Application of Floor Polishes to Maintain Vinyl Composition Tile or Flooring

E648-94a..... Critical Radiant Flux of Floor Covering Systems Using a Radiant Energy Source

E662-94a..... Specific Optical Density of Smoke Generated by Solid Materials

F510-93 ....... Resistance to Abrasion of Resilient Floor Coverings Using an Abrader with a Grit Feed Method

F710-92 ....... Preparing Concrete Floors and other Monolithic Floors to Receive Resilient Flooring

F1066-95 ..... Vinyl Composition Floor Tile

F1344-93 ..... Rubber Floor Tile

C. Federal Specifications (Fed. Spec):

SS-T-312B ... Tile, Floor: Asphalt, Rubber, Vinyl, and Vinyl
INT AMD 2 Composition

D. Resilient Floor Covering Institute (RFCI):

ADH-1 .......... Vinyl Composition Tile Adhesive

MRP ............ Moisture Related Problems Relevant to Resilient Floor Coverings Installed over Concrete

CL-1 ............ Cleaners for Use on Resilient Floor

TM-6 ............ Determination of Quality of Cut (Joint Tightness and Corner Openings) of Resilient Tile

**PART 2 – PRODUCTS**

## 2.1 GENERAL

A. Furnish product type, materials of the same production run and meeting following criteria.

B. Use adhesives, underlayment, primers and polish recommended by the floor resilient material manufacturer.

C. Interior Floor Finishes for Corridors, Stairs, and Halls: Class I, critical radiant flux minimum of 0.45 watts per square centimeter as determined by NFPA 253.

D. Interior Floor Finishes for Remaining Areas: Class II, critical radiant flux minimum of 0.22 watts per square centimeter as determined by NFPA 253.

## 2.2 VINYL COMPOSITION TILE

A. ASTM F1066, Class 2, Type IV, Composition 1, non-asbestos, 300 mm (12 inches) square, 3 mm (1/8 inch) thick. (Verify thickness to match existing.)

B. Color and pattern uniformly distributed throughout thickness.

## 2.3 ADHESIVES

Latex type adhesives RFC ADH-1, Type III, Water based latex as recommended by tile manufacturer.

## 2.4 SEALER & PRIMER (FOR CONCRETE SUBFLOORS)

As recommended by the adhesive and tile manufacturer. Seal for moisture content of 15 lbs. Contractor to provide testing to verify moisture level. See Specification 09880 and, Part 3.2, Subfloor Preparation.

## 2.5 LEVELING COMPOUND (For Concrete Floors)

A. Provide products with latex or polyvinyl acetate resins in the mix.

B. Determine the type of underlayment selected for use by the condition to be corrected.

## 2.6 POLISH AND CLEANERS

A. Cleaners RFCI CL-1.

B. Polish: ASTM D4078.

## 2.7 EDGE STRIPS

A. 28 mm (1-1/8 inch) wide unless shown otherwise.

B. Bevel from maximum thickness to minimum thickness for flush joint unless shown otherwise.

C. Resilient Edge Strip or Reducer Strip: Fed. Specs. SS-T-312, Solid vinyl.

## 2.10 SCREWS

Stainless steel flat head screw.

## 2.11 FEATURE STRIPS

A. Use same material as floor tile.

B. Sizes and shapes as shown.

PART 3 – EXECUTION

## 3.1 PROJECT CONDITIONS

A. Maintain temperature of materials a minimum of 22 ?C (70 ?F,) for 48 hours before installation.

B. Maintain temperature of rooms where work occurs between 21 ?C and 27 ?C (70 ?F and 80 ?F), for at least 48 hours, before, during and after installation.

C. Do not install flooring until building is permanently enclosed and wet construction in or near areas to receive tile materials is complete, dry and cured.

## 3.2 SUBFLOOR PREPARATION

A. Verify that concrete slabs comply with ASTM F710.

B. Correct conditions which will impair proper installation.

C. Fill cracks, joints and other irregularities in concrete with leveling compound.

1. Do not use adhesive for filling or leveling purposes.
2. Do not use leveling compound to correct imperfections which can be corrected by spot grinding.
3. Trowel to smooth surface free of trowel marks, pits, dents, protrusions, cracks or joints.

D. Clean floor of oil, paint, dust, and deleterious substances: Leave floor dry and cured free of residue from existing curing or cleaning agents.

E. Concrete Subfloor Testing:

Determine Adhesion and dryness of the floor by bond and moisture tests as recommended by RFCI manual MRP.

F. Perform additional subfloor preparation to obtain satisfactory adherence of flooring if subfloor test patches allows easy remove of tile.

G. Prime the concrete subfloor if the primer will seal slab conditions that would inhibit bonding, or if priming is recommended by the tile or adhesive manufacturers.

H. Preparation of existing installation shall include the removal of existing resilient floor and existing adhesive. Do not use solvents to remove adhesives.

## 3.3 INSTALLATION

A. Install in accordance with RFCI INS-87 and manufacturer's instructions for application and installation unless specified otherwise.

B. Mix tile from at least two containers. An apparent line either of shades or pattern variance will not be accepted.

C. Tile Layout:

1. If layout is not shown on drawings, lay tile symmetrically about center of room or space with joints aligned.
2. No tile shall be less than 150 mm (6 inches) and of equal width at walls.
3. Place tile pattern in the same direction; do not alternate tiles.

D. Trim tiles to touch for the length of intersections at pipes and vertical projections, seal joints at pipes with waterproof cement.

E. Application:

1. Apply adhesive uniformly with no bare spots.
   a. Conform to RFC1-TM-6 for joint tightness and for corner intersection unless layout pattern shows random corner intersection.
   b. More than 5 percent of the joints not touching will not be accepted.
2. Roll tile floor with a minimum 45 kg (100 pound) roller. No exceptions.

3. The Resident Engineer may have test tiles removed to check for non-uniform adhesion, spotty adhesive coverage, and ease of removal. Install new tile for broken removed tile.

F. Installation of Edge Strips:

1. Locate edge strips under center line of doors unless otherwise shown.
2. Set resilient edge strips in adhesive. Anchor metal edge strips with anchors and screws specified.
3. Where tile edge is exposed, butt edge strip to touch along tile edge.
4. Where thin set ceramic tile abuts resilient tile, set edge strip against floor file and against the ceramic tile edge.

## 3.4 CLEANING AND PROTECTION

A. Clean adhesive marks on exposed surfaces during the application of resilient materials before the adhesive sets. Exposed adhesive is not acceptable.

B. Keep traffic off resilient material for a minimum 72 hours after installation.

C. Clean and polish materials in the following order:

1. For the first two weeks sweep and damp mopped only.
2. After two weeks, scrub resilient materials with a minimum amount of water and a mild detergent. Leave surface clean and free of detergent residue.
3. Apply polish to the floors in accordance with the polish manufacturer's instructions.

D. When construction traffic occurs over tile, cover resilient materials with reinforced kraft paper properly secured and maintained until removal is directed by COTR. At entrances and where wheeled vehicles or carts are used, cover tile with plywood, hardboard, or particle board over paper, secured and maintained until removal is directed by COTR.

E. When protective materials are removed and immediately prior to acceptance, replace any damage tile, re-clean resilient materials, lightly re-apply polish and buff floors.

3.6 LOCATION

A. Unless otherwise specified or shown, install tile flooring, on floor under areas where casework, laboratory and pharmacy furniture and other equipment occurs, except where mounted in wall recesses.

B. Extend tile flooring for room into adjacent closets and alcoves.

---E N D---

CERTIFICATE OF ELECTRONIC FILING

I hereby certify that on October 19, 2007, a copy of the foregoing "APPENDIX TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Tara K. Hogan