IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| WEST BAY BUILDERS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 04-1140C |
| | ) | (Judge Sweeney) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

DEFENDANT'S REPLY TO PLAINTIFF'S RESPONSE
TO DEFENDANT'S CROSS MOTION FOR SUMMARY JUDGMENT

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

DEBORAH A. BYNUM
Assistant Director

TARA K. HOGAN
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, N.W.
Attn: Classification Unit, 8th Floor
Washington, DC 20530
Tel. (202) 616-2228
Fax. (202) 305-7643

December 3, 2007

Attorneys for Defendant

# TABLE OF CONTENTS

**PAGE(S)**

SUMMARY OF ARGUMENT . . . . . . . . . . 1

ARGUMENT . . . . . . . . . . 2

I. The Precedence Clause Does Not Have Application Here . . . . . . . . . . 2

II. Reference To The Moisture Test Requirement Does Not Render West Bay's Interpretation The Most Reasonable . . . . . . . . . . 3

III. The Government's Post-Controversy Conduct Is Irrelevant To This Court's Determination Of Contract Meaning . . . . . . . . . . 4

IV. West Bay's Proffered Interpretation Was Neither Reasonable Nor Relied Upon In Its Bid . . . . . . . . . . 7

A. The Tiling Manufacturer's Recommendations Are Relevant To Determining Whether West Bay's Proffered Interpretation Was Reasonable . . . . . . . . 7

B. West Bay Did Not Rely Upon Its Proffered Interpretation In Preparing Its Bid . . . . . . . . . . 10

CONCLUSION . . . . . . . . . . 12

SUPPLEMENTAL APPENDIX[1]

Declaration of Gary Geisenhofer . . . . . . . . . . 53

Excerpt, Deposition Transcript of Clayton Fraser . . . . . . . . . . 58

Excerpt, Deposition Transcript of Kurtis Vierra . . . . . . . . . . 59

Drawing A60 . . . . . . . . . . 63

---

[1] Page numbers to the supplemental appendix continue chronologically from the end of the defendant's appendix filed on October 19, 2007.

## TABLE OF AUTHORITIES

**CASES** **PAGE(S)**

Appeal of Reyco Construction Co.,
94-2 BCA 26831, 1994 WL 117123 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Edward J. Marden Corp. v. United States,
803 F.2d 701 (Fed. Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 10

Fortec Constructors v. United States,
760 F.2d 1288 (Fed.Cir.1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Franchi Constr. Co., Inc. v. United States,
221 Ct.Cl. 796, 609 F.2d 984 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

General Warehouse Two, Inc. v. United States,
389 F.3d 1016 (Cl. Ct. 1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Hensel Phelps Constr. Co. v. United States,
886 F.2d 1296 (Fed.Cir.1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Macke Company v. United States,
467 F.3d 1323 (Ct. Cl. 1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Mayfair Constr. Co. v. United States,
841 F.2d 1576 (Fed. Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Metropolitan Area Transit v. Nicholson,
463 F.3d 1256 (Fed. Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

P.J. Maffei Bldg. Wrecking Co. v. United States,
732 F.2d 913 (Fed. Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

P.R. Burke Corp. v. United States,
277 F.3d 1346 (Fed. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

## STATUTE

41 U.S.C. § 605(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| WEST BAY BUILDERS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 04-1140C |
| | ) | (Judge Sweeney) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

DEFENDANT'S REPLY TO PLAINTIFF'S RESPONSE
TO DEFENDANT'S CROSS MOTION FOR
SUMMARY JUDGMENT AND SUPPLEMENTAL APPENDIX

Pursuant to Rule 56(b) of the Rules of the United States Court of Federal Claims ("RCFC"), defendant, the United States, respectfully submits this reply to plaintiff West Bay Builders, Inc.'s ("West Bay") response to defendant's cross-motion for summary judgment. In support, we rely upon our opening brief, the Defendant's Proposed Statement of Uncontroverted Fact ("DPFUF"), and the appendix to the defendant's motion for summary judgment ("DA"). For the reasons stated below, we respectfully request that this Court enter summary judgment in favor of the United States and dismiss the complaint.

SUMMARY OF ARGUMENT

As we argued in our opening brief, a patent ambiguity existed in the contract specifications and drawings. Because there was no way for West Bay to know when to install floor sealant and to account for floor sealant in its bid, West Bay had a duty to inquire prior to bidding on the project. West Bay provides several responses to the defendant's cross-motion. None of its arguments show that West Bay's interpretation is reasonable. West Bay argues that this Court should glean meaning of the ambiguous contract provisions from the parties' course of conduct. However, West Bay has not shown that the parties mutually assigned any meaning to

contract provisions prior to the advent of the controversy. Second, West Bay's interpretation is unreasonable given that the tiling manufacturer did not recommend installation of its product given the actual moisture test results. Finally, West Bay did not rely upon its current interpretation of the provisions in bidding the project. Therefore, it is not entitled to rely upon this interpretation now.

## ARGUMENT

### I. The Precedence Clause Does Not Have Application Here

West Bay contends that the instructions accompanying Contract Drawing A60 do not conflict with other specifications. Pl. Resp. at 8. We agree that the directions (1) to install floor sealant at all new work areas and (2) to reduce the emission levels to within three pounds (lbs) can be read harmoniously. However, West Bay's interpretation that Specification 9800 required application of floor sealant only if moisture test results were over 15 lbs and the requirement to install floor sealant at all new work area concrete slabs clearly cannot be read harmoniously. West Bay's argument that the contract drawing instructions applied only to a small portion of the contract is not based upon the actual contract drawings. See DA63.[1]

In rejecting our assertion, DPFUF ¶ 1, that the contract drawings clearly required installation of sealant at all new work areas on the first floor of the renovation project West Bay relies upon the precedence clause. Pl. Resp. at 9. West Bay is correct that the contract contained a precedence clause which instructs that specifications will govern when they conflict with contract drawings. The precedence clause comes into play when conflicts regard directly

---

[1] The only work performed on the second floor was in the bathroom, which was leaking.

competing contract provisions. See, e.g., Hensel Phelps Constr. Co. v. United States, 886 F.2d 1296, 1297 (Fed.Cir.1989) (invoking order of precedence clause to decide whether contract specification required 18 inches or 36 inches of fill to be placed under concrete floor); Franchi Constr. Co., Inc. v. United States, 221 Ct.Cl. 796, 799, 609 F.2d 984, 986 (1979) (invoking order of precedence clause to decide whether "tile was to abut ... partitions after they were erected on the concrete [ ] floor or was to be laid first, with the partitions placed on top of it").

However, "[a] necessary predicate to such precedence is that the specification requirement be clear." Appeal of Reyco Construction Co., 94-2 BCA ¶ 26831, 1994 WL 117123 (1994). As demonstrated in our opening brief, the totality of the specifications, including Amendment #4 did not present West Bay with clear, unambiguous instructions as to the application of the floor sealant. Therefore, West Bay cannot use the precedence clause to dismiss the import of the drawing instructions.

## II. Reference To The Moisture Test Requirement Does Not Render West Bay's Interpretation The Most Reasonable

West Bay bases its argument primarily upon Section 9800's requirement that the contractor perform moisture emission testing. West Bay contends that if it assumed an existing moisture level of 15 lbs, then there would be no reason for the specifications on how to perform the moisture tests. Pl. Mot at 21; Pl. Resp. at 6-7. There are two types of sealants, the heavier of which is generally installed where the measured moisture emission is greater than 15 lbs. Moisture emission testing is required to verify the conditions at the time of application. If greater levels were found than what was specified (in this case, 15 lbs), then a heavier coating was required and it would have been appropriate to adjust the cost. West Bay personnel confirmed their understanding that where the moisture level is greater than 15 lbs, section 9800

directs the contractor to use a different type of sealant system. DA32; 58. This is consistent with Specification 9800 ¶ 3.01's instruction that the contractor should determine "the level of remediation required." See Ex. B to Vierra Decl. p. 4.[2]

The Government has not contended that no testing would ever be required to determine if a heavier sealant system would be necessary. Thus, the fact that the specifications provided for moisture emission testing does not render West Bay's interpretation more reasonable. Rather, they lend credence to the Government's intent to have the floors sealed to an emission level of no more than three pounds.

## III. The Government's Post-Controversy Conduct Is Irrelevant To This Court's Determination Of Contract Meaning

When the Court finds that a contract ambiguity exists, the Court may consider the parties' conduct prior to a controversy arising to determine contractual meaning or intent. Edward J. Marden Corp. v. United States, 803 F.2d 701, 705 (Fed. Cir. 1985). West Bay continues to misapply this doctrine, which is limited to where a party can demonstrate mutual intent prior to the controversy arising. As we noted in our opening brief, West Bay has identified no evidence that, prior to its submittal of its April 30, 2002 Request For Information, the parties agreed on where and when the floor sealant should be installed. West Bay cannot demonstrate that, at the outset of the contract, both parties intended that floor sealant would not be installed unless the demonstrated moisture emission levels were above 15 lbs.

West Bay contends that the parties' discussions following West Bay's April 30, 2002 declaration that it did not intend to install any floor sealant, constituted a "course of conduct" as

[2] The appendix to Mr. Vierra's declaration is not page-numbered. Page numbers refer to chronological order.

the parties were "complying with the contractual requirement for submission of a claim for extra work." Pl. Resp. at 10. A course of conduct may be relevant to determining the meaning of ambiguous terms where the parties have multiple opportunities to object, but do not do so. The conversations between West Bay and the CO, however, were clearly not a course of conduct in which all parties repeatedly had opportunities to disagree with an interpretation, but did not. See, e.g., Metropolitan Area Transit v. Nicholson, 463 F.3d 1256, 1260 (Fed. Cir. 2006) (finding course of conduct dispositive in determining meaning of ambiguous term where party had multiple opportunities to object to a course of conduct but did not). The parties' discussions may have been aimed towards resolving a dispute between the two parties, but that hardly qualifies as a course of conduct.

West Bay also argues that the VA's proposed, but uneffected, modification of the contract demonstrates the VA's intent.[3] First, the CO proposed the modification well after the controversy had arisen. The proposed modification followed West Bay's statement of its intent not to install floor sealant and the CO's direction to West Bay to install sealant. PPFUF ¶¶ 7;8. The parties' views on the contract requirements expressed after the controversy had arisen are irrelevant. Second, the proposed, unexecuted, modification had no legal effect, because neither party signed it.

West Bay cannot demonstrate that, at the outset of the contract, both parties intended that floor sealant would not be installed if the test results were less than fifteen pounds. The two cases that West Bay cites are inapt. See Pl. Resp. at 11. In Macke Co. v. United States, the

---

[3] West Bay incorrectly refers to this document as an "amendment." Pl. Resp. at 11. Amendments are made to solicitations and modifications are made to actual contracts, although the same Standard Form 30 may be used.

predecessor to this Court considered statements made by the contracting officer during the pre-bid conference and a bilateral modification to the contract which clearly recited "the parties' actual understanding . . . from the beginning." 467 F.3d 1323, 1327 (Ct. Cl. 1972). Here, there are no statements by the CO prior to contract formation supporting West Bay's interpretation, nor any executed modifications to the contract expressing the parties' agreement on the issue. In fact, West Bay's project manager testified that he understood that the VA's intention was that floor sealant to be installed to bring the emission level down. DA60.

In General Warehouse Two, Inc. v. United States, the issue was whether the plaintiff, a lessor of a building to the Government, was entitled to increased rental compensation for changes made to the building which resulted in additional rental space for the Government. 181 Cl. Ct. 180, 389 F.3d 1016, 1018 (1967). In determining the meaning of ambiguous contract terms, the Court concluded that the parties' previous conduct in agreeing to extra compensation for other areas of the building demonstrated that both parties expected to pay additional rental when the net usable space was increased. Id. at 1020. Here, there is no evidence of any agreement demonstrated prior to the advent of the controversy.

Finally, West Bay appears to contend that the advent of the controversy was not until the issuance of the contracting officer's final decision ("COFD"). Pl. Resp. at 10-11. This is contrary to the Contracts Disputes Act. The CO's issuance of a COFD was not the beginning of the controversy, but rather the CO's decision on the merits of West Bay's claim, which was "final and conclusive" unless West Bay timely appealed to the board or to this Court. 41 U.S.C. § 605(b). West Bay's April 7, 2003 request for a COFD was a written demand for something actually in dispute: whether West Bay was entitled to any additional compensation for the floor

sealant installation. See Mayfair Constr. Co. v. United States, 841 F.2d 1576, 1577 (Fed. Cir. 1988) (holding it is "beyond cavil that under th[e disputes] clause, no claim exists unless it involves a dispute). Therefore, this Court must reject West Bay's argument on this issue. West Bay has not demonstrated, through a course of conduct or otherwise, that both parties agreed with West Bay's interpretation prior to the issue arising in April 2002.

## IV. West Bay's Proffered Interpretation Was Neither Reasonable Nor Relied Upon In Its Bid

As we argued in our opening brief, even if this Court finds that there is no patent ambiguity, West Bay is not automatically entitled to relief. "While a contractor need not demonstrate that its interpretation of the contract is the only reasonable one, it does bear the burden of showing that its construction is at least a reasonable reading." P.J. Maffei Bldg. Wrecking Co. v. United States, 732 F.2d 913, 917 (Fed. Cir. 1984). West Bay's interpretation was not reasonable. Further, West Bay did not demonstrate that it relied upon its interpretation in preparing its bid. In its response brief, West Bay fails to meaningfully address our contentions. Therefore, even assuming that this Court finds that there is no patent ambiguity, West Bay is nonetheless not entitled to any additional compensation.

### A. The Tiling Manufacturer's Recommendations Are Relevant To Determining Whether West Bay's Proffered Interpretation Was Reasonable

We argued in our opening brief that West Bay's interpretation of the floor sealant provisions was unreasonable because its position that it would not install floor sealant unless the measured moisture emission was over 15 lbs could likely have led to flooring failure prior to the end of the ten year warranty. Def. Mot. at 18. West Bay argues that the VCT manufacturer's requirements for warranty are a "non-issue." Pl. Resp. at 17. West Bay misunderstands the issue. We do not contend that West Bay has breached any warranty or are we pursuing any

breach of warranty claim. Rather, the issue of the VCT manufacturers' warranty requirements is relevant to this Court's determination of whether West Bay's interpretation of the floor sealant provisions was reasonable. While the tiling manufacturer's requirements may not have been part of the contract, they provide a meaningful background against which to judge the reasonableness of West Bay's interpretation. See P.R. Burke Corp. v. United States, 277 F.3d 1346, 1355 (Fed. Cir. 2002); see also Fortec Constructors v. United States, 760 F.2d 1288, 1291 (Fed.Cir.1985)("[i]n deciding the correct meaning of a contract containing a patent ambiguity it is proper to consider the trade standards and practices of the relevant business community.")

Contract provisions clearly did require West Bay to consider the VCT manufacturer's installation and warranty requirements and recommendations. Section 9660 directed the contractor to apply sealant "[a]s recommended by the adhesive and tile manufacturer." DA48 (emphasis added). Section 9880 ¶ 3.2 directed the contractor to obtain information as to the level of moisture emission remediation required from the tiling manufacturer. Ex. B to Vierra Decl., p. 2. The recommendations of Armstrong, the tiling manufacturer, as to the acceptable moisture level is extremely relevant, both by the terms of the contract specifications and in terms of the overall purpose of the contract.

Armstrong did not recommend installation of the VCT where the measured moisture emission of the underlying concrete exceeded five lbs per 1000 sq. ft. DA40. This is consistent with West Bay's project manager's testimony that the industry standard for tiling manufacturer's warranties was three to six lbs per 1000 square feet of moisture emission. DA31.[4] All of Floor

[4] West Bay vigorously but belatedly disputes Defendant's Proposed Findings of Uncontroverted Fact ¶ 13, which is based upon Defendant's Request for Admission No. 13, which states that the manufacturer's requirement would be three pounds. However, West Bay

Seal Technology's moisture emission test results were over six pounds. PPFUF ¶ 6. The fact that the moisture emission results were more than what the tiling manufacturer recommended renders West Bay's interpretation unreasonable. West Bay's project manager conceded that if the moisture test results exceed what the flooring manufacturer will warranty they cannot be ignored. DA59. Therefore, it is beyond dispute that the concrete would have needed sealant before the tiling could be installed. West Bay's interpretation that no floor sealant was required in this case is unreasonable.

West Bay's interpretation is further unreasonable given that one of the main purposes of the contract was to resolve continuing moisture emission problem in the building. DA53. At the time of the pre-bid walk-through, there was visible moisture damage to floor tiles, which had dark joints between the separated tiles. DA53. VA officials described to potential bidders during the pre-bid walkthrough the building's history of moisture problems on the first floor of the building. West Bay did not participate in the pre-bid walkthrough. The sign-in sheets for the two pre-bid walkthroughs do not list any person representing West Bay. DA55-56.

If West Bay believed that the contract requirement was inconsistent with usual industry practice, as an experienced contractor, West Bay should have been alerted and sought clarification prior to bidding on this project. Finally, West Bay's argument that its work was ultimately warrantied is somewhat disingenuous, given that West Bay ultimately installed floor sealant to bring the moisture emission levels to below three lbs. See Pl. Resp. at 18.

---

failed to respond to the defendant's Requests for Admission and they are deemed admitted pursuant to RCFC 36(a). As shown above, however, even assuming the five pounds recommendation shown on DA40, the work would not have been warrantiable based upon the actual test results.

B. West Bay Did Not Rely Upon Its Proffered Interpretation In Preparing Its Bid

Second, West Bay is not entitled to any recovery because it is evident that it did not rely upon its current interpretation of the floor sealant provisions when preparing its bid. In order for a contractor to recover based upon an ambiguous contract provision, the contractor must have relied upon its interpretation of that provision when preparing its bid. See Edward R. Marden, 803 F.2d at 705. Although West Bay contends that its bid was based upon its "reasonable interpretation of the contract," Pl. Resp. at 16, the reality is otherwise.

West Bay's estimator for the Livermore project did not recall reading or receiving Amendment #4 to the solicitation or, indeed, any of the specifications prior to bid. DA13-14. West Bay did not seek any subcontractor proposals from floor sealant manufacturers prior to bid. DPFUF ¶ 12. West Bay did not rely upon any moisture test results in arriving at its bid amount. DPFUF ¶ 9. When asked how he would know how much to bid given that no moisture test results were available, West Bay's estimator conceded that the $2,000 allocated for floor sealant was simply based upon a "gut feeling." DA18.

Certainly, West Bay's assumptions about the floor sealant requirements were not based upon the contract. West Bay repeatedly contends that it assumed that it would apply floor sealant to small patches of new concrete. See PPFUF ¶ 15; Pl. Resp. at 15. Yet, West Bay identifies nothing in the contract documents or even in the general nature of the renovation project which supports the assumption that it would be required to patch only small amounts of new concrete. This assumption specifically conflicts with General Note #2 of Drawing Sheet A60's direction to seal "all new work areas on the 1st floor concrete slab." DPFUF ¶ 1 (emphasis added). The floor plan legend outlined all areas on the first floor which were to be

considered new work areas; these are the areas in which West Bay ultimately installed the moisture barrier. DA63. West Bay's assumptions about the work to be performed were neither based in the drawings nor in the specifications.[5] West Bay's assumptions make even less sense given that a major purpose of the renovation project was to remediate water damage. DA53.

West Bay's allocation in its bid for floor sealant also demonstrates that West Bay did not rely upon its current contract interpretation in bidding the project. West Bay allocated only $2,000 for labor and materials necessary for floor sealant application. DPFUF ¶ 6. West Bay concedes that, under its interpretation of the contract, it would have been responsible, without additional compensation, for installing floor sealant if the moisture emission measured above 15 lbs. Pl. Mot. at 21. Yet, West Bay argues that, at the time of bid, it did not know what the 1999 moisture test results were or what the 2002 moisture test results would be. West Bay's bid apparently did not even consider the possibility that it could be called upon to install the floor sealant in the entire new work area of the first floor if the moisture emission results were over 15 lbs. Under that particular circumstance, West Bay would have been responsible for incurring what amounted to $ 119,040.00 in subcontractor costs, a "dollar magnitude" so high that West Bay's president felt "personally obligated to respond" to the VA's notice to proceed with the sealant. See Ex. I to Vierra Decl., p. 1.

Thus, if one set of conditions had been met, conditions West Bay vociferously contends it did not know at the time of bid, West Bay would bear the price of the sealant application as part of its fixed price contract, potentially losing over $100,000. It is inconceivable that West Bay

---

[5] Indeed, assuming that West Bay was correct that it was only required to patch new concrete, West Bay's current claim should not include any amount of compensation for sealing those areas in the renovation project.

knowingly and reasonably risked so large a potential loss, rather than seeking clarification prior to bid as to what its actual responsibilities would be.

CONCLUSION

For the foregoing reasons, we respectfully request that this Court deny West Bay's motion for summary judgment and enter judgment in favor of the United States.

Respectfully submitted,

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

S/Deborah A. Bynum
DEBORAH A. BYNUM
Assistant Director

S/Tara K. Hogan
TARA K. HOGAN
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, N.W.
Attn: Classification Unit, 8th Floor
Washington, DC 20530
Tel. (202) 616-2228
Fax. (202) 305-7643

December 3, 2007

Attorneys for Defendant

# SUPPLEMENTAL APPENDIX

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| WEST BAY BUILDERS, INC.<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant, | ) | No. 04-1140C<br>(Judge Sweeney) |

**DECLARATION**

Gary Geisenhofer, pursuant to 28 U.S.C. Section 1746, hereby declares under penalty of perjury as follows:

1. I am a Project Manager (Engineering Technician) in the Project Planning Section, Engineering Service, the United States of America Department of Veterans Affairs, Livermore, California and submit this affidavit in support of the United States' Motion for Summary Judgment.

2. I am familiar with the design and specifications for project number 640-00-113L, entitled "Renovate Interior Finish Bldg. 90 Livermore Division." These became part of Solicitation No. 261-0341-01.

3. I attended the pre-bid walkthrough for this solicitation on September 19, 2001 on behalf the Department of Veterans Affairs.

4. Interested bidders were instructed to sign in on a sign-in sheet during the walkthroughs.

5. I reviewed the two sign-in sheets for the walkthroughs, attached as Exhibit 1 to this declaration.

6. No representative of West Bay Builders, Inc. is listed on the walkthrough sign-in sheets.

7. During the walkthrough I attended, VA staff discussed in detail the condition of the floors in the building.

8. Specifically, I told interested bidders that the poor condition of the floor, due in large part to moisture migration through the concrete slab, was a major reason for this renovation project.

9. During the walkthrough, broken tiles and darkened joints between tiles were visible, particularly in the stairwell.

10. Contract drawing A60 describes the work spaces that the contractor was expected to install new floor sealant. All areas that were not to receive sealant were identified as blank. "All new work areas" included all floor surfaces that were to receive new VCT, ceramic tile and carpet.

11. During the walkthrough, contractors were informed the area that VA called "The Alzheimer Addition," (rooms/areas C-101, C-102, C-103, C-104, C-105, C-106, C--107, C-108, C-110, C-111, C-112 and C-113), did not need floor sealant installation.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on November 29, 2007.

Gary Geisenhofer

# Exhibit 1 to Geisenhofer Declaration

VINCE COPY 925 72 2044

B90 WALK-THRU 9/19/01

| | NAME | COMPANY | PHONE NO. |
|---|---|---|---|
| 1. | Anthony Encinas | Exp Gen Inc. | 559 271 8188 |
| 2 | JOHN GODKIN | PARC | 925 371-4610 |
| 3 | Mark Hughes | PARC | 559-233-7156 |
| 4. | DEMETRI GONZALEZ | ZOVICH | 510-274-1273 |
| 5 | GARY GEISENHOFER | VA | 36158 |
| 6 | Jay Randall | Bayview Env. | 510 562 6181 |
| 7. | WILSON BUNOAN | VA | X 22488 |

COPY TO VINCE 925-372-2044 ATTENDANCE SHEET

BLDG 90 WALK-THRU 9/21/01

| NAME | COMPANY | PHONE |
|---|---|---|
| (1) WILSON BUNOAN | VA | x 22488 |
| (2) [illegible] | ACCO | [illegible] |
| (3) FRANK LEDDA | ACCO | 925 681-2226 |
| (4) Anthony Encinas | Explore Gen. | 559/271 8188 off<br>559/275 8886 Fax |
| (5) LANCE LIPPERT | LIPPERT ELECTRIC | 209/827-4959 (PH/FX) |

Q. What do you understand that to mean?

A. It means the system that's specified in this -- in these specs, if needed on a floor that has -- where the moisture is 15 pounds or more, they're specifying the type of system you need to use, if it's 15 or more after you've taken tests.

So it's a standard spec, and it's -- every spec is the same thing on this sort of stuff. It's you go in; you take your moisture tests; you get the results. If the results are greater than 15, you're supposed to apply this -- this floor sealant, which reduces the moisture level, which is required for certain floors so they don't bubble up.

Q. So if you saw a spec like this, how would you estimate what your need would be?

A. Depends on the job. So on a new project, we had all new concrete that we were pouring and that concrete was getting VCT or vinyl on it, we would figure it everywhere.

If it was an existing project, we would figure out the square footage of new concrete, and we would apply it for those areas only.

On existing concrete, that is anything over five -- you know, five years old, a couple years old, the moisture level in almost every case I've ever seen

have to apply a product such as this. There has to be something that specifically tells you to do it.

Either the contract documents will say specifically that you need to apply this type of material or we have used products similar to this that we're talking about today in order to solve problems where we have a building; there isn't a vapor barrier specified; it's time to apply the carpet, and the -- we have to do a calcium chloride test to determine how much moisture is being given off from the concrete.

And if the amount exceeds what the flooring manufacturer will warranty, then we have to do something. We either have to dry the building and suck the water out and force it to cure more rapidly, or we have to apply something -- a vapor barrier such as this.

And typically, then, that gets into a debate about, if there's not one specified, if we're using it to solve a problem. Then that gets into a debate with the owner as to whose responsibility it is to pay for it.

Q. Okay. When you say "a vapor barrier," are we talking about the same thing?

A. Yes.

Q. Floor sealants?

specific parameters of what to apply.

Our test results were far below the 15-pound threshold; therefore, it didn't trigger our use for this specification; therefore, it wasn't required.

We didn't anticipate it. So if we had exceeded the 15 pounds, we probably would have been forced to pay this out of our own pocket. Because we never carried this $120,000.

But we didn't reach that threshold; therefore, we did -- this wasn't required.

Now, what I learned was that the specifications were written from -- incorrectly. They didn't correctly convey the Home's desires.

What I've learned based on my conversations with the Home, Floor Seal Technologies, the other contractor that we quoted was that what they were looking for was a product -- was a statement that said we will apply this product regardless of what the tests say. If the tests came back greater than 15 pounds, then we will upgrade the product -- or the product would have to be upgraded.

If this product that we used was designed to work to 15 pounds, that's how hard it was planned to work. If we came back with a moisture content of 18 pounds, the product would have to be changed, and at

that point, we would be entitled to an upgrade of the cost of material.

Well, what happened from what I understand is they had two consultants. They had Floor Seal Technologies, which their scope is identified as your Exhibit 6, and they had Surface Solutions, and their manufacturer, which was your Exhibit 5.

They had both of those companies working on this project during the creation of the documents. They both provided the spec to the VA and their designers, and the designers merged the two specs, and it came out with a document that has -- that has an error, but one that's not readily apparent unless you know what it is that the Home intended.

And we had no way to know that. So what this -- what they wanted to do was create a document that says, "You will apply it everywhere, period. If your tests show greater than 15 pounds, then you need to use a different product."

But that's not what they said. The specs say, "If you don't exceed 15 pounds, you don't need to apply this product."

So the spec doesn't even comply with the product that they specified because it says, "You will use it if the existing moisture exceeds 15 pounds," and

the product that they specified is not designed to work at a level higher than 15 pounds.

Q. Who are your -- who did you have conversations with at the VA about this issue?

A. Their guy Wilson, their COTR. There was actually, I think, two or three COTRs out there.

I got the impression that Wilson was working underneath somebody, and I don't remember the -- oh, the name Gary Atkins jumps to my head. I don't know why, but he could be out there.

Vincent Onofri (phonetic) -- what's his name? He's on here. It's a guy named Vincent.

Q. Asorio?

A. Yeah, him. And Mel Koenig. Mel was basically working with the on-site staff to figure out what it was that they had expected, and so he was relaying to me what the intentions were, and then him and I were talking about where the specifications stopped short of guaranteeing the Home what they wanted.

And that was -- Mel understood that, and he was able to see the deficiencies in the specifications, and that's why he was initially trying to provide settlement numbers to solve this problem.

Q. Who did you speak with at Floor Seal Technology about the specification?




KEY FLOOR PLAN – SECOND FLOOR

NORTH

1/16" = 1'-0"



KEY FLOOR PLAN – FIRST FLOOR

NORTH

1/16" = 1'-0"

## FLOOR PLAN LEGEND

- REMOVE (E) QUARRY TILE INSTALL NEW QUARRY TILE. PROVIDE PEMKO #151 ALUM. SADDLE THRESHOLD @ TILE/VCT TRANSITION (1/4"X3")
- REMOVE (E) VCT FLOORING AND INSTALL NEW VCT FLOORING
- REMOVE (E) CERAMIC TILE & INSTALL NEW CERAMIC TILE FLOOR PROVIDE PEMKO #151 ALUM. SADDLE THRESHOLD @ TILE/VCT TRANSITION (1/4"X3")
- REMOVE (E) CARPET & INSTALL NEW CARPET
- REMOVE (E) CARPET & INSTALL NEW VCT FLOORING
- REMOVE VCT FLOOR INSTALL NEW CARPET
- NO FLOOR FINISH WORK THIS AREA (SHOWN WITHOUT HATCH OR SHADE)
- ALTERNATE 1: REPLACE CERAMIC TILE W/ NEW CERAMIC TILE AT BATHROOMS 1A-119 & 1A-120)

## GENERAL KEYED PLAN NOTES

1. REMOVE EXISTING FLOOR FINISHES & PREPARE FOR NEW FINISH, AS SHOWN.
2. PROVIDE MOISTURE BARRIER AT ALL NEW WORK AREAS AT 1ST FLOOR CONCRETE SLAB PRIOR TO INSTALLATION OF NEW FINISH. SEE SPECIFICATION 07260.
3. SEE FLOOR FINISH PLANS FOR MORE DETAILED DESCRIPTIONS.
4. REFER TO SPECIFICATION SECTION 01571 FOR ASBESTOS ABATEMENT.




KEY PLAN

N.T.S.

IF SHEET IS LESS THAN 30" X 42" IT IS A REDUCED PRINT- SCALE REDUCED ACCORDINGLY

0 4' 8' 16' 32' 50'
SCALE: 1/16"=1'-0"

AREAS SHOWN ARE REPRESENTATIVE OF EXISTING CONDITIONS. SPECIFIC WORK WITHIN AREAS SHOWN SHOULD BE FIELD VERIFIED.

| SYMBOL | DESCRIPTION | INITIAL | DATE |
| --- | --- | --- | --- |

REVISION

RA & ASSOCIATES
Architecture · Engineering
The Fitzpatrick Building
2000 Broadway Street
Redwood City, CA 94063
PH: (650) 369-0104 FAX: (650) 365-9454

REGISTERED ARCHITECT
LIC. NO. C20808
EXP. 9-30-01
STATE OF CALIFORNIA

Job Title: RENOVATE INTERIOR FINISH BUILDING 90 – LVD

Sheet Title: BUILDING 90 KEY FLOOR PLAN – 1ST & 2ND FLOOR

DEPARTMENT OF VETERANS AFFAIRS
PALO ALTO HEALTH CARE SYSTEM
STATION 640, PALO ALTO, LIVERMORE DIVISION

| | |
| --- | --- |
| Drawn By: EJC Date: | Checked By: Date: |
| Submitted By: Date: | Approved By: Date: |
| Scale: AS NOTED | Using Service Approval: Date: |
| Reviewed For Fire & Safety Compliance: Date: | |
| Reviewed For Maintenance & Repair Compliance: Date: | |
| Reviewed For Security Compliance: Date: | |
| Date: 07/31/01 | Drawing No.: |
| Proj. No: 640-00-113L | Sheet A060 Of |

FINAL CONSTRUCTION DOCUMENTS

P:\153\DRAWING\VAMC000\BLDG90\00-113L\B90_key\A060.dwg

CERTIFICATE OF ELECTRONIC FILING

I hereby certify that on December 3, 2007, a copy of the foregoing "DEFENDANT'S REPLY TO PLAINTIFF'S RESPONSE TO DEFENDANT'S CROSS MOTION FOR SUMMARY JUDGMENT" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

S/Tara K. Hogan