# In the United States Court of Federal Claims

No. 04-1140 C
(Filed: November 26, 2008)

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | | |
|---|---|---|
| WEST BAY BUILDERS, INC., | \* | |
| | \* | RCFC 56; Cross-Motions for Summary |
| Plaintiff, | \* | Judgment; Contract Interpretation; |
| | \* | Patent and Latent Ambiguities; Doctrine of |
| v. | \* | Contra Proferentem |
| | \* | |
| THE UNITED STATES, | \* | |
| | \* | |
| Defendant. | \* | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Timothy L. McInerney, Oakland, CA, for plaintiff.

Tara Kathleen Hogan, United States Department of Justice, Washington, DC, for defendant.

## OPINION AND ORDER

**SWEENEY**, Judge

Before the court are Plaintiff's Motion for Summary Judgment and Defendant's Cross-Motion for Summary Judgment, both of which were filed pursuant to Rule 56 of the Rules of the United States Court of Federal Claims ("RCFC"). Plaintiff seeks a ruling from the court that defendant, acting through the Department of Veterans Affairs ("VA") Northern California Health Care System, failed to compensate it for additional contract costs related to the application of concrete floor moisture sealant during renovations to Building 90 of the VA Palo Alto Health Care System, Livermore Division. Defendant maintains that plaintiff's claim lacks merit because the contract specifications contain patent ambiguities, which obligated plaintiff to seek clarification concerning the installation and application of concrete floor moisture sealant prior to its submission of a bid. Alternatively, defendant argues that even if the contract specifications do not contain patent ambiguities, plaintiff's interpretation of those contract specifications related to the application of concrete floor moisture sealant is both unreasonable and inconsistent with the flooring manufacturer's warranty specifications. The court deems oral argument unnecessary and, for the reasons set forth below, denies plaintiff's motion and grants defendant's cross-motion.

# I.  FACTUAL AND PROCEDURAL HISTORY[1]

On August 17, 2001, the VA Northern California Health Care System, Martinez Division, issued a solicitation for the renovation of the interior finish to Building 90 at the VA Palo Alto Health Care System, Livermore Division ("the project").  Compl. ¶ 4; Compl. Ex. A at 1-3.  The solicitation's description of work clause outlined the scope of the project:

> Contractor shall provide labor, materials, equipment, and supervision to perform the work identified as []Renovate Interior Finish Bldg. 90 at VA Palo Alto Health Care System, Livermore Division: Work includes general construction, selected demolition, alterations, mechanical and electrical work, casework, utility systems, necessary removal of existing asbestos and certain other items.

Compl. ¶ 5; Compl. Ex. A at 1-3.  On November 20, 2001, the VA awarded a fixed-price contract in the amount of $1,267,000.00 to plaintiff West Bay Builders, Inc. ("West Bay"), a California corporation.  Compl. ¶¶ 2, 9; Def.'s PFUF ¶ 5.  Those portions of the contract specifications that relate to the application of concrete floor moisture sealant are at issue in this case.

## A.  The Nature of Concrete Floor Moisture Sealant

Floor moisture sealant is "a product placed on concrete floor[ing] in order to keep moisture from the concrete from damaging the flooring placed above the concrete."  Def.'s PFUF ¶ 14; accord Def.'s App. 25 (Vierra Dep. 21:13-15 (stating that concrete floor moisture sealant "is a product that you put on a concrete floor in order to keep the moisture from the concrete from damaging the flooring")); Def.'s App. 58 (Fraser Dep. 24:11-13 (stating that floor moisture sealant "reduces the moisture level, which is required for certain floors so they don't bubble up")).  Floor moisture sealant is used primarily on concrete flooring, Def.'s App. 25 (Vierra Dep. 21:16-17), which is mixed with water that eventually evaporates from the concrete, id. at 26 (Vierra Dep. 26:19-22).  As Mr. Vierra, West Bay's project manager, testified during his deposition, concrete

---

[1]  The facts are derived from the complaint ("Compl.") and the exhibits attached thereto ("Compl. Ex."); the declaration of Kurtis Vierra ("Vierra Decl.") and the exhibits attached thereto ("Vierra Decl. Ex."); defendant's cross-motion for summary judgment ("Def.'s Cross-Mot.") and the consecutively numbered appendices submitted with defendant's cross-motion and reply brief ("Def.'s App."), which include the depositions of Kurtis Vierra ("Vierra Dep.") and Clayton Fraser ("Fraser Dep."), and the declaration of Gary Geisenhofer ("Geisenhofer Decl."); plaintiff's proposed findings of uncontroverted fact ("Pl.'s PFUF"); and defendant's proposed findings of uncontroverted fact ("Def.'s PFUF").  Unless otherwise noted, the facts are undisputed.

is a sponge; it's porous.  So if there's a lot of water in the ground–in the surface, then it will go into the concrete slab, and then . . . the concrete will act like a sponge, and it will suck the moisture out and distribute it to the top of the slab, and then floors have a hard time staying applied.

Id. at 27 (Vierra Dep. 23:7-13).  Floor moisture sealant is usually not required under carpeting "because carpet can breathe, and so the moisture can just evaporate through the carpet, and it doesn't become a problem."  Id. (Vierra Dep. 23:18-21).

Floor moisture sealant is a liquid substance that "has to be applied with a roller or a squeegee or a trowel, something to spread it around, depending on the nature of the material itself."  Id. at 26 (Vierra Dep. 22:2-6).  The thickness of floor moisture sealant varies depending upon its strength, viz., the amount of water it is designed to block from evaporating toward the surface.  Id. (Vierra Dep. 22:7-9).  Thus, if the floor moisture sealant is "only intended to stop a little bit of water, then you might be able to apply it with a squeegee"; however, a thicker product might require the applicator to use a trowel or, in some cases, a knife.  Id. (Vierra Dep. 22:10-15).

## 1.  Moisture Testing

Floor moisture levels are determined utilizing calcium chloride tests, which "generally consist of several small domed dishes that are set out on the floor to create a sealed, one square foot section of floor."  Def.'s Cross-Mot. 3.  Mr. Vierra described these dishes as "hockey pucks, essentially.  They look like clear, plastic Petri dishes with essentially something in it that looks like Styrofoam, the individual granules of Styrofoam."  Def.'s App. 28 (Vierra Dep. 33:13-16).  Calcium chloride testing kits are commercially available and do not require specific licensure to perform.  Id. (Vierra Dep. 33:18-22).  Once a section of the floor is cleaned, the testing kit is set on the floor, and the lid is taped to the floor to create a sealed, square-foot section for testing.  Id. at 28-29 (Vierra Dep. 33:23-34:2).  The testing kit then traps all of the moisture that is released from the concrete.  Id. at 29 (Vierra Dep. 34:3-4).  Mr. Vierra indicated that while the calcium chloride tests are accurate, they nonetheless are "really just a snapshot in time.  [The test] establishes what the level is for this period."  Id. at 34 (Vierra Dep. 39:4-5); accord Def.'s Cross-Mot. 3 (indicating that the calcium chloride test results "demonstrate how much water has emitted from the concrete within a 24 hour time period").  According to Mr. Vierra, the floor manufacturer is usually responsible for performing the calcium chloride tests.  Def.'s App. 34 (Vierra Dep. 39:16-20).

## 2.  Industry Standards and Practices

Mr. Vierra testified that the industry standard for concrete moisture levels is "usually [in] the range . . . [of] three to six pounds of moisture per thousand square feet over 24 hours."  Id. at 31 (Vierra Dep. 36:7-10).  According to Mr. Vierra, "once you get beyond three to six pounds, then you need to involve the flooring manufacturer to figure out an acceptable level."  Id. (Vierra

Dep. 36:12-14).  Because the amount of moisture within concrete can vary, numerous manufacturers produce different types and strengths of floor moisture sealant systems.  Id. at 30-31 (Vierra Dep. 35:21-36:2).  The strength and cost of floor moisture sealant are directly proportional: "the harder you expect the floor sealant to work, the more expensive it is."  Id. at 31 (Vierra Dep. 36:2-4).  In terms of explaining the strength of floor moisture sealant, Mr. Vierra offered two examples: a floor that emits nine pounds of moisture would not require a sealant "that's going to have to work very hard" to bring the moisture level down to industry standards, whereas a floor that emits eighteen pounds of moisture will "need something that's going to work really hard, and that becomes more expensive."  Id. (Vierra Dep. 36:15-19).

Once the concrete moisture level is ascertained, the installer of the flooring must consult the specifications from the flooring manufacturer prior to installation.  Id. at 32 (Vierra Dep. 37:7-10).  The flooring manufacturer's specifications will establish an acceptable concrete moisture level in order to ensure that the flooring can be properly installed; otherwise, if the "product isn't able to stick with the current glues that are on the market, [the manufacturer is] expected to come back because [its] floor failed."  Id. (Vierra Dep. 37:19-22); see also id. at 59 (Vierra Dep. 25:11-16 (stating that if the measured amount of moisture "exceeds what the flooring manufacturer will warranty, then we have to do something [else, such as] dry the building and suck the water out and force it to cure more rapidly, or we have to apply . . . a vapor barrier")).  Floor manufacturer warranties typically last between one to three years.  Id. at 33 (Vierra Dep. 38:18).  After that period expires, maintenance of the flooring becomes the responsibility of the facility where the flooring in installed.  Id. (Vierra Dep. 38:13-15).

## B.  The Project Specifications[2]

The part of the project relevant to this action involved the installation of vinyl composition tile ("VCT") flooring over a concrete slab.  Def.'s Cross-Mot. 2.  Section 09660 of the specifications, entitled "Resilient Tile Flooring," concerned "the installation of vinyl composition tile flooring and accessories," Def.'s App. 45, and contained numerous provisions detailing, among other things, the types of materials and products required (i.e., adhesives, sealer and primer, leveling compound, polish, cleaners, edge strips, screws); product condition requirements; subflooring preparation; and instructions related to installation, cleaning, and protection, id. at 46-52.  For example, paragraph 2.3 required the contractor to utilize a particular water-based latex adhesive as recommended by the tile manufacturer.  Id. at 48.  Paragraph 2.4, which addressed sealer and primer for concrete subflooring, required application "[a]s recommended by the adhesive and tile manufacturer.  Seal for moisture content of 15 lbs. Contractor to provide testing to verify moisture level.  See Specification 09880 and[] Part 3.2,

---

[2]  It appears that neither party submitted complete copies of the solicitation or the contract specifications.  With respect to the latter, the parties furnished excerpts of portions of the specifications that each believes is relevant to this action.  West Bay appended a three-page copy of the awarded contract to its complaint.  See Compl. Ex. A.

Subfloor Preparation."[3]  Id.  Additionally, paragraph 3.2 of section 09660, which addressed subfloor preparation, required that the contractor perform, among other things, the following functions: fill cracks, joints, and other irregularities in the concrete with a leveling compound; clean floors of oil, paint, dust, and "deleterious substances"; leave floors dry, cured, and free of residue from cleaning agents; prime the concrete subfloor if the primer would seal slab conditions that inhibit bonding; and remove existing resilient flooring and existing adhesives without the use of solvents.  Id. at 49-50.

Section 09800, entitled "Special Coatings Floor Concrete Moisture Sealant," detailed the "[m]ultiple component specification[s] for suspended, on, or below-grade horizontal concrete floors," included the type of products the contractor would use, and contained provisions related to "[r]epairs and preparation of concrete floors."  Vierra Decl. Ex. B at 2.  Without further definition, paragraph 1.02 of section 09800 described a "system," which "shall consist of treatments designed to control alkalinity, and to reduce vapor emission to specified, measurable[] compliance levels."  Id.  Paragraph 1.02A indicated that the "system" "shall reduce emission levels to within 3.0 lbs[.], and should be installed in all cases where the starting calculation is 15.0 lbs[.] or more."  Id.  Paragraph 1.03A, which governed "Quality Assurance," stated that "[t]he treated area shall demonstrate a reduction of moisture vapor emission to the level specified by the manufacturer of the finish flooring materials."[4]  Id.

Additionally, section 09800 contained provisions related to moisture testing that the contractor must perform prior to application of the system.  Id. at 3.  But see Def.'s App. 34 (Vierra Dep. 39:16-20 (indicating that the flooring manufacturer typically performs the calcium chloride testing)).  Paragraph 1.06, entitled "Quantification Testing," specifically required:

---

[3]  The reference to "Specification 09880" apparently was a typographical error.  Section 09800, as discussed below, governed the application of concrete floor moisture sealant.  See Vierra Decl. Ex. B at 2.

[4]  Pursuant to paragraph 1.03B, the manufacturer of the vapor emission compliance treatment was required to "supply written proof of at least 10 years successful experience in vapor emission reduction."  Vierra Decl. Ex. B at 2.  Furthermore, paragraph 1.03B stated: "Provide at least 5 verifiable projects with address, contact and phone number where system was successfully used to reduce before emission from 15 lbs[.] or more to 3 lbs[.] or less."  Id.  It is unclear whether the manufacturer of the vapor emission compliance treatment or the applicator was required to provide the information referenced in paragraph 1.03B.  Although paragraph 1.03B referred to the manufacturer, additional parts of paragraph 1.03 addressed requirements applicable to the applicator.  For example, paragraph 1.03C required that the manufacturer possess at least ten years of business experience.  Id.  By contrast, paragraphs 1.03E and 1.03F required that the applicator receive training and certification, provide a valid contractor's license upon request, and furnish verification that it is certified by the manufacturer.  Id.  Furthermore, paragraph 1.03G stated that a "10-year warranty shall be given covering all labor and materials" upon completion of the system application.  Id.

A.  Testing shall be conducted with calcium chloride test kits using the following test schedule: Minimum of 3 kits for up to one thousand square feet; and an additional test kit for each ensuing thousand square feet or portion thereof.  Kits shall be placed in either a rectangular or cross-diagonal pattern.[5]

Vierra Decl. Ex. B at 3 (footnote added).  Paragraph 2.02A required that the contractor utilize "prepackaged calcium chloride dome test kits, administered by independent laboratory or competent contractor or inspector," to test moisture vapor emission levels.  Id.  Additionally, paragraph 2.02A: (1) required that results be expressed "in pounds of moisture vapor emitted per 24 hours in a 1,000 square foot area"; (2) stipulated that "measurements must be taken in the anticipated service environment"; and (3) indicated that because testing requires sixty to seventy-two hours, "such time must be planned into the schedule."  Id.; cf. Def.'s Cross-Mot. 3 (noting that the calcium chloride dishes are "set out for a 36-72 hour period.  The user can then either weigh the dishes or send them to a laboratory for results.").

Unbeknownst to West Bay, the VA previously hired Floor Seal Technology as a consultant before it issued the solicitation.  Pl.'s PFUF ¶ 5.  On July 23, 1999, Floor Seal Technology conducted a series of calcium chloride tests to determine moisture emission levels on the floors of the project.  Id.; Vierra Decl. Ex. D.  These test results indicated the following floor moisture level emissions:

**Table 1**

| Location[6] | Weight at Termination of Testing | Hours | Result (Lbs. of Moisture) |
|---|---|---|---|
| Stairway 1 | 38.1 | 74.5 | 12.1 |
| Electrical Room | 32.0 | 74.3 | 2.7 |
| Stairway 2 | 39.2 | 74.1 | 14.4 |
| B-181 | 36.9 | 73.7 | 9.8 |
| B-178 | 35.2 | 73.4 | 7.8 |

[5]  Although this provision was labeled paragraph 1.06A, there was no paragraph 1.06B. See Vierra Decl. Ex. B at 3.

[6]  Although the locations identified as B-181 and B-178 are not defined in any of the parties' submissions, the court infers, based upon Contract Drawing A060, which contained the key floor plan and final construction documents furnished by defendant, that these two areas are located on the first floor of Building 90.  See Def.'s App. 63.

Vierra Decl. Ex. D (footnote added); Pl.'s PFUF ¶ 5.  The VA did not, however, furnish these test results to West Bay.  Pl.'s PFUF ¶ 5.  Instead, West Bay later obtained this information directly from Floor Seal Technology.[7]  Id.

On September 18, 2001, the VA issued Amendment #4 to the solicitation, which addressed concrete floor moisture sealant requirements.  Vierra Decl. Ex. B at 4; Def.'s PFUF ¶ 2.  Issued in order "to correct [the] specifications," Vierra Decl. Ex. B at 4, Amendment #4 modified paragraph 3.01E, which now read: "Based upon the results of the test data as described in section 1.03B, determine the level of remediation required.  Such information must be obtained from the manufacturers of the products specified for the finished floor system.  (Use 15 pounds)."[8]  Id.  West Bay did not submit a request for information or seek clarification from the VA concerning Amendment #4 prior to its submission of a bid for the contract.  Def.'s PFUF ¶ 3.

## C. The VA's Pre-Bid Walkthrough Inspections

On September 19 and September 21, 2001, the VA conducted two pre-bid walkthrough inspections of Building 90 with and for prospective bidders.  Def.'s App. 56-57; cf. Vierra Decl. Ex. B at 1 (indicating that a pre-bid walkthrough was scheduled for September 4, 2001).  Interested bidders "were instructed to sign in on a sign-in sheet during the walkthroughs."  Def.'s App. 53 (Geisenhofer Decl. ¶ 4).  West Bay did not attend either of these walkthroughs.[9]  Id. (Geisenhofer Decl. ¶ 6).  West Bay also did not submit a request for information or seek clarification about any issue related to concrete floor moisture sealant prior to the submission of its bid for the contract.  Def.'s PFUF ¶ 4.

---

[7] These test results were enumerated in an April 29, 2002 "Moisture Vapor Emission Test & Concrete Analysis" report provided to West Bay by Floor Seal Technology.  See Vierra Decl. Ex. D.  At no time prior to the submission of its bid did West Bay ask if concrete floor moisture tests had been conducted or if results of such tests were available.  See Def.'s PFUF ¶ 9 (indicating that West Bay did not rely upon any moisture testing results when estimating its cost for concrete floor moisture sealant prior to submitting its bid on the project); infra note 14.

[8] The original version of paragraph 3.01E referenced paragraph 1.06 and did not include the instruction to "(Use 15 pounds)."  See Vierra Decl. Ex. B at 3.

[9] In his declaration, Mr. Geisenhofer, who was a Project Manager for the VA, stated that walkthrough attendees were able to see the condition of the floor, which contained broken tiles, darkened joints, and other conditions that were caused "in large part [due] to moisture migration through the concrete slab," prior to their submission of bids.  Def.'s App. 53 (Geisenhofer Decl. ¶¶ 7-9).  Although West Bay does not dispute that one of its representatives was not present during either walkthrough, it challenges the relevance of the "alleged visible conditions of the Project during the walkthrough . . . ."  Pl.'s Sur-Reply Evid. Gov't's Reply Supp. Cross-Mot. ("Pl.'s Sur-Reply") 4.

### D.  Contract Award

West Bay submitted its bid to the VA on September 27, 2001.  Compl. ¶ 7.  In its bid, West Bay allocated $2,000.00 for floor sealant.  Def.'s PFUF ¶ 6.  Within this allocation, West Bay included its costs for vapor testing, as well as overhead costs and profit.  Id. ¶¶ 7-8.  When it estimated this cost for floor sealant, West Bay did not rely upon any moisture testing results.  Id. ¶ 9.  On November 20, 2001, the VA awarded the contract to West Bay for $1,267,000.00.  Id. ¶ 8-9; Def.'s App. 43.  The VA assigned Melvin P. Koenig as the contracting officer acting on behalf of the VA, Compl. ¶ 11, and issued a Notice to Proceed to West Bay on January 9, 2002, id. ¶ 10; Def.'s App. 44.  West Bay was required to complete the project within 436 days following its receipt of the Notice to Proceed.  Def.'s App. 44.  Mr. Vierra was responsible for the completion of the project.  Pl.'s PFUF ¶ 7; Vierra Decl. ¶ 2.

### E.  West Bay's Performance Under the Contract

Pursuant to paragraphs 1.02A, 1.06 and 2.02A of section 09800 of the specifications, West Bay conducted calcium chloride tests on the floors of the project.  Pl.'s PFUF ¶ 4; Vierra Decl. ¶ 5.  Although it is unclear when West Bay performed these tests, it apparently sent the samples to Taylor Tools, located in Denver, Colorado, in or around April 2002.  See Vierra Decl. Ex. C.  As reported in a letter dated April 22, 2002, Taylor Tools analyzed the samples it received from West Bay and determined the following:

**Table 2**

| Plot Number[10] | Change in Weight (grams) | Test Duration Hours | Result (Lbs. of Moisture) |
|---|---|---|---|
| Test Plot #1 | 4.6 | 66.50 | 7.52 |
| Test Plot #2 | 2.8 | 66.50 | 4.58 |

Id. (footnote added).  Taylor Tools noted in its report that it could only calculate test results for tests conducted within a sixty to seventy-two hour time frame and that the results column "indicate[s] the level of moisture migration (in lbs[.]) over a 1,000 square foot area during a twenty four (24) hour time period."  Id.  It represented to West Bay that these results "reflect the tests we performed on the samples we received at our office.  We did not perform the moisture collection tests and we do not know if they were properly conducted or if anything occurred while the samples were in transit which could have affected our measurements of moisture content."  Id.

---

[10]  The parties' submissions do not indicate the location of these test plots.

Also in or around April 2002, West Bay hired Floor Seal Technology to perform calcium chloride tests on the floors of the project.  Pl.'s PFUF ¶ 6.  On April 26, 2002, Floor Seal Technology administered four moisture sealant tests, which yielded the following results:

**Table 3**

| Location[11] | Weight at Termination of Testing | Hours | Result (Lbs. of Moisture) |
|---|---|---|---|
| Room (a) | 35.0 | 71.6 | 8.0 |
| Hallway | 36.2 | 71.6 | 9.8 |
| Hallway | 35.0 | 71.6 | 8.0 |
| Room (b) | 35.8 | 71.6 | 9.3 |

Vierra Decl. Ex. D (footnote added).  As with the initial tests that West Bay performed and sent to Taylor Tools, see Vierra Decl. Ex. C; Table 2, supra, the tests performed by Floor Seal Technology indicated moisture emission levels for the floors on the project over a 1,000 square-foot area during a twenty-four hour period, Vierra Decl. ¶ 8.

### 1.  West Bay's Request for Information ("RFI")

On April 30, 2002, West Bay submitted RFI Number 237-007 to Mr. Koenig.  Vierra Decl. Ex. E.  In the RFI, Mr. Vierra indicated that West Bay's moisture test results measured 7.52 and 4.58 pounds per 1,000 square feet during a twenty-four hour period.  Id.  West Bay noted that paragraph 1.02A of section 09800 required application of moisture sealant "only where 'the starting calculation is 15.0 lbs[.] or more.'"[12]  Id. (quoting Vierra Decl. Ex. B at 2).  Because its testing yielded results that "are well under the threshold for this specification," West Bay stated that "it is our position that the scope outlined in section 09800 is not required."  Id.  West Bay did not reference the results from Floor Seal Technology, which were also below 15.0 pounds.  See Vierra Decl. Ex. D; cf. Def.'s PFUF ¶ 11 (stating that all moisture emission test results performed by or on behalf of West Bay in April 2002 were greater than 3.0 pounds).

---

[11]  The parties' submissions do not indicate the precise location of the rooms and hallways that were tested in Building 90.

[12]  In his May 2, 2002 response to West Bay's RFI, Mr. Koenig attached an electronic mail communication containing a memorandum from Armando Binsol, who provided a "technical opinion" for the VA as part of the VA's "Engineering response."  Vierra Decl. Ex. F at 1.  Mr. Binsol indicated that "[t]he spec[ification] section 09800, section 1.02, para. A, confirms the contractor's statement."  Id. at 2.

Mr. Koenig responded to West Bay's RFI on May 2, 2002, and enclosed Mr. Binsol's memorandum. Vierra Decl. Ex. F at 1-2; supra note 12. Mr. Koenig indicated that the "15 pounds" reference in Amendment #4 had been revised: "Amendment #4 . . . established the level of sealant required at 15 lbs[.] to be brought down to a maximum of 3 pounds. Apparently, the level encountered is now revised to 14.4 lbs[.] per [Mr. Binsol's] email with a final sealant result bringing the level down the 3 lbs[.] as before."[13] Vierra Decl. Ex. F at 1. Mr. Binsol's memorandum stated, in part:

> We disagree with the contractor on rejecting the requirement of specification section 09800. The moisture test for the work required cannot be based on 'current' test result[s] conducted by the contractor on 4/22/02. The bid package was completed in September[] 1999[,] and specification 09800 was prepared and bid[] by contractors based on test result[s] conducted by an independent test laboratory in 1999. If [West Bay] ha[d] an issue on the moisture level at that time, it should have been brought prior to bid. The contractor's bid on the requirement of specification 09800 must have been based on a level of remediation prior to bid submission and cannot be based on test result[s] conducted two months after start of construction.[14]

Id. at 2 (footnote added). Mr. Binsol also indicated that the VA should "direct the contractor to apply the floor sealant based on the Government test result of 14.4 lbs[.] at no additional cost to the VA." Id.

Furthermore, Mr. Koenig noted that West Bay's performance schedule allotted time for sealant application and questioned West Bay as to why this allocation was made if West Bay believed that the application of floor moisture sealant was not required. Id. at 1. Mr. Koenig added:

> One of the primary objectives of this remodeling project was to not only replace the tile but also to seal the subsurface. It is very doubtful that you install tile without substantial sealant levels [sic] would remain in place and useable [sic] given the fact that winter vapor pressure levels have already been measured at 14.4 lbs. How would you expect then for your tile to last for the required 10 year warranty period?

---

[13] The reference to "14.4 lbs[.]" was apparently derived from the July 26, 1999 test result for Stairway 2 performed by Floor Seal Technology. See Pl.'s PFUF ¶ 9 ("Mr. Binsol's electronic mail [memorandum] stated that West Bay should utilize old test data from 1999, which had one of five tests indicating the emission level to be 14.4 pounds, instead of the current test data on the existing emission level."); Table 1, supra.

[14] According to West Bay, it was unaware of any calcium chloride test results performed by Floor Seal Technology for the VA in July 1999 prior to its bid. See Pl.'s PFUF ¶ 5.

Id.  Mr. Koenig concluded: "You are directed to proceed with scaling immediately."  Id.  West Bay ultimately proceeded as directed.  Compl. ¶ 15.

West Bay's president, Paul Thompson, provided a same-day response to Mr. Koenig's May 2, 2002 letter.  Vierra Decl. Ex. I.  Mr. Thompson indicated that West Bay allotted "a minimum amount of time in our schedule for the application of the sealant control treatment," time that West Bay determined "based on the fact that any new concrete patches would require this moisture control sealant."  Id.  Mr. Thompson explained that West Bay "anticipated that there might be some concrete 'patching' which would have excessive moisture levels" and indicated that "excessive amounts of moisture are usually found in "newly placed concrete."  Id.  West Bay, Mr. Thompson stated, would install the moisture sealant "[i]f the moisture level exceeds certain levels . . . ."  Id.  Mr. Thompson also asked that Mr. Koenig "please read section 09800 and tell me where it indicates that West Bay Builders is obligated to seal the entire project."  Id.  Additionally, Mr. Thompson addressed the "14.4 lbs[.]" reference contained in Mr. Binsol's memorandum:

> In your letter[,] you also make reference to the fact that winter vapor levels were measured at 14.4 pounds.  The attached memo states **moisture test for the work required cannot be based on 'current' test result[s]**–this statement makes absolutely no sense.  Should we use test results from when they constructed the building fifty years ago?  The memo also states that the independent test conducted in 1999 showed test results of 14.4 pounds of moisture.  Could you please indicate where in the contract documents [it states] that we should use test results, which are three years old, as the basis for determining if the moisture sealant is required[?]  Not only are those test results irrelevant[,] they are not incorporated into the contract documents in any shape or form.  West Bay Builders bid section 09800 exactly in accordance with the verbiage in section 09800.  If test levels exceed 15 pounds of moisture[,] then we will install the moisture control product.  Because of the dollar magnitude of this work[,] combined with the absence of dispute resolution procedures in the specifications[,] we are **not** proceeding with this work.

Id.

## 2.  West Bay Submits Its Claim to the VA

On May 3, 2002, West Bay submitted Change Proposal Estimate #3, a claim for additional contract costs on the project for "extra work."[15]  Compl. ¶ 12; Pl.'s PFUF ¶ 14.  But see Compl. Ex. C (containing West Bay's change proposal estimate, which was dated May 2,

---

[15]  Defendant disputes that West Bay's claim was for extra work.  Def.'s Resp. Pl.'s PFUF ¶ 14.  According to defendant, whether West Bay's claim constituted new work under the contract is a question of law for the court's determination.  Id.

2002); Vierra Decl. Ex. J (same).  In its change proposal estimate, West Bay estimated an additional $157,681.00 associated with "shotblast and seal floors where moisture test does not exceed the 15 lb[.] threshold identified in specifications."  Vierra Decl. Ex. G.  West Bay also requested a thirty-day extension of time within which to complete these tasks.  Id.  According to Mr. Vierra, this claim "was based on the cost estimates provided by Surface Solution Innovations 2000, a company that was considered by West Bay to perform the application of sealant on the Project."  Vierra Decl. ¶ 16; see also Vierra Decl. Ex. H (containing a May 1, 2002 estimate in the amount of $121,185.00 from Surface Solution Innovations 2000 that included: (1) furnishing and installing vapor emission systems "guaranteed to bring any moisture level down to 3 lbs."; (2) shotblasting to prepare substrate; and (3) furnishing and installing calcium chloride tests).

Following this series of correspondence, West Bay and the VA held a conference on May 7, 2002.  See Vierra Decl. Ex. K.  On May 9, 2002, Mr. Koenig issued to West Bay a "formal direction to proceed with floor moisture vapor sealing of the entire area being renovated by West Bay Builders under the current contract."  Id.  Mr. Koenig clarified:

> For purposes of the sealing application[,] it was the intent of the VA to indicate in the contract (via [A]mendment #4) that the successful bidder on this project was to use 15 lbs[.] of vapor pressure as the existing level for all floor surfaces.  The maximum level of vapor pressure measured **after** application in all areas shall not exceed 3 lbs.  In addition, West Bay Builders, upon acceptance by the VA of sealant and tile installation, shall warrant the work for a period of 10 years in accordance with existing contract terms and conditions.

Id.  Mr. Koenig also informed West Bay that it must provide notice to the VA within the next thirty days if West Bay intended to submit a claim for the cost associated with the sealant effort.[16] Id.

West Bay submitted a revised claim, Change Proposal Estimate #3.2, on June 10, 2002. Vierra Decl. Ex. L at 1.  This claim totaled $128,833.00, which was "the corrected price for the scope of work . . . ."  Compl. ¶ 16;[17] accord Vierra Decl. Ex. L at 1-2.  Mr. Vierra explained that

---

[16]  Mr. Koenig set forth that West Bay's claim "will have to include a certification" that its claim is made in good faith.  Vierra Decl. Ex. K.  Moreover, Mr. Koenig apprised West Bay that its claim "must also stand the test of reasonableness and will be assessed in the same manner as any other negotiated procurement."  Id.

[17]  Beginning with paragraph sixteen, West Bay's complaint contains errors in which the paragraphs revert to number thirteen and proceed in ascending order.  Consequently, the allegations contained in each paragraph following paragraph fifteen are incorrectly numbered. To avoid confusion, the court refers to the paragraphs contained in West Bay's complaint in their proper consecutive order.  Thus, the second paragraph 13 is renumbered paragraph 16, the second paragraph 14 is renumbered paragraph 17, the second paragraph 15 is renumbered

West Bay revised its original Change Proposal Estimate #3 "to reflect the actual subcontractor performing the work."  Vierra Decl. Ex. L at 2.  He reiterated West Bay's position:

> Based on the specific language in paragraph 1.02.A of section 09800 (Special Coatings Floor Concrete Moisture Sealant), this scope of work is not required where the moisture tests do not exceed 15 lbs.  As our previous documentation has shown, none of the moisture test[s] at this facility has exceeded the 15 lb[.] threshold that would require the application of this section of the specifications.
>
> We have proceeded with this work based on our conversations and the [Veterans Health Administration's] written direction to proceed.  Our position[] remains that this work is not required by the Contract Documents and therefore, we are entitled to full compensation for this additional scope.[18]

Id. (footnote added).  Mr. Koenig responded to West Bay's June 10, 2002 claim on November 6, 2002.[19]  Compl. Ex. E.  Mr. Koenig indicated that West Bay's claim "is currently under review and a decision will be issued within 60 days of my receipt of supplemental data."  Id.  Mr. Koenig requested West Bay's "actual labor costs" and the "actual subcontract costs incurred for the effort noted in the proposal of Floor Seal Technology proposal dated 8 May 2002."  Id.  West Bay provided the requested information to Mr. Koenig on November 11, 2002, Compl. ¶ 18, and Mr. Koenig "requested further information" the following day, id. ¶ 19.

### 3.  The VA Determines That West Bay's Claim Has Merit

On January 8, 2003, Mr. Koenig concluded his review of West Bay's claim: "A lengthy review of the merit of your claim has resulted in an interpretation of the contract provisions which is favorable to West Bay Builders.  Therefore, the costs incurred will be treated as a Government directed Change Order . . . ."  Compl. Ex. F.  The total for allowed costs and profits was calculated by Mr. Koenig as $128,279.20.  Id.  Mr. Koenig also included an "Amendment of Solicitation/Modification of Contract" ("Supplemental Agreement #4"), which required West Bay's signature.  Id.; Compl. ¶ 20.  Supplemental Agreement #4 provided "full consideration to West Bay Builders as a result of a Government direction on 3 May 2002 and 9 May 2002 to seal approximately 32,000 square feet of concrete sub-flooring to a maximum measured vapor

---

paragraph 18, the original paragraph 16 is renumbered 19, and so forth.

[18]  Mr. Vierra also provided copies of West Bay's current cost estimate for the work to be performed, the quotation from its subcontractor, the moisture test results, and the required certification for a claim exceeding $100,000.00.  See Vierra Decl. Ex. L at 3; Vierra Decl. Ex. M.

[19]  Mr. Koenig's delay in responding to West Bay's June 10, 2002 claim was due to his apparent absence following a surgical procedure "and other priorities with end of FY02 projects."  Compl. Ex. E.

pressure of 3 lbs[.] assuming an existing condition of 15 lbs[.] vapor pressure throughout." Compl. Ex. F.

On January 15, 2003, West Bay notified Mr. Koening that Supplemental Agreement #4 contained no provision for the extension of time West Bay requested.  Compl. Ex. G.  Mr. Vierra noted that "the current schedule is tracking a total of 23 working days for this work."  Id.  "Based on the 23 additional days and our submitted cost of $618.56 per day," Mr. Vierra wrote, "the additional cost for the time extension would be $14,226.88."  Id.  West Bay requested information about "how the time extension will be incorporated into [] Supplemental Agreement [#4]."  Id.

### 4. The VA Denies West Bay's Claim

Mr. Koenig's April 4, 2003 response did not address the issues raised by West Bay in its January 15, 2003 communication:

> 1.  A further review of your claim by VA Legal Counsel has resulted in a determination that the Government contract specifications contained a 'patent ambiguity' with regards to the necessity for sealing the floors.  Essentially[,] this means if our specifications are ambiguous and do not adequately address standard industry practice[,] then it is incumbent upon the contractor to raise the issue with the Government prior to submitting a bid.  There is an abundance of case law confirming this principle.

> 2.  However, I am prepared to make you a final offer of $64,140.00 to settle the issue.  If you determine that this consideration is inadequate[,] then you may make one more request for a Final Decision[,] at which time your payment request would be either accepted or denied.  If denied[,] then the door is open for you to proceed with an Appeal under the Disputes provisions of the contract.

> 3.  Please evaluate my offer carefully.  It is my best and final-offer [sic].  Any additional amounts paid to West Bay Builders would have to result from a decision under appeal.

Compl. Ex. H.  West Bay rejected Mr. Koenig's offer on April 7, 2003, stating: "After reviewing your letter, we find that we cannot accept your settlement offer.  There is also substantial case law indicating that when there is an ambiguity in the Contract Documents that results in increased obligations for one party, it is the responsibility of the drafter of the documents to clarify the ambiguity."  Compl. Ex. I.  Furthermore, West Bay requested a final decision from Mr. Koenig and indicated that a decision that resulted in "any less than full payment of our claim" would prompt it to file an appeal under the disputes provision of the contract.  Id.

In a "Final Decision of the Contracting Officer" ("Final Decision") dated July 7, 2003, Mr. Koenig denied West Bay's claim for $128,833.00.  Compl. Ex. J.  The Final Decision stated, in pertinent part:

2.  I have reviewed your claim to recover costs associated with moisture sealing 24,800 square feet concrete floors with an assumed moisture accumulation of 15 lbs[.] down to 3 lbs[.] with a 10 year warranty.  I have determined that the contract specifications required that the floors be sealed to 3 lbs[.] assuming a 15 lb[.] moisture accumulation overall.  If you did not understand the contract floor moisture sealing requirements[,] you were required to seek clarification from the Contracting Officer in a timely manner prior to submitting a proposal on this project.  You did not seek such clarification and thus, your claim is denied.

3.  This is the final decision of the Contracting Officer.  You may appeal this decision to the agency board of contract appeals.  If you decide to appeal, you must, within 90 days from the date you receive this decision, mail or otherwise furnish written notice to the agency board of contract appeals . . . .  Instead of appealing to the agency board of contract appeals, you may bring an action directly in the United States Court of Federal Claims . . . within 12 months of the date you receive this decision.

Id.

### F.  Procedural History

West Bay received Mr. Koenig's Final Decision on July 9, 2003, see id., and filed a complaint in the United States Court of Federal Claims ("Court of Federal Claims") on July 9, 2004.  The case was reassigned to the undersigned on January 6, 2006.  Following briefing of plaintiff's motion and defendant's cross-motion for summary judgment, plaintiff filed a motion to withdraw deemed admissions, which the court denied.  See West Bay Builders, Inc. v. United States, 80 Fed. Cl. 700 (2008) ("West Bay I").[20]

---

[20]  After the court issued its decision in West Bay I, it directed the parties to file status reports in which they indicated their respective positions regarding how, if at all, West Bay I affected the issues pending before the court.  West Bay indicated that its deemed admissions "have no impact[] because the admissions are not central to the dispositive issue of interpretation of the contract specifications."  Pl.'s Status Report Pursuant Court's June 24, 2008 Order 2.  Defendant indicated that West Bay's deemed admissions "narrow[] a significant issue for the Court: whether West Bay's proffered contract interpretation is reasonable."  Def.'s Status Report 2-3.

## II.  LEGAL STANDARDS

### A.  Subject Matter Jurisdiction

Subject matter jurisdiction is "an inflexible matter that must be considered before proceeding to evaluate the merits of a case." Matthews v. United States, 72 Fed. Cl. 274, 278 (2006).  "Without jurisdiction the court cannot proceed at all in any cause.  Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause." Ex parte McCardle, 74 U.S. (7 Wall.) 506, 514 (1868).  Subject matter jurisdiction may be challenged at any time by the parties or by the court sua sponte. Folden v. United States, 379 F.3d 1344, 1354 (Fed. Cir. 2004).

The ability of this court to hear and decide suits against the United States is limited.  "The United States, as sovereign, is immune from suit save as it consents to be sued." United States v. Sherwood, 312 U.S. 584, 586 (1941).  The waiver of immunity "cannot be implied but must be unequivocally expressed." United States v. King, 395 U.S. 1, 4 (1969).  The Tucker Act confers upon the Court of Federal Claims jurisdiction to "render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1) (2000).  It also provides the court with jurisdiction to entertain claims brought under the Contract Disputes Act of 1978 ("CDA"), 41 U.S.C. §§ 601-613 (2000). See 28 U.S.C. § 1491(a)(2) ("The Court of Federal Claims shall have jurisdiction to render judgment upon any claim by or against, or dispute with, a contractor arising under section 10(a)(1) of the Contract Disputes Act of 1978 . . . .").

Although the Tucker Act waives the sovereign immunity of the United States for claims for money damages, it "'itself does not create a substantive cause of action; in order to come within the jurisdictional reach and the waiver of the Tucker Act, a plaintiff must identify a separate source of substantive law that creates the right to money damages.'" Greenlee County, Ariz. v. United States, 487 F.3d 871, 875 (Fed. Cir. 2007) (quoting Fisher v. United States, 402 F.3d 1167, 1172 (Fed. Cir. 2005)), cert. denied, 128 S. Ct. 1082 (2008).  The separate source of substantive law must constitute a "money-mandating constitutional provision, statute or regulation that has been violated, or an express or implied contract with the United States." Loveladies Harbor, Inc. v. United States, 27 F.3d 1545, 1554 (Fed. Cir. 1994) (en banc).  In this case, West Bay alleges that jurisdiction is proper under the CDA and that its claim is based upon an express written contract with defendant. See Compl. ¶ 1.

### B.  Cross-Motions for Summary Judgment–RCFC 56

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law.  RCFC 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  Where, as in the instant case, both parties move for summary

judgment, each party bears the burden of demonstrating the absence of material facts in its own case.  Celotex Corp., 477 U.S. at 322-23; see also A Olympic Forwarder, Inc. v. United States, 33 Fed. Cl. 514, 518 (1995) ("A cross-motion is a party's claim that it alone is entitled to summary judgment.").  "The fact that both parties have moved for summary judgment does not mean that the court must grant judgment as a matter of law for one side or the other."  Prineville Sawmill Co. v. United States, 859 F.2d 905, 911 (Fed. Cir. 1988) (citing Mingus Constructors, Inc. v. United States, 812 F.2d 1387, 1390 (Fed. Cir. 1987)); accord A Olympic Forwarder, Inc., 33 Fed. Cl. at 518 ("It does not follow . . . that if one motion is rejected the other is necessarily supported.").  Instead, "[t]he court must evaluate each party's motion on its own merit and resolve all reasonable inferences against the party whose motion is under consideration."  A Olympic Forwarder, Inc., 33 Fed. Cl. at 518 (citing Corman v. United States, 26 Cl. Ct. 1011, 1014 (1992)).

Each moving party may discharge its burden of demonstrating no genuine issue of material fact by "pointing out . . . that there is an absence of evidence to support the nonmoving party's case."  Id.  A fact is material if it "might affect the outcome of the suit under the governing law."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); accord Cloutier v. United States, 19 Cl. Ct. 326, 328 (1990) ("A material fact is one which will make a difference in the result of a case."), aff'd, 937 F.2d 622 (Fed. Cir. 1991).  An issue is genuine if it "may reasonably be resolved in favor of either party."  Anderson, 477 U.S. at 250.  The moving party is not required to support its application with affidavits, but instead may rely solely on the pleadings, depositions, answers to interrogatories, and admissions.  Celotex Corp., 477 U.S. at 324.  The nonmoving party then bears the burden of showing that there are genuine issues of material fact for trial, id., and must come forward with "specific facts showing that there is a genuine issue for trial," RCFC 56(e).

The court must view inferences to be drawn from the underlying facts in the light most favorable to the nonmoving party.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  If the nonmoving party produces sufficient evidence to raise a genuine issue of fact material to the outcome of the case, then the motion for summary judgment should be denied.  Eli Lilly & Co. v. Barr Labs., Inc., 251 F.3d 955, 971 (Fed. Cir. 2001).  Even where the facts are not disputed, the moving party still must demonstrate that it is entitled to judgment as a matter of law.  Massey v. Del Labs., Inc., 118 F.3d 1568, 1573 (Fed. Cir. 1997).  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"  Matsushita Elec. Indus. Co., 475 U.S. at 587 (quoting First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 289 (1968)).  Following "adequate time for discovery," entry of summary judgment is mandated against a party who fails to establish "an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex Corp., 477 U.S. at 322.

## C. Principles of Contract Interpretation

Contract interpretation is a question of law, Lucent Techs., Inc. v. Gateway, Inc., 543 F.3d 710, 717 (Fed. Cir. 2008); Winstar Corp. v. United States, 64 F.3d 1531, 1540 (Fed. Cir. 1995) (en banc), aff'd, 518 U.S. 839 (1996), and is therefore "generally amenable to summary judgment," Varilease Tech. Group, Inc. v. United States, 289 F.3d 795, 798 (Fed. Cir. 2002) (citing Textron Def. Sys. v. Widnall, 143 F.3d 1465, 1468 (Fed. Cir. 1998)). Whether a contract provision is ambiguous is a question of law, as is whether an ambiguity is patent or latent.[21] See NVT Techs., Inc. v. United States, 370 F.3d 1153, 1159 (Fed. Cir. 2004). "When the United States enters into contract relations, its rights and duties therein are governed generally by the law applicable to contracts between private individuals." Lynch v. United States, 292 U.S. 571, 579 (1934). As such, "to resolve the current dispute, the court must identify and apply 'principles of general contract law.'" Praecomm, Inc. v. United States, 78 Fed. Cl. 5, 10 (2007) (quoting Franconia Assocs. v. United States, 536 U.S. 129, 141 (2002)).

The court applies "three primary rules of contract interpretation." Enron Fed. Solutions, Inc. v. United States, 80 Fed. Cl. 382, 393 (2008). First, contract interpretation "begins with the language of the written agreement." NVT Techs., Inc., 370 F.3d at 1159; see also Enron Fed. Solutions, Inc., 80 Fed. Cl. at 393 (stating that contract interpretation "start[s] with the plain meaning of the Contract's text"). A contract document "is read in accordance with its express terms and the plain meaning thereof," C. Sanchez & Son, Inc. v. United States, 6 F.3d 1539, 1543 (Fed. Cir. 1993); accord U.S. Sur. Co. v. United States, 83 Fed. Cl. 306, 311 (2008), and these terms are accorded "their ordinary meaning unless the parties mutually intended and agreed to an alternative meaning," Harris v. Dep't of Veterans Affairs, 142 F.3d 1463, 1467 (Fed. Cir. 1998). The contract language "must be given that meaning that would be derived from the contract by a reasonably intelligent person acquainted with the contemporaneous circumstances,'" Metric Constructors, Inc. v. NASA, 169 F.3d 747, 752 (Fed. Cir. 1999) (quoting Hol-Gar Mfg. Corp. v. United States, 351 F.2d 972, 975 (Ct. Cl. 1965)), and "any subjective, unexpressed intent of one of the parties is ineffective," Sterling, Winchester & Long, L.L.C. v. United States, 83 Fed. Cl. 179, 183 (2008).

Second, the court applies the "settled principle[] of contract interpretation," Dalton v. Cessna Aircraft Co., 98 F.3d 1298, 1305 (Fed. Cir. 1996), that a contract "be considered as a whole and interpreted so as to harmonize and give reasonable meaning to all of its parts, NVT Techs., Inc., 370 F.3d at 1159. Such an interpretation "is to be preferred over one that leaves a portion of the contract useless, inexplicable, void, or superfluous." Id. (citing Gould, Inc. v. United States, 935 F.2d 1271, 1274 (Fed. Cir. 1991)); see also United Int'l Investigative Serv. v. United States, 109 F.3d 734, 737 (Fed. Cir. 1997) (stating that the interpretation of a contract must "avoid[] conflict or surplusage of its provisions"). Third, "[t]he mere fact that the parties disagree with regard to the interpretation of a specific provision[] does not, standing alone,

---

[21] Patent and latent ambiguities are discussed in Parts II.C.2.a and II.C.2.b, infra, respectively.

render that provision ambiguous." Enron Fed. Solutions, Inc., 80 Fed. Cl. at 393; see also Metric Constructors, Inc., 169 F.3d at 751 ("To show an ambiguity[,] it is not enough that the parties differ in their respective interpretations of a contract term.").

## 1.  Unambiguous Contract Provisions

When a contract term is "clear and unambiguous on its face, the plain and ordinary meaning of the contract controls . . . ." Sterling, Winchester & Long, L.L.C., 83 Fed. Cl. at 183. As such, the court "cannot assign it another meaning, no matter how reasonable that other meaning might seem to be." Triax Pac., Inc. v. West, 130 F.3d 1469, 1473 (Fed. Cir. 1997). Thus, when the court encounters unambiguous contract terms, "extrinsic evidence is inadmissible to interpret them." Barron Bancshares, Inc. v. United States, 366 F.3d 1360, 1375 (Fed. Cir. 2004); see also Barseback Kraft AB v. United States, 121 F.3d 1475, 1479 (Fed. Cir. 1997) (stating that courts will give clear and unambiguous contract provisions "their plain and ordinary meaning and will not resort to parol evidence").  "To permit otherwise," the United States Court of Appeals for the Federal Circuit ("Federal Circuit") cautioned, "would cast 'a long shadow of uncertainty over all transactions' and contracts." McAbee Constr. Inc. v. United States, 97 F.3d 1431, 1435 (Fed. Cir. 1996) (quoting Trident Ctr. v. Conn. Gen. Life Ins. Co., 847 F.2d 564, 569 (9th Cir. 1988)).

## 2.  Ambiguous Contract Provisions

By contrast, a contract provision is ambiguous "only . . . if susceptible to more than one reasonable meaning," Barron Bancshares, Inc., 366 F.3d at 1375-76, and each meaning "is found to be consistent with the contract language," Enron Fed. Solutions, Inc., 80 Fed. Cl. at 394.  In other words, differing interpretations "must fall within a 'zone of reasonableness.'" Metric Constructors, Inc., 169 F.3d at 751.  Where the contract language is ambiguous, disputed issues of fact may arise concerning the parties' intent. Perry-McCall Constr., Inc. v. United States, 46 Fed. Cl. 664, 672 (2000).

"Ambiguities in a government contract are normally resolved against the drafter." Triax Pac., Inc., 130 F.3d at 1474.  As the Federal Circuit stated in Turner Construction Co. v. United States, "[w]hen a dispute arises as to the interpretation of a contract and the contractor's interpretation is reasonable, we apply the rule of contra proferentem, which requires that ambiguous or unclear terms that are subject to more than one reasonable interpretation be construed against the party who drafted the document." 367 F.3d 1319, 1321 (Fed. Cir. 2004). However, an exception to this rule applies depending upon the type of ambiguity contained in the contract. Triax Pac., Inc., 130 F.3d at 1474.  Thus, "[i]n order to decide how to apply the doctrine of contra proferentem, after a court finds contract terms to be ambiguous and 'susceptible to more than one reasonable interpretation,' [it] must first determine whether the ambiguity is latent or patent." Burchick Constr. Co. v. United States, 83 Fed. Cl. 12, 19 (2008) (quoting Turner Constr. Co., 367 F.3d at 1321); accord Metric Constructors, Inc., 169 F.3d at 751 ("If an ambiguity exists, the next question is whether that ambiguity is patent.").

### a. Patent Ambiguities

A patent ambiguity is one that is "obvious, gross, glaring, so that [the] plaintiff contractor had a duty to inquire about it at the start." H & M Moving, Inc. v. United States, 499 F.2d 660, 671 (Ct. Cl. 1974). Patent ambiguities encompass "an obvious omission, inconsistency, or discrepancy in significance," Beacon Constr. Co. of Mass. v. United States, 314 F.2d 501, 504 (Ct. Cl. 1963), or "an obvious error in drafting, a gross discrepancy, or an inadvertent but glaring gap," WPC Enters., Inc. v. United States, 323 F.2d 874, 876 (Ct. Cl. 1963). A patent ambiguity "exists when there is a facial inconsistency between provisions or terms within the contract." Travelers Cas. & Sur. Co. of Am. v. United States, 75 Fed. Cl. 696, 711 (2007). Thus, a patent ambiguity "should be, to the reasonable contractor, apparent on the face of the contract . . . ." Id.; accord P.R. Burke Corp. v. United States, 277 F.3d 1346, 1355 (Fed. Cir. 2002) (indicating that a patent ambiguity appears "on the face of the contract").

The United States Court of Claims ("Court of Claims"), the predecessor court of the Federal Circuit, Coltec Indus., Inc. v. United States, 454 F.3d 1340, 1353 (2006); Ins. Co. of the W. v. United States, 83 Fed. Cl. 535, 539 n.5 (2008), described the inquiry into whether an ambiguity is patent as "not a simple yes-no proposition[,] but [one] involv[ing] placing the contractual language at a point along a spectrum: Is it so glaring as to raise a duty to inquire?," Newsom v. United States, 676 F.2d 647, 650 (Ct. Cl. 1982); see also Jaynes v. United States, 75 Fed. Cl. 218, 235 (2007) ("What constitutes a patent ambiguity must be determined 'on an ad hoc basis by looking to what a reasonable man would find to be patent and glaring.'" (quoting L. Rosenman Corp. v. United States, 390 F.2d 711, 713 (Ct. Cl. 1968))). "The doctrine of patent ambiguity is an exception to the general rule of contra proferentem[,] which construes an ambiguity against the drafter . . . ." Metric Constructors, Inc., 169 F.3d at 751. Thus, a patent ambiguity "'would place the reasonable contractor on notice and prompt the contractor to rectify the inconsistency by inquiring of the appropriate parties.'" Metcalf Constr. Co. v. United States, 53 Fed. Cl. 617, 630 (2002) (quoting Nielsen-Dillingham Builders, J.V. v. United States, 43 Fed. Cl. 5, 11 (1999)); see also Fortec Constructors v. United States, 760 F.2d 1288, 1291 (Fed. Cir. 1985) (stating that the existence of a patent ambiguity "raises the duty of inquiry, regardless of the reasonableness of the contractor's interpretation"); Newsom, 676 F.2d at 649 (indicating that the contractor "has a duty to inquire of the contracting officer the true meaning of the contract before submitting a bid"); Input/Output Tech., Inc. v. United States, 44 Fed. Cl. 65, 72 (1999) (stating that the duty of inquiry requires the contractor "to ask about the correct meaning of the contract prior to submitting a bid"). If the contractor or bidder "fails to inquire with regard to the provision, [its] interpretation will fail." NVT Techs., Inc., 370 F.3d at 1162. Consequently, "[a] contractor may not recover for a patent ambiguity." E.L. Hamm & Assocs., Inc. v. England, 379 F.3d 1334, 1342 (Fed. Cir. 2004). The patent ambiguity doctrine, the Federal Circuit explained,

> is a court-made rule that is designed to ensure, to the greatest extent possible, that all parties bidding on a contract share a common understanding of the scope of the project. That objective is particularly important in government contracts, in which significant post-award modifications are limited by the government's obligation to

use competitive bidding procedures and by the risk of prejudice to other potential contractors.  In addition, the duty of inquiry prevents the contractors from taking advantage of ambiguities in government contracts by adopting narrow interpretations in preparing their bids and then, after the award, seeking equitable adjustments to perform the additional work the government actually wanted.

Triax Pac., Inc., 130 F.3d at 1475 (citation omitted).

### b.  Latent Ambiguities

By contrast, a latent ambiguity is a "hidden or concealed defect which is not apparent on the face of the document, could not be discovered by reasonable or customary care, and is not so 'patent and glaring as to impose an affirmative duty on plaintiff to seek clarification.'" Diggins Equip. Corp. v. United States, 17 Cl. Ct. 358, 360 (1989) (quoting Avedon Corp. v. United States, 15 Cl. Ct. 771, 777 (1988)).  A latent ambiguity "arises only once the contract is applied," Travelers Cas. & Sur. Co. of Am., 75 Fed. Cl. at 711, and "generally becomes evident[] when, 'considered in light of the objective circumstances, two conflicting interpretations appear reasonable,'" Input/Output Tech., Inc., 44 Fed. Cl. at 72 n.10 (quoting Cray Research, Inc. v. United States, 41 Fed. Cl. 427, 435 (1998)).  "[T]he general rule of contra proferentem controls" with regard to latent ambiguities.  Burchick Constr. Co., 83 Fed. Cl. at 20.  Thus, the doctrine of contra proferentem "places the risk of latent ambiguity, lack of clarity, or absence of proper warning on the drafting party."  Id.  This doctrine, however, is applied by courts

only when other approaches to contract interpretation have failed.  Accordingly, our predecessor court held that 'if an ambiguity cannot be cleared up by reading the contract as a whole or looking to the circumstances attending the transaction and the conduct of the parties, the ambiguity should be resolved against the party who drafted the contract.'

Gardiner, Kamya & Assocs., P.C. v. Jackson, 467 F.3d 1348, 1352 (Fed. Cir. 2006) (quoting Chris Berg, Inc. v. United States, 455 F.2d 1037, 1044 (Ct. Cl. 1972)).

The determination that an ambiguity is latent does not necessarily result in the court adopting the contractor's interpretation.  Rather, the court adopts the "contractor's interpretation of a latent ambiguity . . . only . . . if it is found to be reasonable."  Cmty. Heating & Plumbing v. Kelso, 987 F.2d 1575, 1579 (Fed. Cir. 1993).  Thus, "[i]f the ambiguity . . . is latent, and plaintiff's interpretation is reasonable, plaintiff will prevail over an equally reasonable interpretation by defendant."  Diggins Equip. Corp., 17 Cl. Ct. at 360; accord Alliant Techsys. Inc. v. United States, 74 Fed. Cl. 566, 577 (2007) ("The Court will adopt a contractor's reasonable interpretation of a latent ambiguity under the contra proferentem rule-construing an ambiguity against the drafter.  If the contractor's interpretation of such a contract provision is determined to be reasonable, the contractor will prevail against the author of the contract." (citations omitted)).

# III. DISCUSSION

## A. Overview of the Parties' Positions

West Bay maintains that the specifications require the application of floor sealant "to the entire floor area of the Project . . . if test results of emission level[s] indicated 15 pounds of vapor emission level[s] or more." Pl.'s Mot. Summ. J. ("Pl.'s Mot.") 18. It asserts that various provisions in the specifications mandated moisture level testing and that it was "reasonable to believe that . . . if test results showed emission levels to exceed 15.0 pounds, West Bay was to proceed with sealant applications on all floor areas of the Project." Id. at 21. West Bay emphasizes that it performed these tests. See id. at 9-10. It asserts that "[b]ecause none of the tests administered to measure the 'starting calculations' of emission levels yielded the result of 15.0 lbs[.] or more, West Bay was not required to install the application of the sealant." Id. at 9. West Bay therefore rejects defendant's contention that any ambiguity exists in the specifications:

> There is no ambiguity in Section 09800, especially if the section is to be interpreted to give meaning to all of its parts, addendums, or amendment. Contrary to the VA's contention that West Bay had a duty to inquire of the VA of this section's patent ambiguity, West Bay had no such duty[] because there was no "obvious," "gross," "glaring," or "substantial" ambiguity to [the] contract document itself to impose such duty on West Bay.

Id. at 13; accord Pl.'s Resp. Def.'s Cross-Mot. & Reply Def.'s Opp'n Pl.'s Mot. ("Pl.'s Resp. & Reply") 3 (emphasizing that "the VA found no patent ambiguity in its reading of the subject sections . . . until after it approved West Bay's claim and its legal counsel became involved in the dispute"). Rather, West Bay asserts, "[t]he VA's conduct was patently inconsistent and contradictory, not the contract specifications." Pl.'s Resp. & Reply 3; accord id. at 6 ("The language of the specifications never changed, only the VA's spin.").

Alternatively, West Bay argues that any alleged ambiguity in the specifications is latent. See Pl.'s Mot. 25. It notes that "[i]t was the VA who brought up this issue of alleged ambiguity of section 3.01E after West Bay had already begun performing on the Project, not West Bay." Id.; accord Pl.'s Resp. & Reply 3 ("During construction, the VA found no patent ambiguity in its reading of the subject sections."). Furthermore, any ambiguity that may exist in the specifications, West Bay asserts, "is not glaring, gross, []or substantial." Pl.'s Mot. 25. West Bay emphasizes that its interpretation of the specifications has been both "reasonable and consistent," Pl.'s Resp. & Reply 9, maintains that its interpretation of the contract falls within a zone of reasonableness, id. at 12-14, and argues that "the VA should not be allowed to hide behind its patent ambiguity argument . . . [and] to reject [West Bay's claim for] extra work on the basis of ambiguous contract provisions," Pl.'s Mot. 28.

Defendant, by contrast, states that the contract at issue "provided several clauses relating to sealing of the building's concrete floors. Read as a whole, the specifications, defendant

asserts, provided West Bay with contradictory instructions as to when to apply sealant." Def.'s Cross-Mot. 8; accord Def.'s Reply Pl.'s Resp. Def.'s Cross-Mot. ("Def.'s Reply") 3 ("[T]he totality of the specifications, including Amendment #4[,] did not present West Bay with clear, unambiguous instructions as to the application of the floor sealant."). According to defendant, the specifications contain at least four contradictory instructions regarding moisture sealant application. Def.'s Cross-Mot. 8. These instructions, defendant maintains, "were so facially confusing as to render the contract patently ambiguous." Id. Thus, defendant maintains that "a patent ambiguity existed in the contract specifications and drawings," that West Bay had "no way . . . to know when to install floor sealant and to account for floor sealant in its bid," and that West Bay "had a duty to inquire prior to bidding on the project." Def.'s Reply 1. According to defendant,

> [i]n preparing a bid to perform this work, a reasonable contractor would have been put on notice of the inconsistency because it would not have known, based on the contract documents, how much of the concrete floor would need to be sealed, what the starting moisture emission measured was or would be, or to what level it would be required to reduce moisture emission.

Def.'s Cross-Mot. 14. Furthermore, defendant argues that West Bay "did not rely upon its current interpretation of the floor sealant provisions when preparing its bid." Def.'s Reply 10. Rather, defendant states that the assumptions West Bay adopted about the floor sealant requirements "were not based upon the contract." Id.

## B. Determining the Plain Meaning of the Specifications

The parties advance differing interpretations of the specifications' requirements as they pertain to the application of concrete floor moisture sealant. However, the parties' views regarding the meaning of the specifications do not, by themselves, render these provisions ambiguous. See Enron Fed. Solutions, Inc., 80 Fed. Cl. at 393. Rather, as discussed above, the court's interpretation of the specifications begins with the terms employed therein. See id. Unless the parties "mutually intended and agreed to an alternative meaning," these terms are accorded their ordinary meaning, Harris, 142 F.3d at 1467, which "would be derived from the contract by a reasonably intelligent [contractor] acquainted with the contemporaneous circumstances," Metric Constructors, Inc., 169 F.3d at 752. The court considers the specifications in their totality such that its interpretation "harmonize[s] and give[s] reasonable meaning to all of its parts. NVT Techs., Inc., 370 F.3d at 1159. In so doing, the court determines whether the specifications are clear and unambiguous on their face. Sterling, Winchester & Long, L.L.C., 83 Fed. Cl. at 183. If the specifications are ambiguous, then the court determines whether the ambiguity is patent or latent. See Metric Constructors, Inc., 169 F.3d at 751.

### 1. Varying Uses of Terminology Throughout the Specifications

At the outset, the court notes that the specifications reference several different terms that are used inconsistently and are undefined. Among these terms are "system," "treatment," "component," "moisture barrier," and "level." The court explains below how these terms are utilized in the specifications.

Paragraph 1.02 of section 09800 stated that the "system" "shall consist of treatments designed to control alkalinity, and to reduce vapor emission to specified, measurable, compliance levels." Vierra Decl. Ex. B at 2. Paragraph 1.02A also referenced the "system," which "shall reduce emission levels" to within three pounds and "should be installed in all cases" where initial moisture levels of fifteen pounds or greater are measured. Id. Additionally, paragraph 1.03E directed the applicator to receive training and certification by the "manufacturer of the system." Id. These provisions suggest that the "system" is (1) a particular product, (2) applied to concrete flooring, (3) capable of reducing vapor emissions to specified, measurable, compliance levels, and (4) capable of reducing emission levels to within three pounds when installed in all cases where initial moisture levels equal or exceed fifteen pounds. However, paragraph 3.01E referred to a "finished floor system," which suggests that the term "system" means a completed, installed product rather than something that either reduces emission levels or consists of "treatments." Id. at 4.

Paragraph 1.02, as mentioned above, provided that the "system" "shall consist of treatments . . . ." Id. at 2 (emphasis added). Whereas paragraph 1.03E directed the applicator to obtain certification from the system manufacturer, paragraph 1.03B required that the "manufacturer of the vapor emission compliance treatment" supply written proof demonstrating its success in vapor emission reduction. Id. (emphasis added). The phrase "vapor emission compliance treatment" also appeared in paragraph 1.03C; however, it was neither defined nor utilized again in other provisions. Instead, subsequent provisions, namely paragraphs 1.03G, 1.04A, 1.05A, 3.01B, and 3.03B, again employed the term "system." See id. at 2-4 (containing references to "completion of the system application," material specifications and "supporting data for the system," the "[a]pplication of all components of the system," "[f]oreign materials detrimental to the system," and "protection of the system and system process"); cf. Def.'s App. 63 (containing Contract Drawing A060, which instructed the contractor to "[p]rovide moisture barrier at all new work areas at 1st floor concrete slab prior to installation of new finish" (emphasis added)). Therefore, it is unclear whether the "system" consisted of "treatments" or "vapor emission compliance treatment[s]" and what the difference, if any, was between these two types of treatments.

The term "component," the specifications stated, "shall be . . . [a] material with documented performance reduction in vapor emission," "shall be applied in a facility occupied by nursing home patients," and "shall include a coating mixture for bonding the system's multi-coat laminate." Vierra Decl. Ex. B at 3. Although paragraph 1.05A stated that the system consisted of "components," id., it is unclear whether a "component" was a subpart of or was

synonymous with either a "treatment" or a "vapor emission compliance treatment."  It is also unclear whether a "treatment" consisted of the application of a "moisture barrier," or whether a "moisture barrier" was one "component" that comprises the entire "system" or was an entirely distinctive product that is applied separately.

Additionally, sections 09800 and 09660 referenced different "levels."  Paragraph 1.02 of section 09800 provided that the "system" "shall . . . reduce vapor emission to <u>specified, measurable[] compliance levels</u>." <u>Id.</u> at 2 (emphasis added).  Paragraph 1.03A instructed that the "treated area shall demonstrate a reduction of moisture vapor emission <u>to the level specified by the manufacturer of the finish flooring materials</u>." <u>Id.</u> (emphasis added).  Additionally, paragraph 3.01E directed the contractor to "determine <u>the level of remediation</u> required." <u>Id.</u> at 4. Furthermore, paragraph 1.02A provided that the "system shall reduce <u>emission levels</u> to within 3.0 lbs[.]" <u>Id.</u> at 2 (emphasis added).  Finally, paragraph 2.4 of section 09660 directed the contractor to "[s]eal for moisture content of 15 lbs.  Contractor to provide testing to verify <u>moisture level</u>." Def.'s App. 48 (emphasis added).  Therefore, sections 09800 and 09660 offered the contractor at least five different interpretations of the meaning of vapor emission levels: (1) specified, measurable compliance levels; (2) levels provided by the floor manufacturer; (3) remediation levels obtained from calcium chloride testing; (4) levels that were less than or equal to three pounds; and (5) verified moisture levels that were sealed for a moisture content of fifteen pounds.

## 2.  Unclear Directions to the Contractor

The court also notes that various provisions contained absolute requirements while others were phrased in such a manner that was permissive and seemingly afforded the contractor more discretion.  Numerous paragraphs within section 09800 utilized the word "shall," which is defined as "an order, promise, requirement, or obligation." <u>American Heritage College Dictionary</u> 1273 (4th ed. 2004).  "Shall," therefore, connotes mandatory language. <u>Hellebrand v. Sec'y, Dep't of HHS</u>, 999 F.2d 1565, 1570 (Fed. Cir. 1993); <u>Andersen Consulting v. United States</u>, 959 F.2d 929, 932 (Fed. Cir. 1992); <u>J.H. Miles & Co. v. United States</u>, 3 Cl. Ct. 10, 13 (1983).  Thus, where the specifications provided that the system "<u>shall</u> consist of treatments" (paragraph 1.02) and "<u>shall</u> reduce emission levels to within 3.0 lbs[.]" (paragraph 1.02A), Vierra Decl. Ex. B at 2 (emphasis added), these provisions contained affirmative obligations. Furthermore, the directive in paragraph 1.03A that the "treated area <u>shall</u> demonstrate a reduction of moisture vapor emission" was an absolute requirement.[22] <u>Id.</u>

At the same time, however, certain provisions were not drafted in absolute terms.  For example, while paragraph 1.02A mandated that the system must reduce emission levels to within

---

[22]  Other provisions such as paragraph 2.02A, which stated that time for moisture testing "<u>must</u> be planned into the schedule," Vierra Decl. Ex. B at 3 (emphasis added), were mandatory in nature. <u>See</u> <u>Contreras v. United States</u>, 64 Fed. Cl. 583, 592-93 (2005) (indicating that "the use of 'shall' or 'must[]' . . . very obviously connotes mandatory action").

three pounds, it also stated that the system "<u>should</u> be installed in all cases where the starting calculation is 15 lbs[.] or more." Vierra Decl. Ex. B at 2 (emphasis added). Unlike "shall," "should" is used to either express "probability or expectation" or "conditionality or contingency," <u>American Heritage College Dictionary</u>, <u>supra</u>, at 1284, and is indicative of permissive language, <u>see</u> <u>Dancy v. United States</u>, 668 F.2d 1224, 1228 n.10 (Ct. Cl. 1982) (determining that the phrase "'should be modified'" contained "permission language" that "may not give rise to an affirmative duty"). Thus, within paragraph 1.02A itself, the contractor was given mandatory and discretionary instructions.

Moreover, other provisions within the specifications employed neither "shall" nor "should" and therefore did not clearly indicate whether the instructions were mandatory or permissive. For example, unlike paragraphs 1.05A, 1.05B, and 1.05D, all of which utilized the term "shall" to impose affirmative obligations, paragraph 1.05C stated: "<u>Provide adequate ventilation</u> during application within an enclosed space." Vierra Decl. Ex. B at 3 (emphasis added). Similarly, paragraph 2.4 of section 09660, which governed sealer and primer for concrete subfloors, provided: "<u>As recommended</u> by the adhesive and tile manufacturer. <u>Seal for moisture content</u> of 15 lbs. Contractor <u>to provide</u> testing to verify moisture level." Def.'s App. 48 (emphasis added). Furthermore, paragraph 3.01E, like paragraph 1.02A, simultaneously provided mandatory and unclear instructions: "Based upon the results of the test data as described in section 1.03B, <u>determine the level of remediation required</u>. Such information <u>must be obtained</u> from the manufacturers of the products specified for the finished floor system. (Use 15 pounds)." Vierra Decl. Ex. B at 4 (emphasis added). Based upon the instructions set forth in these provisions and the absence of language indicating otherwise, it is uncertain whether the contractor was required to or was strongly encouraged to perform these tasks.

### 3. Uncertainty Introduced Through Amendment #4

The parties dispute the meaning of Amendment #4 and its effect upon other provisions of the specifications. West Bay asserts that Amendment #4 only affects paragraphs 1.03B and 3.01E. Pl.'s Mot. 23-24. Defendant argues that Amendment #4 "does not provide clear instructions" and instead "adds to the confusion." Def.'s Cross-Mot. 11. It claims that West Bay's attempt to interpret Amendment #4 "proves the point that the totality of the clauses and Amendment [#]4 were confusing and required that the contractor seek clarification from [the] VA." <u>Id.</u> at 13.

Amendment #4 modified paragraph 3.01E in two ways. First, it replaced an internal cross-reference to paragraph 1.06 with paragraph 1.03B. Second, it added the clause "(Use 15 pounds)" to the end of the paragraph. Vierra Decl. Ex. B at 5. With respect to the first modification effectuated via Amendment #4, paragraph 3.01E directed the contractor to determine the level of remediation required "[b]ased upon the results of the test data as described in section 1.03B." <u>Id.</u> at 4. Paragraph 1.03B, however, neither addressed the contractor nor discussed moisture testing. Instead, it provided:

-26-

> The manufacturer of the vapor emission compliance treatment shall provide
> written proof of at least 10 years successful experience in vapor emission
> reduction.  Provide at least 5 verifiable projects with address, contact and phone
> number where system was successfully used to reduce before emission from 15
> lbs[.] or more to 3 lbs[.] or less.

Id. at 2 (emphasis added).  Paragraph 1.06, which was originally cross-referenced in paragraph
3.01E, governed "Quantification Testing" and set forth specific requirements for the number of
calcium chloride testing kits and their geometric placement across the concrete flooring.  See id.
at 3.  Like paragraph 3.01E, paragraph 1.06 addressed the contractor rather than the
manufacturer.[23]  See id. at 3-4.  Based upon Amendment #4, it is unclear how the contractor
could determine a specific level of remediation based upon test results that were absent from a
provision concerning the manufacturer's documentation of its "vapor emission compliance
treatment."

    With respect to the second modification effectuated via Amendment #4, the instruction to
"(Use 15 pounds)" was devoid of language indicating whether it was mandatory or permissive.
More importantly, it is unclear to which portion of paragraph 3.01E the clause referred.  It is
possible that Amendment #4 intended for the contractor to use fifteen pounds in conjunction with
its determination of the level of remediation required based upon test results.  It is equally
possible that the "15 pounds" reference related to the materials that must be provided by the
manufacturer pursuant to paragraph 1.03B.  West Bay advances this latter intrepretation and
contends that "Amendment #4 did not require the contractor to assume anything, but was a
reference to information on the product's performance on past projects as described in Paragraph
1.03(B) of section 09800."  Pl.'s Resp. & Reply 5.

## C. The Specifications Are Ambiguous

    As the previous section demonstrates, the numerous inconsistencies in terminology and
cross-references render the specifications unclear.  Notwithstanding the lack of clarity, the court
must determine whether the specifications are "susceptible to more than one reasonable
meaning," Barron Bancshares, Inc., 366 F.3d at 1375-76, such that each meaning is consistent
with the contract language, Enron Fed. Solutions, Inc., 80 Fed. Cl. at 394.  If the court finds that
more than one reasonable meaning exists, then the specifications are ambiguous.  Barron
Bancshares, Inc., 366 F.3d at 1375-76.  For the reasons discussed below, the court determines
that the specifications contain multiple ambiguities.

––––––––––––––––––––

    [23]  Paragraph 1.06A provided that "[t]esting shall be conducted with calcium chloride test
kits . . . ."  Vierra Decl. Ex. B at 3.  Pursuant to paragraph 2.02A, moisture testing "will not be
conducted by [the] system manufacturer, it's [sic] affiliates or agents."  Id.

**1.  Section 09800 Provided Conflicting Directions to the Contractor**

**a.  Paragraphs 1.02 and 1.02A**

West Bay emphasizes that the court must look to the organizational structure of the specifications.  It notes that paragraph 1.02A "is not placed or buried in the middle or toward the end of the contract specifications.  Instead, it is placed near the beginning of Section 09800." Pl.'s Mot. 19.  The location of this provision, West Bay asserts, indicates that paragraph 1.02A was "intended to be read first and to be taken as a task that is a priority in determining the sealant system."[24]  Id.  West Bay suggests that "[i]t makes sense that a contractual clause that sets the threshold on whether sealant application should be performed be placed at the beginning of the contract document."[25]  Id.; accord Pl.'s Resp. & Reply 4 (arguing that paragraphs 1.02A and 1.03A are consistent and do not contradict each other).  It is both "reasonable and logical," West Bay asserts, "for the contractor to interpret that the 'preparation' phase of testing of emission level[s] of the floor comes before the actual sealant application phase of the contract."  Pl.'s Mot. 21.  Thus, West Bay argues that it was "reasonable to believe that it first needed to test the existing conditions of the floors, and then if test[] results showed emission levels to exceed 15.0 pounds, West Bay was to proceed with sealant applications on all floor areas of the Project."  Id.

Substantively, West Bay notes that paragraph 1.02A "indicates that the application of floor sealant to the entire floor area of the Project is required if test results of emission level[s] indicated 15 pounds of vapor emission level or more."  Id. at 18.  This provision, West Bay argues, "is unambiguous" because "it instructed the contractor that the sealant application, if applied, should reduce emission levels to within 3 pounds; but the sealant needs to be installed only when test data show the emission level to be 15 pounds or more."  Id.  Thus, West Bay asserts, moisture sealant need not be applied "if the starting calculation show[s] emission level[s] to be less than 15 pounds . . . ."  Id.

Defendant, however, argues that West Bay's interpretation of the entire specifications is flawed because it is based solely upon paragraph 1.02A.  Def.'s Cross-Mot. 9.  Although defendant acknowledges that paragraph 1.02A "alone may have been clear," it maintains that the court "must look at the contract document as a whole to determine whether any ambiguity exists."  Id. at 12; accord id. at 5 ("West Bay's assumption that it would only seal the concrete if moisture emission tests resulted in measurements above 15 lbs[.] ignores the other patently contradictory and confusing instructions in the specifications and drawings.").  With respect to

---

[24]  Defendant questions this analysis: "Nor does the placement of ¶ 1.02(A) at the beginning of the specification [0]9800 mean that later, or other specifications, have diminished import, as West Bay implies."  Def.'s Cross-Mot. 12.

[25]  West Bay applies this argument to paragraphs 1.06 and 2.02, which it notes "are placed ahead of Part 3 of section 09800 that deals with the actual application of the sealant."  Pl.'s Mot. 21.

paragraph 1.02A, defendant argues:

> [S]ection 09800 ¶ 1.02(A) requires that the sealant reduce moisture levels to
> "within" 3.0 lbs[.]–presumably less than 3.0 lbs[.], although this too is
> unclear–and that it be installed in all cases where the "starting calculation" is 15.0
> lbs[.] or more.  Paragraph 1.02(A) provides no guidance as to what the starting
> calculation may consist of and what should be done with floor sections having
> moisture levels between 3.0 and 15.0 lbs[.], as was the case here.

Id. at 11 (quoting Vierra Decl. Ex. B at 2).

Contrary to West Bay's assertions, the court determines that paragraphs 1.02 and 1.02A
are ambiguous.  Paragraph 1.02 required that the system "reduce vapor emission to specified,
measurable[] compliance levels."  Vierra Decl. Ex. B at 2.  If West Bay is correct that it is
reasonable for it to first test the existing conditions of the floors, see Pl.'s Mot. 21, then it follows
that provisions governing moisture testing would precede, rather than follow, paragraphs 1.02
and 1.02A.  First, the moisture testing provisions in the specifications provide parameters
concerning the detection of actual moisture emission levels, not specified, measurable
compliance levels.  Second, the specifications are silent with respect to what level constituted a
specified, measurable compliance level or how that level should be determined.  In fact, these
levels could be any of the following: three pounds, fifteen pounds, an amount greater than three
but less than fifteen pounds, or an amount specified by the manufacturer.  Therefore, because
paragraph 1.02 was unclear, paragraph 1.02A, which required that the system reduce emission
levels to within three pounds, see Vierra Decl. Ex. B at 2, provided a directive that may or may
not be deemed contradictory.

Furthermore, paragraph 1.02A indicated that the system "should be installed in all cases
where the starting calculation" equaled or exceeded fifteen pounds.  Id.  While the phrase
"starting calculation" presumes that moisture testing of the concrete floor is necessary, paragraph
1.02A provided no definitive instruction to the contractor once testing yielded a "starting
calculation."  As drafted, paragraph 1.02A required that the system "should" be installed where
testing yielded moisture levels registering or exceeding fifteen pounds and installation must
reduce emission levels to less than three pounds.  Paragraph 1.02A offered no guidance for
circumstances where testing yielded moisture levels less than fifteen pounds and greater than
three pounds.  It also offered no guidance with respect to what constituted a specified,
measurable compliance level.  Consequently, the court concludes that paragraphs 1.02 and 1.02A
are ambiguous.

### b.  Paragraph 1.03A

West Bay argues that paragraph 1.03A, "which is immediately preceded by Paragraph
1.02," only applies "if the contractor determined that the floor area needs treatment."  Pl.'s Resp.
& Reply 4.  According to West Bay, the phrase "treated area" contained in paragraph 1.03A

"refers to treatment of the floor area, i.e.[,] the application of sealant to the area if treatment is required pursuant to Paragraph 1.02(A)." Id.  This interpretation, West Bay argues, indicates that paragraphs 1.02A and 1.03A "are consistent" with each other and that the VA's contention that they are contradictory is "an erroneous interpretation." Id.  According to West Bay, it "was fully ready to perform the extra work [of applying concrete floor moisture sealant] at no extra cost to the VA if the test results show[ed] existing emission levels to be 15 lbs[.] or more.  This was the risk that West Bay was ready to bear based on its interpretation of contract specifications and its assessment of the Project." Pl.'s Sur-Reply 4.

Defendant, however, emphasizes that paragraph 1.03A contradicted paragraph 1.02A.  According to defendant, the latter "required West Bay to use a sealant that would reduce moisture emission levels to under three pounds and to install such sealant where the tested result was 15.0 pounds or more," while the former "required installation of a sealant that would reduce moisture vapor emissions to the level required by the tiling manufacturer." Def.'s Cross-Mot. 9.  The tiling manufacturer, defendant asserts, required floor sealant application where moisture levels exceeded five pounds. Id.; see also Def.'s App. 40 (containing the manufacturer's installation tips, which provided that "[m]oisture test results should not exceed 5 pounds/1000 sq[.] ft[.]/24 hours"). But see Pl.'s Resp. & Reply 17 (arguing that the manufacturer's installation tips were not incorporated into a warranty requirement and that defendant's interpretation of the installation tips is "as unreasonable as its interpretation of its contract").

Paragraph 1.03A required that the "treated area . . . demonstrate a reduction of moisture vapor emission to the level specified by the manufacturer of the finish flooring materials." Vierra Decl. Ex. B at 2 (emphasis added).  Unlike paragraphs 1.02 and 1.02A, paragraph 1.03A referenced the "treated area" and not the "system." Nevertheless, paragraph 1.03A, when read in conjunction with paragraphs 1.02 and 1.02A, offered another, potentially contradictory instruction to the contractor.  It must (1) "reduce vapor emission to specified, measurable[] compliance levels," (2) "reduce emission levels to within 3.0 lbs[.]," and (3) ensure that the treated area demonstrate vapor emission reduction "to the level specified by the manufacturer of the finish flooring materials." Vierra Decl. Ex. B at 2.  Furthermore, the contractor was encouraged to install the "system" where moisture levels equaled or exceeded fifteen pounds.

West Bay's interpretation of paragraph 1.03A ignores the three-pound threshold mandated in paragraph 1.02A, which could, but may not necessarily, contradict the manufacturer's level stated in paragraph 1.03A.  If the manufacturer's requisite moisture level was less than or equal to three pounds, then these provisions can be harmonized.  However, if the manufacturer's specification exceeded three pounds, then the two provisions conflict.  Moreover, it remains unclear how the treated area of concrete can demonstrate a reduction of moisture vapor emission to either a manufacturer-specified level or to a level less than or equal to three pounds if the system that presumably reduced moisture vapor emission only "should" be installed where moisture levels equaled or exceeded a fifteen pound threshold.  As a result, paragraph 1.03A is ambiguous when considered together with paragraphs 1.02 and 1.02A.

### c.  Amendment #4 and Paragraph 3.01E

According to defendant, Amendment #4 "notified bidders of corrections being made to the sealant specifications."  Def.'s Cross-Mot. 10.  It argues that Amendment #4 is ambiguous because the phrase "(Use 15 pounds)" "could, but does not clearly, instruct the contractor to assume an existing amount of 15 lbs[.] of moisture."  Id.  Although defendant acknowledges that Amendment #4 "refers to the 'Quality Assurance' portion" of section 09800, it disputes West Bay's interpretation:

> West Bay assigns a meaning to the "use 15 lbs[.]" language as possibly referring to "the measure" in considering the reliability data of the proposed sealant subcontractor.  Section 1.03B requested information on projects where the proposed sealant "was successfully used to reduce before emission from 15 lbs[.] to 3 lbs."  Thus, that section already used "15 lbs[.]" as the stated measure for the sealant's reliability.  West Bay acknowledges that fact by stating that Amendment #4's "use 15 lbs[.]" language is merely a "reiteration" of the requirement in the section.

Id. at 13 (quoting Vierra Decl. Ex. B at 4) (citations omitted).  Defendant therefore maintains that "the totality of the clauses and Amendment [#]4 were confusing and required that the contractor seek clarification from [the] VA.  The issuance of Amendment [#]4, while not clear, put West Bay on specific notice as to a potential issue with the sealant specifications."  Id.

Defendant maintains that paragraph 3.01E "requires the contractor to determine the level of sealant remediation required based upon the flooring manufacturer specifications, an interpretation supported by" paragraph 1.03A.  Id. at 11.  According to defendant, the specifications contemplated "two types of sealant, the heavier of which is generally installed where the measured moisture emission is greater than 15 lbs[.]"  Def.'s Reply 3.  It explains:

> Moisture emission testing is required to verify the conditions at the time of application.  If greater levels were found than what was specified (in this case, 15 lbs[.]), then a heavier coating was required and it would have been appropriate to adjust the cost.  West Bay personnel confirmed their understanding that where the moisture level is greater than 15 lbs[.], section [0]9800 directs the contractor to use a different type of sealant system.  This is consistent with Specification [0]9800 ¶ 3.01's instruction that the contractor should determine "the level of remediation required."

Id. at 3-4 (quoting Vierra Decl. Ex. B at 4) (citation omitted).  Defendant emphasizes that it "has not contended that no testing would ever be required to determine if a heavier sealant system would be necessary."  Id. at 4.

According to West Bay, Amendment #4 contains "[t]he only alleged ambiguity in section 09800," and this ambiguity, it notes, was first raised by the VA in its formal notice to proceed in May 2002.  Pl.'s Mot. 23.  West Bay maintains that defendant's interpretation of Amendment #4 requires it to "<u>assume</u> the actual starting calculation is 15 pounds," which it argues "directly violates the plain meaning approach to Paragraph 1.02A."[26]  Id. at 18.  This proffered interpretation by defendant, West Bay claims, "suggests that the emission level has yet to be determined, and therefore is to be measured, not to be assumed."[27]  Id.; cf. Pl.'s Sur-Reply 7 (stating that defendant's initial position concerning the effect of Amendment #4 "was that the contract requires the contractor to skip testing and to apply floor sealant to the entire area of the Project").  Moreover, West Bay rejects defendant's argument that testing was required only to determine whether a heavier type of sealant was required for areas where the moisture level was greater than fifteen pounds:

> If the Government was correct in its interpretation of Amendment #4, which allegedly requires West Bay to skip testing . . . , then there is really no need for West Bay to conduct any testing to determine whether a heavier type of sealant is to be utilized.  Yet the Government is now characterizing section 09800 as requiring the contractor to test for the sole purpose of determining whether an additional and heavier type of sealant is to be used where the moisture level is greater than 15 lbs.  It makes no sense to ask the contractor to assume the moisture emission level to be 15 lbs[.] so that all floor areas are to be sealed, and then ask the contractor to test to see if a heavier type of sealant is to be used where the emission level is 15 lbs.

Pl.'s Sur-Reply 8.

Although it does not dispute that varying types of moisture sealant may be applied to concrete depending upon the amount of moisture emission that is detected, West Bay characterizes defendant's interpretation as one that "makes no sense."  Id.; see also id. at 9 (stating that defendant's interpretation that "the testing requirement is only about requiring the

---

[26]  West Bay claims that defendant's interpretation of Amendment #4 "requested West Bay to completely ignore the plain meaning requirement of Paragraph 1.02, Paragraph 1.06, and Paragraph 2.02A for [the] contractor to conduct testing prior to sealant application."  Pl.'s Mot. 23; see also id. (stating that defendant's interpretation of Amendment #4 "would effectively negate" other provisions contained in the specifications); Pl.'s Resp. & Reply 4 (stating that the VA informed West Bay that it intended for Amendment #4 "to assume an existing level of 15 lbs[.] of moisture, which eliminated the testing requirement").

[27]  Furthermore, West Bay argues that the VA offered contradictory and "strained" interpretations of Amendment #4, particularly "when it formally directed the contractor to perform work, and then later abandoned its interpretation when it was more convenient to argue that it did not really understand its own contract."  Pl.'s Resp. & Reply 5.

contractor to apply a heavier type of sealant" is "strained").  It emphasizes that defendant cannot simultaneously maintain, on the one hand, that the contractor must assume moisture levels of fifteen pounds so that the entire concrete floor can be sealed and, on the other hand, expect the contractor "to test to see if a heavier type of sealant is to be used where the emission level is 15 lbs[.]" Id. at 8.  Defendant's interpretation of section 09800, West Bay concludes, eviscerates the need to include any moisture testing under the specifications, id., whereas West Bay argues that the plain language of section 09800 "requires the contractor to test in order to determine whether any sealant is to be applied on the Project," id. at 9.

Instead, West Bay argues that the directive to "(Use 15 pounds)" contained in Amendment #4 "is related to historical product performance data," and not to any actual moisture level.  Pl.'s Mot. 18.  West Bay therefore claims that "Amendment #4 did not require the contractor to assume anything, but was a reference to information on the product's performance on past projects as described in Paragraph 1.03(B) of Section 09800."  Pl.'s Resp. & Reply 5; see also id. (stating that the VA "does not directly reject West Bay's interpretation but agrees that such language does not clearly instruct the bidder to assume anything").

The parties, as noted above, do not disagree that Amendment #4 is ambiguous.  West Bay's argument that the fifteen-pound directive contained in Amendment #4 referred only to the manufacturer's documentation is reasonable given the cross-reference to paragraph 1.03B, which suggested that Amendment #4 simply reduced the manufacturer's documentation requirement from greater than or equal to fifteen pounds to fifteen pounds.  This interpretation suggests that the VA was more concerned with receiving documentation of the manufacturer's ability to remediate moisture emission levels of fifteen pounds, rather than a significantly higher calculation.  Defendant's interpretation that a different strength of material was required depending upon the level of moisture measured is similarly reasonable, particularly in light of the multiple references throughout the specifications to a fifteen-pound threshold, even if the specifications are silent as to a specific strength of sealant.

Ultimately, the court concludes that Amendment #4 is ambiguous because it provided no definitive instruction to the contractor.  The reference to paragraph 1.03B is a non sequitur when read in conjunction with the remainder of paragraph 3.01E, and the significance of the clause "(Use 15 pounds)" is entirely unclear.  Amendment #4 and paragraph 3.01E simply cannot be harmonized with the remaining provisions in section 09800 that refer to several different moisture levels that equal fifteen pounds, exceed fifteen pounds, are less than three pounds, and are within the range of three to fifteen pounds.

### d.  Paragraphs 1.06 and 2.02

West Bay argues that the clause "15.0 lbs[.] or more" contained in paragraph 1.02A indicates that it must test, rather than assume, moisture emission levels.  Pl.'s Mot. 18.  Thus, West Bay focuses upon the "explicit reference[s] to the testing and the measurement of moisture emission levels" in paragraphs 1.06 and 2.02A, which preceded the directives related to the

actual application of moisture sealant found in Part 3 of section 09800.  Id. at 20-21.  According to West Bay, these provisions required it to test existing emission levels on the concrete floor first.  Id. at 21; accord id. (stating that "it is reasonable and logical for the contractor to interpret that the 'preparation' phase of testing of [the] emission level of the floor comes before the actual sealant application phase of the contract").

West Bay argues that paragraphs 1.06 and 2.02, when read together with paragraph 1.02, require moisture testing and then instruct the contractor to proceed with sealant "application if the starting calculation shows emission level[s] to be 15 pounds or more . . . ."  Id.  This interpretation, West Bay maintains, "is reasonable," particularly since it would be required "to proceed with sealant applications on all floor areas of the Project" if the tests results it performed "showed emission levels to exceed 15.0 pounds."  Id.  It states:

> [T]he moisture test results from 1999, as well as six other moisture test results from 2002, showed that the emission levels on the Project [were] well below the 15.0 lbs[.] threshold under section 09800.  These test results conformed with West Bay's reasonable expectation that sealant application is not within the scope of the contract specifications.

Pl.'s Sur-Reply 4.  Adopting the VA's interpretation of the meaning of the fifteen-pound threshold without actually performing moisture testing, West Bay contends, would render paragraphs 1.05 and 2.02A meaningless.  Pl.'s Mot. 21.

Paragraphs 1.06A and 2.02A set forth the procedure for conducting calcium chloride testing.  See Vierra Decl. Ex. B at 3.  Although West Bay focuses upon the VA's conduct during the course of its performance of the contract once a dispute arose between the parties, the Federal Circuit has stated that "'the courts will look to the construction the parties have given to the instrument by their conduct before a controversy arises.'"  Edward R. Marden Corp. v. United States, 803 F.2d 701, 705 (Fed. Cir. 1986) (quoting United States v. Cross, 477 F.2d 317, 318 (10th Cir. 1973)) (emphasis added).  Therefore, the relevant inquiry is how the moisture testing requirements relate to other provisions in the specifications, not how defendant's post-dispute conduct or interpretations illuminate the meaning of the specifications.

Paragraphs 1.06A and 2.02A are not themselves ambiguous; however, the specifications are ambiguous because, as discussed above, they failed to provide clear instructions to the contractor as to whether moisture testing was, in fact, required and, if so, how the contractor must or should proceed once moisture testing was completed.  Consequently, the ambiguous nature of many provisions contained within section 09800 called into question the applicability of paragraphs 1.06 and 2.02, even where those provisions described in unambiguous terms the procedure to which the contractor must adhere when performing moisture testing.

**2. Section 09660**

Defendant emphasizes that West Bay failed to consider section 09660 in its motion for summary judgment: "West Bay's analysis omits Section [0]9660, the specification requiring the contractor to both 'seal <u>for</u> moisture content of 15 lbs.' and to refer to tiling manufacturer requirements . . . ." Def.'s Cross-Mot. 12.  According to defendant,

> [p]aragraph 2.4 of section [0]9660 required West Bay to seal the concrete using the recommendations of the adhesive and tile manufacturer, an interpretation supported by ¶ 3.01(E) of Specification [09800].  This specification also instructed to 'seal for a moisture content of 15 lbs.'  It is vague whether the final moisture content, after sealant application, should be 15 lbs[.], which would conflict with ¶ 1.02(A)'s requirement of a final moisture emission level of 3 lbs.

<u>Id.</u> at 10.  Defendant maintains that the directives in section 09660 to seal "for" a moisture level of fifteen pounds and to seal as recommended by the flooring manufacturer created an ambiguity, <u>Id.</u> at 11, that West Bay "does not, and cannot, harmonize," <u>id.</u> at 12.

Because section 09660 directed the contractor to apply moisture sealant as recommended by the adhesive and tile manufacturer, defendant asserts that this provision, along with other similar provisions in section 09800, required West Bay to consult the installation recommendations of Armstrong, the tiling manufacturer.  Def.'s Reply 8.  As such, defendant asserts that Armstrong's installation recommendations are relevant because they provide important information about the acceptable moisture level that would ensure that the flooring does not fail.  <u>Id.</u>  Defendant notes that Armstrong

> did not recommend installation of the VCT where the measured moisture emission of the underlying concrete exceeded five lbs[.] per 1000 sq. ft.  This is consistent with West Bay's project manager's testimony that the industry standard for tiling manufacturer warranties was three to six lbs[.] per 1000 square feet of moisture emission.

<u>Id.</u> (citations omitted).  Defendant notes that each test result provided by Floor Seal Technology, <u>see</u> Tables 1 & 3, <u>supra</u>, detected moisture levels exceeding six pounds.  Def.'s Reply at 8-9.  Accordingly, defendant argues that West Bay's contention that no floor sealant was required is unreasonable.  <u>Id.</u>

West Bay rejects defendant's contention that paragraph 2.4 of section 09660, when read together with section 09800, is ambiguous.  Pl.'s Resp. & Reply 6.  Rather, it construes the instructions contained in paragraph 2.4–"to 'seal moisture contents of 15 lbs[.]' and 'to provide testing to verify moisture level'–as "consistent with West Bay's interpretation of other portions of the contract specifications, and particularly Section 09800, that the contractor was required to perform actual testing to determine moisture emission levels and to seal if moisture contents are

-35-

15 lbs[.]" <u>Id.</u>  This paragraph, West Bay states, supports its contention that the specifications required that it conduct moisture emission tests and that "the contractor is not to <u>assume</u> existing emission level[s] to be 15 lbs[.]" <u>Id.</u> at 7.

According to West Bay, the instruction to use moisture sealer "[a]s recommended by the adhesive and tile manufacturer," Def.'s App. 48, "does not negate the testing requirement, especially when this statement directly precedes the statement that the contractor is 'to provide testing to verify moisture level,'" Pl.'s Resp. & Reply 7 (quoting Def.'s App. 48).  Instead, West Bay asserts that paragraph 2.4,

> when taken as a whole, means that the contractor is to perform testing to determine moisture emission levels and to seal if testing shows moisture contents are 15 lbs[.], and the sealant application, if necessary, should be performed "as recommended by the adhesive and tile manufacturer."  This reasonable interpretation is consistent with West Bay's interpretation of Section 09800.

<u>Id.</u>  West Bay rejects defendant's interpretation–that "'it is vague whether the final moisture content, <u>after</u> sealant application, should be 15 lbs[.]'"–as "contradictory and unintelligible" because the VA never advanced this position during contract performance.  <u>Id.</u> at 8 (quoting Def.'s Cross-Mot. 10).  West Bay concludes that it is "undisp[uted] that testing is required and the purpose of the testing is to determine if moisture sealant should be applied."  <u>Id.</u>

As discussed above, the terminology utilized in paragraph 2.4 did not give the contractor a clear indication as to whether it must or should apply sealer and primer "[a]s recommended by the adhesive and tile manufacturer," whether it must or should "[s]eal for moisture content of 15 lbs[.]," and whether it must or should "provide testing to verify moisture level."  Def.'s App. 48.  On this basis alone, paragraph 2.4, which, in many respects, reiterated similar contradictory instructions that were contained in paragraphs 1.02A and 1.03A of section 09800, is ambiguous.

When read together with section 09800, paragraph 2.4 creates further ambiguities.  While West Bay acknowledges that paragraph 2.4 contained a fifteen-pound threshold that is found throughout section 09800, this reference alone cannot be harmonized with the various conflicting directives provided to the contractor with respect to a fifteen-pound moisture level.  Whereas paragraph 2.4 indicated that the contractor "[s]eal for moisture content of 15 lbs[.]," <u>id.</u>, this instruction conflicts with paragraph 1.02A of section 09800, which recommended that the contractor install the "system" only when the "starting calculation" equaled or exceeded fifteen pounds, Vierra Decl. Ex. B at 2.  Similarly, it is unclear whether a moisture content of fifteen pounds corresponds to the requirement in paragraph 1.03A of section 09800 that moisture reduction must reach a "level specified by the manufacturer."  <u>Id.</u>  Additionally, paragraph 2.4 pertained to "concrete subfloors," Def.'s App. 48, and was not limited only to "treated area[s]," Vierra Decl. Ex. B at 2.  Furthermore, while paragraph 2.4 stated that the contractor "provide testing to verify moisture level," Def.'s App. 48, which might comport with the requirements set forth in paragraphs 1.06A and 2.02A of section 09800, Vierra Decl. Ex. B at 2-3, use of the term

"verify" in paragraph 2.4 may contemplate a separate series of moisture tests. In other words, once initial moisture tests were performed pursuant to paragraphs 1.06A and 2.02A of paragraph 09800, it is conceivable that paragraph 2.4 potentially recommended or required that the contractor perform moisture testing to verify moisture levels after the "system" was applied to any "treated area" of the concrete. See id. at 2; Def.'s App. 48. These uncertainties render paragraph 2.4 of section 09660, when considered together with section 09800, ambiguous.

### 3. Contract Drawing A060 and the Order of Precedence Clause

Finally, defendant indicates that Contract Drawing A060 "requires the contractor to '[p]rovide moisture barrier at all new work areas at 1st floor concrete slab prior to installation of new finish.'" Def.'s Cross-Mot. 10 (quoting Def.'s PFUF ¶ 1) (alteration in original). According to defendant, the instructions contained within Contract Drawing A060 "clearly require installation of moisture barrier sealant at all new work areas, regardless of any initial moisture test results . . . ." Id.; accord id. at 11 ("[D]rawing A060 requires a moisture barrier for all new concrete work areas before the new flooring materials are installed, regardless of the results of moisture levels tests."). Furthermore, defendant maintains that these instructions "do not identify the final moisture level required after sealant application." Id. at 10.

Defendant argues that West Bay's reliance upon the order of precedence clause is misplaced because the provision only "comes into play when conflicts [concern] directly competing contract provisions."[28] Def.'s Reply 2-3 (citing cases). According to defendant, "the totality of the specifications, including Amendment #4[,] did not present West Bay with clear, unambiguous instructions as to the application of the floor sealant." Id. Relying upon Reyco Construction Co., ASBCA No. 46245, 94-2 BCA ¶ 26,831 (1994), defendant argues that the specifications must be clear before West Bay can invoke the order of precedence clause. Def.'s Reply 3. Because it asserts that the specifications are unclear, defendant maintains that West Bay "cannot use the precedence clause to dismiss the import of the drawing instructions." Id.

West Bay asserts that defendant's "reading of the Drawing A60 [sic] is incorrect" and that the "plain-reading [sic] of the floor plan legend . . . and other provisions of the specifications indicate that the 'new works areas' . . . refer to the areas of new concrete to be applied to the Project, which are distinct from the areas where new floor covering materials were to be applied." Pl.'s Sur-Reply 5; accord Pl.'s Resp. & Reply 8 (arguing that "[o]nly a small portion of the existing floors were to be patched with new concrete"). According to West Bay, Contract Drawing A060 "specifically requires the contractor to refer to Section 09800 for instructions on the application of floor sealant. It is reasonable for West Bay to interpret Drawing 060 [sic] to mean that the two sections complement one another, instead of what the VA alleges to be ambiguous and contradictory." Pl.'s Resp. & Reply 9.

---

[28] The order of precedence clause provided, in relevant part: "In cases of difference between drawings and specifications, the specifications shall govern." Pl.'s App. Resp. & Reply 1.

West Bay also maintains that defendant's argument, which it asserts "equat[es] 'new work areas at first floor concrete slab' with installation of new floor covering materials" is flawed and "was never made during the construction." Pl.'s Sur-Reply 6. According to West Bay, Contract Drawing A060 "does not characterize the various floor installations as 'first floor concrete slab'" but instead "refers the contractor to Section [0]9800 . . . , which instructs the contractor to apply sealant only when the emission test result is 15.0 lbs[.] or more." Id. Furthermore, West Bay notes that the order of precedence clause, see supra note 28, resolves any alleged conflict between Contract Drawing A060 and the specifications in favor of the specifications. Pl.'s Resp. & Reply 9.

As previously noted in Part III.B.1, supra, Contract Drawing A060 introduced the phrase "moisture barrier" and, as a result, created additional confusion. Def.'s App. 63. It is unclear what constituted "all new work areas," both within the context of Contract Drawing A060 itself and within the broader context of the entire specifications. Although West Bay relies upon the order of precedence clause to dismiss any potential conflicts between Contract Drawing A060 and the remainder of the specifications, its reliance is misplaced.

An order of precedence clause applies in order "to resolve conflicts between contract specifications and drawings, such that if 'the contract contains an order of precedence clause, the specifications shall control [over the drawings].'" Abraham v. Rockwell Int'l Corp., 326 F.3d 1242, 1253 n.6 (Fed. Cir. 2003) (quoting Hensel Phelps Constr. Co. v. United States, 886 F.2d 1296, 1298 (Fed. Cir. 1989) (alteration in original)). This court noted in Apollo Sheet Metal, Inc. v. United States that "such conflicts regard precise, and directly competing, contract provisions," such as "inconsistencies . . . where two provisions conflict regarding the length, width, height, placement, time, duration, or other such particularized specifications. In metaphorical terms, an order of precedence clause is invoked to resolve inconsistencies between apples and apples, one green, the other red." 44 Fed. Cl. 210, 213-14 (1999).

In this case, the court is not faced with inconsistencies between section 09800 and Contract Drawing A060 that are akin to differences in hue between apples. In essence, the specifications and Contract Drawing A060 offered preparation instructions for apples and pears. Section 09800, among other things, recommended application of the "system" only where starting moisture emission levels equaled or exceeded fifteen pounds; however, Contract Drawing A060 did not indicate whether the "moisture barrier" should or must be installed "at all new work areas at 1st floor concrete slab." Def.'s App. 63. Furthermore, Contract Drawing A060 did not explicitly reference section 09800. See Def.'s App. 63 (referencing specification section 07260). As such, it is entirely unclear as to whether, if at all, the clause "all new work areas" in Contract Drawing A060 related to the "treated area" referenced in paragraph 1.03A in section 09800. Cf. Vierra Decl. Ex. B at 2 (indicating that the "treated area shall demonstrate a reduction of moisture vapor emission to the level specified by the manufacturer of the finish flooring materials").

Moreover, as explained previously, the specifications themselves, without even considering Contract Drawing A060, are entirely inconsistent.  In Edward R. Marden Corp., the Federal Circuit determined that there was "a substantial doubt as to which of the inconsistent directions of the specifications should govern" and therefore held that the order of precedence clause did not resolve the discrepancy.  803 F.2d at 705.  The court finds that the same situation applies in this case.  Indeed, it finds the reasoning set forth by the Armed Services Board of Contract Appeals ("ASBCA") in Reyco Construction Co. persuasive.[29]  There, the ASBCA addressed whether the appellant contractor was entitled to an equitable adjustment based upon the government's refusal to permit it to install cement grout rather than epoxy grout.  In construing the specifications, the ASBCA determined that the specifications "gave mixed signals as to the type of grout required under the base plate."  94-2 BCA ¶ 26,831.  Specifically, it noted that certain requirements "indicated a cementitious grout" was necessary, while other testing procedures listed were "also used for epoxy grouts."  Id.  Contract drawings, however, indicated that epoxy grout was required.  Id.  As such, the ASBCA found that "the specifications were ambiguous as to the type of grout required."  Id.  Because the specifications were unclear, which the ASBCA determined was "a necessary predicate" for reliance upon an order of precedence provision, the ASBCA concluded that the appellant had a duty to inquire before bidding with an assumption that it could install cementitious grout.  Id.  Accordingly, because the specifications in this case are unclear, West Bay cannot rely upon the order of precedence in an effort to rebut defendant's contention that Contract Drawing A060 presented additional, contradictory instructions about the application of concrete floor moisture sealant.

### D.  The Ambiguities Contained Within the Specifications Are Patent

Having concluded that the specifications contain multiple ambiguities, the court must determine whether these ambiguities are patent.  Metric Constructors, Inc., 169 F.3d at 751.  As noted above, a patent ambiguity is "obvious, gross, [and] glaring," H & M Moving, Inc., 499 F.2d at 671, and "exists when there is a facial inconsistency between provisions or terms within the contract," Travelers Cas. & Sur. Co. of Am., 75 Fed. Cl. at 711.  The court "'look[s] to what a reasonable [contractor] would find to be patent and glaring'" in order to ascertain whether an ambiguity is patent.  Jaynes, 75 Fed. Cl. at 235 (quoting L. Rosenman Corp., 390 F.2d at 713).

In this case, the court concludes that the ambiguities presented in the specifications are glaring and are apparent on the face of the contract itself.  Beginning with paragraph 1.02A of section 09800, the specifications mandated that application of the "system" reduce emission levels to within three pounds while they simultaneously recommended installation only in cases where the "starting calculation" measured fifteen pounds or greater.  This provision alone is both inconsistent and confusing, and West Bay should have been prompted to inquire of the VA concerning its meaning prior to its submission of a bid on the project.  Newsom, 676 F.2d at 650;

---

[29]  Although decisions of the ASBCA "are not accorded stare decisis effect," Universal Restoration, Inc. v. United States, 16 Cl. Ct. 214, 218 (1989), the court may find the reasoning contained therein persuasive, Night Vision Corp. v. United States, 68 Fed. Cl. 368, 380 (2005).

accord Metcalf Constr. Co., 53 Fed. Cl. at 630, Input/Output Tech., Inc., 44 Fed. Cl. at 72. Paragraph 2.4 of section 09660, which directed the contractor to "[s]eal for moisture content of 15 lbs[.]," Def.'s App. 48, contradicted the permissive language contained in paragraph 1.02A. Once again, these inconsistencies, which are unquestionably apparent on the face of the contract, should have prompted West Bay to question their meaning. Even if the ambiguities contained within these two provisions alone were not readily apparent, West Bay cannot claim that the "gross discrepanc[ies] or . . . inadvertent but glaring gap[s]," WPC Enters., Inc., 323 F.2d at 876, between paragraphs 1.02, 1.02A, 1.03A, paragraph 2.4 of section 09660, and Amendment #4 were not apparent or obvious based upon a reading of the contract.

The specifications at issue in this case contained multiple ambiguities that provided West Bay with unclear and conflicting instructions concerning when and where it must apply concrete floor moisture sealant during its renovation of the project. Notwithstanding the fact that the specifications were poorly drafted, the inconsistent uses of terminology, the unclear directions provided, and the uncertainties concerning what clauses constituted requirements or recommendations were so glaring and obvious on the face of the specifications that they could be discovered by reasonable or customary care. As such, West Bay had an affirmative obligation to inquire of the VA as to the meaning of these patent ambiguities. See Fortec Constructors, 760 F.2d at 1291. Because West Bay failed to do so, the court cannot apply the doctrine of contra proferentem against the VA, which drafted the specifications, West Bay's interpretation of the specifications must fail, and West Bay is not entitled to recovery.[30] See E.L. Hamm & Assocs., Inc., 379 F.3d at 1342; NVT Techs., Inc., 370 F.3d at 1162.

### E. The VA's Conduct Is Not Relevant to a Determination of Whether the Contract Specifications Are Ambiguous

As noted above, West Bay asserts numerous arguments concerning the VA's conduct, particularly with respect to how the VA adopted inconsistent positions throughout West Bay's performance of the contract, as evidence of the parties' course of conduct. See, e.g., Pl.'s Mot. 26 (stating that "the VA resorted to ever-changing and contradictory arguments"). Certainly, the VA's directives offered little clarification once West Bay began performing under the contract. Indeed, the VA added to the confusion by, among other things, revising the fifteen-pound threshold to 14.4 pounds and suggesting that moisture testing "cannot be based on 'current' test result[s] conducted by the contractor." Vierra Decl. Ex. F at 2; see also Pl.'s Mot. 26 (arguing that the VA directed West Bay to "assume 15 pounds of vapor pressure as the existing level for all floor surfaces, instead of relying on any test results," which West Bay claims was "an alternative but contradictory argument that required [it] to base the existing moisture level on . . . test result[s] conducted in . . . 1999 at 14.4 pounds," and suggesting an "irony" in the

---

[30] Because the court concludes that the specifications contain patent ambiguities, it need not reach the issue of whether West Bay's proffered interpretation of the specifications is reasonable. See Cmty. Heating & Plumbing, 987 F.2d at 1579 (noting that the court adopts the contractor's interpretation of latent ambiguities only if such an interpretation is reasonable).

VA's instruction that West Bay use 14.4 pounds "as the 'existing' emission level" while it also concurrently directed West Bay to "'assume 15 pounds' as the emission level"). Furthermore, West Bay highlights the VA's inconsistent conduct by noting that the VA initially determined that its claim "'resulted in an interpretation of the contract provisions which is favorable to West Bay,'" Pl.'s Mot. 27 (quoting Vierra Decl. Ex. N), but then "subsequently rescinded the [amendment] after West Bay inquired about a request for time extension," id.

West Bay maintains that "[w]here ambiguity exists in a contract, the construction placed on it by the parties in their dealings and by their conduct will furnish a court with persuasive evidence of their meaning." Id. at 25 (citing Floyd v. Ring Constr. Corp., 165 F.2d 125 (8th Cir. 1948)). West Bay asserts:

> The VA attempts to evade the fact[] that it held contradictory and inconsistent positions by arguing that "West Bay has identified no demonstrated mutual intent" and that [the] VA's formal modification agreeing with West Bay's interpretation "hardly qualifies as a course of conduct demonstrating parties' intent . . .[.]" The error with this line of argument is that, when West Bay and [the] VA were communicating and discussing the merit of West Bay's claim, both West Bay and [the] VA were complying with the contractual requirement for submission of a claim for extra work, which qualifies as a course of conduct during contract performance.[31]

Pl.'s Resp. & Reply 10 (footnote added). Thus, West Bay asks the court to "take notice of [the] parties' respective conducts and determine that the VA should not be allowed to hide behind its patent ambiguity argument [such that] West Bay should be compensated for performing the extra work." Pl.'s Mot. 28.

Defendant does not disagree that "the Court may consider the parties' conduct prior to a controversy arising to determine contractual meaning or intent." Def.'s Reply 4 (citing Edward R. Marden Corp., 803 F.2d at 705). However, it asserts that West Bay "continues to misapply this doctrine, which is limited to [those circumstances] where a party can demonstrate mutual intent prior to the controversy arising." Id. According to defendant, West Bay "provides no evidence of the parties' conduct which demonstrates an intent on the matter throughout the contract performance." Def.'s Cross-Mot. 20; accord Def.'s Reply 6 ("Here, there are no statements by the [contracting officer] prior to contract formation supporting West Bay's interpretation, nor any executed modifications to the contract expressing the parties' agreement on the issue."). Instead, defendant notes, West Bay "proposes that this Court consider the parties' legal positions during the dispute to determine the meaning of ambiguous provisions." Def.'s Mot. 20; see also Def.'s Reply 4-5 (noting West Bay's contention that "the parties'

---

[31] Defendant notes that the VA's modification was both "proposed" and "unexecuted." Def.'s Reply 5. As such, defendant argues that it "had no legal effect[] because neither party signed it." Id.

discussions following West Bay's April 30, 2002 declaration that it did not intend to install any floor sealant[] constituted a 'course of conduct'"). This position, defendant argues, contradicts the principle that "following a contracting officer's final decision, 'the parties start in court or before the board with a clean slate.'" Def.'s Cross-Mot. 20 (quoting <u>Wilner v. United States</u>, 24 F.3d 1397, 1402 (Fed. Cir. 2004)); <u>accord</u> Def.'s Reply 6 (arguing that West Bay's contention that the controversy between it and the VA commenced when the VA issued its final decision is contrary to the CDA).

Furthermore, defendant highlights the fact that "[a] course of conduct may be relevant to determining the meaning of ambiguous terms where the parties have multiple opportunities to object, but do not do so." Def.'s Reply 5. Under the circumstances of this case, defendant asserts that "[t]he conversations between West Bay and the [contracting officer] . . . were clearly not a course of conduct in which all parties repeatedly had opportunities to disagree with an interpretation, but did not." <u>Id.</u> In fact, defendant maintains that the parties' efforts to resolve their dispute "hardly qualifies as a course of conduct" and that their respective "views on the contract requirements expressed after the controversy had arisen are irrelevant." <u>Id.</u>

West Bay maintains that "[c]ase law supports the view that [the] VA's conduct prior to the contracting officer's final decision should be considered by this Court as evidence of the VA's intent." Pl.'s Resp. & Reply 11. Of course, the VA's prior conduct includes its April 4, 2003 offer of settlement.[32] <u>See</u> Vierra Decl. Ex. P. West Bay cites <u>Macke Co. v. United States</u>, wherein the Court of Claims noted:

> In this inquiry, the greatest help comes, not from the bare text of the original contract, but from external indications of the parties' joint understanding, contemporaneously and later, of what the contract imported. The case is an excellent specimen of the truism that how the parties act under the arrangement, before the advent of controversy, is often more revealing than the dry language of the written agreement by itself.

---

[32] West Bay notes that it and the VA's communications and discussions were in compliance "with the contractual requirement for submission of a claim for extra work, which qualifies as a course of conduct during contract performance," Pl.'s Resp. & Reply 10, and it submitted the VA's offer of settlement in support of its motion for summary judgment. <u>See</u> Vierra Decl. Ex. P. Evidence of the parties' settlement negotiations, however, is not admissible. <u>See</u> Fed. R. Evid. 408; <u>PCL Constr. Servs., Inc. v. United States</u>, 84 Fed. Cl. 408, 431 (2008) (stating that Rule 408 of the Federal Rules of Evidence "prohibits the admissibility of statements made in settlement negotiations if offered to prove liability or the amount of a claim"). Although defendant did not move to strike this evidence, the court declines to consider documents related to the parties' settlement negotiations, particularly since West Bay proffers this evidence to prove the VA engaged in inconsistent conduct.

467 F.2d 1323, 1325 (Ct. Cl. 1972).  In <u>Macke Co.</u>, the contractor entered into a contract with the Exchange Council, a non-appropriated fund activity of the Kennedy Space Center, in which the contractor obtained the right to supply food services at the space center.  <u>Id.</u> at 1324.  Under the terms of the contract, the Exchange Council was not required to pay the contractor.  <u>Id.</u>  Instead, the contractor expected a profit during the lifetime of the contract and anticipated a loss in the first year.  <u>Id.</u> at 1324, 1326.  Ultimately, the agreement proved to be unprofitable, and the Exchange Council did nothing to alleviate the losses incurred by the contractor.  <u>Id.</u> at 1324.  The parties subsequently negotiated a modification to the contract, and the court considered statements made by the contracting officer during both the pre-bid conference and the modification negotiations because they "clearly exposed and confirmed what the parties' actual understanding had been from the beginning."  <u>Id.</u> at 1326.

West Bay's reliance upon <u>Macke Co.</u> is misplaced.  Here, West Bay has not alleged or argued–and there are no facts before the court demonstrating–that the VA made any statements during pre-bid discussions that would support West Bay's interpretation of the specifications.  Whereas the parties in <u>Macke Co.</u> negotiated and executed a post-bid modification to the contract, West Bay never alleges or presents evidence that the parties negotiated or executed any modifications to the specifications after the VA accepted West Bay's bid on the contract–but before their dispute arose–in which they expressed an agreement concerning requirements for the application of concrete floor moisture sealant.  In fact, the VA issued Amendment #4, the significant specification modification at issue in this case, on September 18, 2001, <u>see</u> Vierra Decl. Ex. B at 5, nine days before West Bay submitted its bid on the project, <u>see</u> Compl. ¶ 7.  Furthermore, West Bay's focus upon the VA's conduct only postdates May 3, 2002, the date on which it first submitted a claim for additional costs for "extra work."  <u>Id.</u> ¶ 11; <u>see</u> Vierra Decl. Ex. L at 2-3 (containing a June 10, 2002 letter from West Bay to Mr. Koenig that included a certification for its claim); Vierra Decl. Ex. N at 1 (containing a January 8, 2003 letter from Mr. Koenig in which the VA found West Bay's claim meritorious and requested that West Bay sign and return a supplemental agreement); Vierra Decl. Ex. O (containing a January 15, 2003 letter from West Bay to Mr. Koenig questioning whether West Bay's requested extension of time would be incorporated into the supplemental agreement); Vierra Decl. Ex. P (containing an April 4, 2003 letter from Mr. Koenig to West Bay indicating that the specifications were patently ambiguous and proposing a final offer to settle the dispute); Vierra Decl. Ex. Q (containing West Bay's April 7, 2003 response to Mr. Koenig's final offer in which it declined the VA's settlement offer and made a request for a final decision); Vierra Decl. Ex. R at 1-2 (containing Mr. Koenig's July 7, 2003 Final Decision denying West Bay's claim).  No evidence West Bay presents in support of its motion for summary judgment suggests that the parties engaged in any course of conduct concerning the application of concrete floor moisture sealant until a dispute arose over the parties' interpretation of the specifications in 2002.

West Bay also relies upon <u>General Warehouse Two, Inc. v. United States</u>, wherein the Court of Claims construed ambiguous contract provisions in favor of the contractor.  389 F.2d 1016, 1019-20 (Ct. Cl. 1967).  In <u>General Warehouse Two, Inc.</u>, the Court of Claims addressed a dispute concerning the recovery of additional rental monies for office space in a building the

contractor constructed and leased to the government.  Id. at 1017.  After the contractor was awarded the contract, but before construction began, the government issued change orders that increased the building's dimensions and modified the building's basic interior design.  Id. at 1018.  These changes, in turn, affected the meaning of terms contained in the solicitation, id. at 1017-18, and ultimately created an ambiguity concerning whether the contractor was entitled to rental compensation for additional corridor space, id. at 1019.  The General Warehouse Two, Inc. court found that the parties' prior conduct evidenced their expectation that additional rent would be paid when the net amount of usable space was increased.  Id. at 1020.

General Warehouse Two, Inc., like Macke Co., is wholly distinguishable from the instant case.  Again, West Bay proffers no evidence that it and the VA negotiated amendments to the specifications that concerned or expressed the parties' mutual understanding of what the specifications required vis-à-vis the application of concrete floor moisture sealant.  While the General Warehouse Two, Inc. court indicated that "the conduct of the parties to a contract is of great weight in interpreting the contract," id., its analysis of the parties' conduct focused upon conduct prior to the development of the dispute, not afterwards.  West Bay, as noted above, focuses upon the VA's conduct after their dispute became apparent, not before.  Accordingly, General Warehouse Two, Inc. does not support West Bay's argument that the court may consider the VA's conduct that followed the instigation of their dispute, including the VA's initial, favorable determination of its claim and its subsequent reversal of that determination after West Bay did not execute the VA's proposed supplemental agreement.  See Vierra Decl. Ex. N at 1; Vierra Decl. Ex. O.

## IV.  CONCLUSION

For the reasons stated above, plaintiff's motion for summary judgment is **DENIED** and defendant's cross-motion for summary judgment is **GRANTED**.  Accordingly, plaintiff's complaint is **DISMISSED**.  The Clerk of Court is directed to enter judgment in accordance with this Opinion and Order.  No costs.

**IT IS SO ORDERED.**

s/ Margaret M. Sweeney
MARGARET M. SWEENEY
Judge